**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

TEAM SCHIERL COMPANIES and
HEARTLAND FARMS, INC., on behalf of
themselves and all others similarly situated,

                    Plaintiffs,

v.

ASPIRUS, INC., and ASPIRUS
NETWORK, INC.,

                    Defendants.

**Civil Action No. 22-cv-580**

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................................... 1

II.     PARTIES ......................................................................................................................... 11

    A.      Plaintiffs ..................................................................................................................11

    B.      Defendants ..............................................................................................................11

III.    JURISDICTION AND VENUE ...................................................................................... 12

IV.     HOSPITALS AND INSURANCE MARKETS ............................................................... 12

    A.      Competition Between Health Care Providers for Inclusion in Insurance
            Networks is Critical for Price Competition in Health Care ...................................12

    B.      Aspirus's Scheme Substantially Foreclosed Competition in the
            Relevant Markets ....................................................................................................15

V.      MONOPOLY POWER IN THE RELEVANT MARKETS ............................................. 17

    A.      The Relevant Services Markets ..............................................................................21

    B.      The Relevant Geographic Markets .........................................................................23

    C.      Aspirus Controls a Dominant Share of the Relevant Markets ...............................24

    D.      There Are Significant Barriers to Entry into the Relevant Markets .......................26

VI.     ANTICOMPETITIVE CONDUCT ................................................................................. 27

    A.      Aspirus Has Engaged in a Multifaceted Anticompetitive Scheme .........................28

        1.      Aspirus engages in anticompetitive exclusive dealing. ............................... 29

        2.      Aspirus engages in anticompetitive "tying" of Outpatient services to
                GAC services. ............................................................................................. 31

        3.      Aspirus colludes with horizontal competitors in the Relevant Markets. ..... 33

        4.      Aspirus's Scheme foreclosed a substantial share of commerce in the
                Relevant Markets. ....................................................................................... 34

VII.    ANTICOMPETITIVE EFFECTS.................................................................................... 34

VIII.   CLASS ACTION ALLEGATIONS ................................................................................. 35

i

IX.  INTERSTATE TRADE AND COMMERCE ........................................................... 37

X.  CLAIMS FOR RELIEF ........................................................................................... 38

XI.  DEMAND FOR JUDGMENT .................................................................................... 39

XII. JURY DEMAND ....................................................................................................... 39

Plaintiffs Schierl, Inc. d/b/a Team Schierl Companies ("TSC") and Heartland Farms, Inc. (collectively, "Plaintiffs"), through their undersigned counsel, bring this class action on behalf of themselves and all others similarly situated, against defendants Aspirus, Inc., and its wholly owned subsidiary, Aspirus Network, Inc. ("ANI") (collectively, "Defendants" or "Aspirus"). Based on personal knowledge, the investigation of counsel, and publicly available information, Plaintiffs allege as follows:

## I.    INTRODUCTION

1.    This is an action for unlawful monopolization, restraint of trade, and price fixing against Aspirus, the dominant health care provider in Northern and Central Wisconsin, and its subsidiary clinical network, ANI. Plaintiffs are two Wisconsin family businesses, each offering a self-funded health plan for employees and their families. Plaintiffs' health plans pay Aspirus for health care, and Plaintiffs seek damages and injunctive and equitable relief under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. Aspirus has engaged in a continuing scheme to suppress competition and artificially inflate prices for health care services provided by Aspirus and ANI.

2.    As described below, health care markets operate differently than many consumer goods and services markets. Those who ultimately choose the health care services to be provided (*i.e.*, the patient and/or health care provider) are different than the "payers" who pay most of the bills for the services (*i.e.*, commercial insurance plans or "self-insured" employers who pay for employees' health care). This disconnect means that the primary source of price competition for health care services comes from the payers who contract with a network of providers for a bundle of services to be offered at negotiated contract prices. The insurers then market to employers or individuals a health plan, which includes an "in network" set of providers whose services are covered by the plan. "Out of network" providers typically are either not covered by the plan or

will require much higher co-payments by insureds.

3.    Aspirus, as a dominant provider of health care services, has exploited this system for its own gain. Aspirus uses various means, including exclusionary contracts and other coercive and collusive conduct, to foreclose the ability of rival providers to contract with payers—commercial health plans and self-insured employers—and thus to prevent those payers from assembling networks that can compete against Aspirus on price and quality. The result is that Aspirus has maintained monopoly power while continuing to charge supracompetitive prices.

4.    Plaintiffs seek to represent a class of similarly situated direct purchasers of health care from Aspirus, including commercial and self-funded health insurance plans ("health plans" or the "Class," which is more specifically defined below). Plaintiffs and the proposed Class have been and continue to be injured because Aspirus's prices are artificially inflated due to the anticompetitive conduct alleged herein.

5.    Aspirus began in 1886 as a single 25-bed hospital in Wausau, Wisconsin, established to serve the people of North-Central Wisconsin. The Wausau hospital, now called Aspirus Wausau Hospital ("AWH"), has grown into a 325-bed facility staffed by more than 350 physicians across more than 40 specialties. Over the years, but particularly over the last two decades, Aspirus has grown into a medical care behemoth and now owns and operates in Wisconsin 13 hospitals, dozens of related clinics, and numerous pharmacies, nursing homes, home health agencies, and other associated health care institutions. The Aspirus health system has over 11,000 employees and earns well over $1 billion per year in revenue.

6.    As described below, Aspirus owns numerous important general acute care ("GAC") facilities in North-Central Wisconsin. AWH is the dominant hospital in North-Central Wisconsin, and it is the primary facility providing certain essential health care functions in its geographic

region. Payers cannot assemble sufficiently comprehensive and commercially viable provider networks without including AWH and other Aspirus GAC facilities in the networks. Until recently, one of Aspirus's most important competitors was Ascension Wisconsin, which owned and operated numerous hospitals, clinics, and related facilities in North-Central Wisconsin. In 2021, Aspirus acquired nearly all of Ascension's facilities in North-Central Wisconsin.

7.     Also critical to Aspirus's dominance is Aspirus Network, Inc. ("ANI"), its clinical network of hospitals, more than 800 primary and specialty care physicians (roughly three-quarters of whom are employed or directly affiliated with Aspirus and one-quarter of whom are purportedly independent), and allied health care professionals (collectively, "ANI Providers"). As described below, ANI uses its dominance to lock the vast majority of health care providers in the region into exclusive relationships with ANI. Because refusal to join ANI effectively cuts off access to referrals from Aspirus's dominant slate of providers and access to ANI's favorable reimbursement rates for services, purportedly "independent" providers are compelled to join ANI. Because of ANI's size and scope, providers effectively have no economic choice but to join ANI.

8.     ANI forces its providers to sign agreements with the network that curtail providers' independence, effectively creating exclusive arrangements. Once locked into ANI by contract, ANI Providers are not free to negotiate separate financial arrangements with health plans. ANI instead negotiates prices with health plans on behalf of all ANI Providers, preventing health plans from causing individual providers to compete against each other for health plans' business. Additionally, as described below, ANI Providers are not free to negotiate separate contracts with payers. Instead, ANI's agreements with providers require ANI Providers to seek consent before entering into direct contracts with payers. In the absence of ANI's exclusive dealing agreements, health plans would seek to assemble "networks" of low cost/high quality health care providers for

- 3 -

preferential billing arrangements for insureds (with lower deductibles and/or co-pays). Aspirus's exclusive dealing agreements, as part of the illegal anticompetitive scheme alleged herein, however, forecloses such competition that would have driven down prices and increased quality of health care in North-Central Wisconsin.

9.      In large part due to the conduct challenged herein, Aspirus's entire service area is beset by extraordinarily high health care costs. Controlling these costs has become a primary objective for individuals, health plans, and businesses within the state. As described in detail in this Complaint, Aspirus's conduct has not only impeded that goal, but has substantially and artificially inflated health care costs and prices paid by Plaintiffs and the proposed Class, while at the same time impairing quality of service. Indeed, while Wisconsin has high health care costs overall, Aspirus's prices are even higher than average in Wisconsin and are increasing at a faster rate than the prices charged by other health care providers in Wisconsin. Aspirus's anticompetitive conduct is the cause of these inflated prices.

10.      Defendants injured Plaintiffs and the Class through a continuing anticompetitive scheme involving the illegal maintenance and enhancement of Aspirus's monopoly power in two health care services markets (the "Relevant Markets") in North-Central Wisconsin (the "Relevant Geographic Market," described in more detail below):

(a)      the market for inpatient general acute care ("GAC") services in hospitals, consisting of a broad group of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital ("GAC Market"); and

(b)      the market for Outpatient care, encompassing the medical services that are not inpatient medical services or that do not require an overnight stay ("Outpatient Market").

11.     Aspirus dominates the GAC Market, having at all relevant times approximately 65% market share. That dominant overall market share understates Aspirus's market power because Aspirus's GAC facilities are so prevalent in North-Central Wisconsin, and AWH is so important of a GAC facility, that no payer could assemble a commercially viable network that excludes Aspirus's facilities altogether. Additionally, Aspirus dominates the Outpatient Market, having greater than 75% market share. Likewise, payers who want to offer health plans in North-Central Wisconsin cannot offer a commercially viable plan that avoids Aspirus's Outpatient Market providers, including the ANI Providers, altogether.

12.     Defendants' executives have described its monopolization scheme in internal conversations as comprising a "castle and moat" strategy. The "castle" is Aspirus's dominance of the GAC Market, where Aspirus has a high market share and controls numerous important GAC facilities throughout North-Central Wisconsin, including AWH, which is a "must have" facility for payers looking to offer a commercially viable health insurance plan in North-Central Wisconsin. The "moat" is ANI, which controls Outpatient providers' prices, and which requires payers to contract with *all* ANI Providers and facilities—in both the GAC and Outpatient Markets—if any of them wants to offer a network that includes *any* ANI providers. Because ANI locks up a dominant share of the Outpatient Market, and then negotiates as an exclusive provider block, it is effectively impossible to assemble one or more rival networks that could compete with Aspirus and drive down prices.

13.     Beginning at least as early as 2016, Aspirus carried out its strategy through a series of continuing anticompetitive acts (the "Scheme"), which includes, among other things, exclusive dealing, anticompetitive tying, and collusion in both Relevant Markets.

(a)     **First**, Aspirus uses its monopoly power in the GAC Market to coerce providers into

joining ANI by signing contracts that lock those providers into *de facto* exclusive contracts. ANI includes not only Aspirus-owned GAC and Outpatient facilities, but also includes purportedly independent health care providers. Aspirus coerces these providers into signing the ANI contracts by conditioning access to referrals from ANI's dominant slate of GAC and Outpatient providers, and access to higher insurance reimbursement rates that are available to those providers, on signing an exclusionary agreement with ANI. Further, Outpatient providers risk losing admitting privileges to Aspirus facilities by running afoul of either Aspirus or ANI. Loss of referrals, favorable rates, or admitting privileges is potentially catastrophic for an Outpatient Services provider.

(b)    **Second**, ANI imposes *de facto* exclusive contracts that lock ANI Providers into exclusive deals with ANI and foreclose the ANI Providers from contracting with payers to create networks that would compete against Aspirus and drive down Aspirus's prices. In particular, ANI requires that any ANI Provider seek Aspirus's consent before the ANI Provider can enter into a direct contract with any payer that also contracts with ANI, and ANI will withhold that consent from any provider that will become part of a network that will compete with Aspirus. While ANI characterizes that as "limited exclusivity," essentially every payer offering a plan in North-Central Wisconsin has a contract with ANI, meaning that the dominant slate of ANI Providers—accounting for at least 75% of the Outpatient Market—are not available to health plans that want to create a network that will compete on price. ANI Providers risk expulsion from ANI if they enter into direct contracts with payers to be part of a network that competes with Aspirus. These ANI

exclusive contracts are essentially perpetual because ANI Providers are not free to terminate them without risking loss of the access to Aspirus's facilities, referral network, and reimbursement rates critical to the financial viability of the providers.

(c)    **Third**, ANI engages in "referral trapping" by requiring ANI Providers to refer patients exclusively, or nearly exclusively, within the network of ANI Providers. Because of the size and dominance of ANI, this requirement increases the coercion for independent providers to join ANI because a provider knows that leaving ANI means leaving behind a vast referral network. This referral trapping also prevents rivals from expanding in the GAC and Outpatient Markets, further bolstering Aspirus's monopoly power.

(d)    **Fourth**, Aspirus uses its monopoly power in both Relevant Markets to make "all or nothing" contractual offers and/or negotiating tactics that require health plans wanting to include *any* Aspirus provider in its network to include *all* Aspirus providers, including ANI Providers, in its network. This is an anticompetitive tying arrangement. As explained below, anticompetitive tying is where a firm with a monopoly in one market (the "tying" market) forces buyers to buy products from that firm in a separate market (the "tied" market). Here, Aspirus engages in anticompetitive tying in two respects. First, Aspirus uses its power in the Outpatient Market (largely through ANI) to force health plans to accept all Aspirus GAC facilities. Likewise, Aspirus uses its market power in the GAC market, including the all-important AWH facility, to force payers to accept the entire ANI network, including the Outpatient Services providers. Essentially, health plans that want to assemble a commercially viable network must include all Aspirus facilities and thus

cannot create a viable network that competes vigorously with Aspirus.

(e) **Fifth**, Aspirus uses ANI to fix the price for services in the Outpatient Market. ANI negotiates contracts with payers that establish uniform pricing for ANI Providers, including purportedly independent providers. Because Aspirus requires consent from any ANI Provider before it can establish a direct contract with a payer, Aspirus essentially has determined the prices that will be charged by all ANI Providers to payers in the Relevant Markets. That is, payers are not only prevented from assembling networks of providers that can compete with Aspirus, but the prices charged by ANI Providers are fixed by ANI—even for those ANI Providers that are purportedly independent practitioners.

(f) **Sixth**, Aspirus colluded with competitors in North-Central Wisconsin, including Marshfield Clinic, a hospital system, and also with purportedly independent ANI Providers, to prevent price competition for health care services in the Relevant Markets. In particular, there is a type of pricing that does not depend on payer contracts—called "reference-based pricing" ("RBP")—that can be used to pay lower-than-list pricing for medical care based on established benchmark prices, such as what Medicare would pay for a particular procedure. Aspirus approached its competitors to convince them to agree not to accept RBP in order to avoid having RBP lower pricing in the Relevant Markets.

14.    In sum, Aspirus has monopoly power in the GAC Market because it controls numerous important GAC facilities, including its "must have" flagship hospital in Wausau. Aspirus has monopoly power in the Outpatient Market through its control of ANI Providers. No health plan operating in North-Central Wisconsin can put together a commercially viable provider

network *without* including at least *some* Aspirus Outpatient and GAC facilities and providers. Aspirus has added to its monopoly power in both markets by trapping referrals within the ANI network and tying its dominant Outpatient provider network (ANI) to its GAC facilities through its "all or nothing" scheme.

15. Because of this GAC Market dominance, Aspirus has coerced formerly independent providers into joining ANI. Once providers join ANI, they are locked into contracts that require Aspirus's consent before they can enter into direct contracts with health plans. These ANI contracts are *de facto* exclusive dealing, and the ANI Providers cannot leave ANI without losing access to the critical referral network and risking the loss of admitting privileges at Aspirus's GAC facilities. The web of ANI contracts prevents payers from negotiating directly, and separately from the ANI Network as a whole, with a substantial share of the Outpatient Market—at least 75%. Such conduct prevents payers from putting together a network that can compete with Aspirus.

16. Aspirus's anticompetitive tying and exclusive dealing are designed to restrain competition at the payer network level. As discussed herein, health insurers need to assemble commercially viable networks that include a sufficient number of *both* GAC and Outpatient providers. By (a) locking ANI Providers into exclusive relationships with Aspirus, preventing independent providers from contracting with payers, and by (b) tying Aspirus's and ANI's GAC and Outpatient providers' services together through "all or nothing" arrangements, Aspirus has foreclosed a substantial share—approximately 75% or more—of the Relevant Markets from competition. This prevents health plans from assembling networks of providers that can and will compete with Aspirus on price.

17. Aspirus also prevents price competition in the Outpatient Market by setting the

prices that ANI Providers will charge to payers, and then restricting the ability of ANI Providers to enter into separate contracts with payers. This is an illegal horizontal conspiracy to fix prices in the Outpatient Market in that Aspirus's competitors that are ANI providers have agreed with Aspirus not to compete on price, but instead to charge the price Aspirus chooses. In addition, when Aspirus found out that some providers were accepting RBP from some patients and self-insured companies, it communicated with the ANI Providers and with Marshfield to convince them to stop accepting RBP because it would have the effect of lowering pricing in the Relevant Markets.

18.     The Scheme was designed to, and did, foreclose a substantial share of competition in the Relevant Markets, maintain and enhance Aspirus's monopoly power in the Relevant Markets, and enable Aspirus to charge supracompetitive prices for GAC and Outpatient services—i.e., to charge prices for those services that are higher than they would have been absent the anticompetitive conduct. There are no legitimate procompetitive benefits to this Scheme, which only serves to drive up prices, reduce quality of care, and reduce choice for patients. Plaintiffs and members of the Class have been, and continue to be, injured by paying supracompetitive prices to Aspirus due to the Scheme during the Class Period (defined below).

19.     Health care costs in Wisconsin are high, and they are particularly high in North-Central Wisconsin due in significant part to Aspirus's Scheme. The Scheme acts as a drag on the economy of North-Central Wisconsin because health plans, employers, and individuals in North-Central Wisconsin are forced to pay exorbitant rates for necessary health care services. This lawsuit seeks to return overcharges paid by Plaintiffs and the proposed Class to the injured parties, and to enjoin Aspirus from continuing to engage in its anticompetitive Scheme.

## II.    PARTIES

### A.    Plaintiffs

20.    Plaintiff **Team Schierl Companies ("TSC")**, headquartered in Stevens Point, Wisconsin, is a family-owned organization of five independent business ventures in the automotive, convenience store, quick-serve restaurant, brand promotion, and commercial real estate business sectors. TSC was founded in 1956 as a one-truck fuel oil business, and over the last sixty years, it has grown to include 63 retail businesses and a spirits brand, with over 600 employees, in North-Central Wisconsin and Upper Michigan. TSC provides a self-insured health plan to its employees and their families, and it has purchased GAC and Outpatient services directly from Aspirus at supracompetitive prices due to the challenged Scheme.

21.    Plaintiff **Heartland Farms, Inc. ("Heartland")**, headquartered in Hancock, Wisconsin, is a fifth-generation family-owned farm producing potatoes, sweet corn, canning peas, green beans, and soybeans on 27,000 acres. Heartland began in 1873 as an 80-acre farm in Amherst Junction, Wisconsin, and the original homestead is still farmed by the family today. Heartland provides a self-insured health plan to its employees and their families, and it has purchased GAC and Outpatient services directly from Aspirus at supracompetitive prices due to the challenged Scheme.

### B.    Defendants

22.    Defendant **Aspirus, Inc. ("Aspirus")**, a Wisconsin corporation, is a nonprofit health system based in Wausau, Wisconsin. It provides a wide range of GAC and Outpatient Services in North-Central Wisconsin. Its facilities include 13 hospitals in North-Central Wisconsin (and 4 hospitals in Michigan) and dozens of clinics, home health and hospice care, pharmacies, critical care facilities, nursing homes, and physician practices. The crown jewel of Aspirus's facilities is Aspirus Wausau Hospital ("AWH"), with 325 beds and 350 staff physicians across 35

specialties, as well as one of the only Level-II Trauma facilities in Wisconsin. Aspirus has annual net revenues in excess of $1 billion.

23.    Defendant **Aspirus Network, Inc. ("ANI")**, a Wisconsin corporation and wholly owned subsidiary of Aspirus, is a network of primary and specialty care physicians, hospitals, and allied health care professionals. ANI includes approximately 800 primary and specialty care physicians (roughly three-quarters of whom are employed or affiliated with Aspirus and one-quarter of whom are independent), eight hospitals, five ambulatory surgery centers, and other allied healthcare professionals. ANI negotiates contracts on behalf of its members with employers and health plans.

## III.    JURISDICTION AND VENUE

24.    This Court has jurisdiction over this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15c & 26; and under 28 U.S.C. §§ 1331 & 1337.

25.    This Court has personal jurisdiction over Defendants because they are domiciled and/or registered to transact business in North-Central Wisconsin, and they have transacted business in North-Central Wisconsin relevant to this antitrust action.

26.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391. Defendants conduct substantial business in this district and their conduct both gives rise to Plaintiffs' claims occurring in this District and also affected interstate commerce.

## IV.    HOSPITALS AND INSURANCE MARKETS

### A. Competition Between Health Care Providers for Inclusion in Insurance Networks is Critical for Price Competition in Health Care

27.    Hospitals are an important part of the American economy, not just in terms of health, but also in terms of dollars and cents. The largest chunk of America's healthcare spending

goes to hospitals.

28.     Hospital markets throughout the United States have become increasingly concentrated. Research shows that this growing consolidation has raised prices for patients and payers. In 2020, the Medicare Payment Advisory Commission (MedPAC) reviewed published research on hospital consolidation and concluded that the "preponderance of evidence suggests that hospital consolidation leads to higher prices for commercially insured patients."[1] In short, less competition means hospitals can charge higher prices and get away with it. As stated in a July 9, 2021, Executive Order by President Biden: "Hospital consolidation has left many areas, particularly rural communities, with inadequate or more expensive healthcare options."[2] A study by the New England journal of Medicine found that hospital consolidation also often leads to worse quality of care.[3]

29.     Markets for hospital services are different from other product or services markets. With health care, unlike many other industries, those who largely pay for the services (typically, commercial insurers or self-insured employers) do not choose, and those who choose (typically, the patients) do not pay most of the cost of the goods and services. While health care providers often play a role in choosing the treatment, providers typically do not consider price when

---

[1] Medicare Payment Advisory Commission, *Report to Congress: Medicare Payment Policy* (March 2020), *available at* https://www.medpac.gov/document/http-www-medpac-gov-docs-default-source-reports-mar20_entirereport_sec-pdf/ (last visited Oct. 11, 2022); *see also* Zack Cooper & Martin Gaynor, *Addressing Hospital Concentration and Rising Consolidation in the United States*, *available at* https://onepercentsteps.com/policy-briefs/addressing-hospital-concentration-and-rising-consolidation-in-the-united-states/ (last visited Oct. 11, 2022).

[2] E.O. No. 14036, *Promoting Competition in the American Economy* (Jul. 9, 2021), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/07/09/executive-order-on-promoting-competition-in-the-american-economy/ (last visited Oct. 11, 2022).

[3] Nancy D. Beaulieu, *et al.*, *Changes in Quality of Care after Hospital Mergers and Acquisitions*, The New England J. of Med. (Jan. 2, 2020).

recommending treatments, and indeed, they often do not even know the price that either the patients will pay (through deductibles or co-pays) or that the insurers will pay. Health plans—consisting of commercial payors (such as Humana) and self-funded payors whose claims are administered by insurers or third-party administrators (or "TPAs")—purchase medical services for the benefit of their members.

30.     Health insurance plans negotiate with hospitals for bundles of services that they will offer to members as "in-network" benefits. If a health plan and heath care provider (like a hospital system) reach a deal for a bundle of services (for instance, all GAC services), the hospital will be considered in-network for every service in that bundle. This means that for any service in that bundle, if a health plan's member receives that service from the hospital, the health plan will pay the hospital the "allowed amount" the two parties negotiated for that service (with insureds responsible for any deductibles and co-payments under the health plans). To create a commercially viable network, health plans typically must contract for an array of both GAC and Outpatient services providers within a geographic area because the prospective insureds in that area will need in-network access to a sufficient number of GAC and Outpatient providers.

31.     In competitive health care markets, when health insurance plans negotiate for a bundle of services, the health insurance plans may choose to include as in-network only *some* services (or facilities) and to exclude others from the bundle. For example, the health insurance plan may choose to have one hospital be in-network for all GAC services but choose not to include that hospital in-network for Outpatient services because the plan could purchase higher quality and/or less expensive Outpatient services from other providers. Similarly, in a competitive market, a health insurance plan might decline to purchase any services from a hospital if that hospital's prices or quality of care are not competitive with other nearby providers. This ability to choose

among different providers of services for a single health plan helps to control health care costs because it compels health care providers to compete to be included in health plans.

32.    In competitive markets, providers compete to be selected for inclusion in health plans. Likewise, health insurance plans compete to be selected by employers to offer to their workers or compete to be selected by individuals. Because of the unique way that health care services are purchased and consumed, this competition is essential for there to be services of acceptable quality at competitive prices and to control health care costs and prices. This market dynamic allows dominant health systems to game competition in a way that harms competition and consumers. Indeed, by harming this critical form of competition, the Scheme enabled Aspirus to exploit its monopoly power in both Relevant Markets to bolster and to maintain that power and charge supracompetitive prices.

**B.    Aspirus's Scheme Substantially Foreclosed Competition in the Relevant Markets**

33.    The unique features of health care markets, as just described, provide an opportunity for health care providers with significant market power to restrain trade and bolster monopoly power illegally—either by locking up a substantial share of the providers in the relevant market through unduly restrictive agreements or by colluding with providers to prevent those providers from contracting with payers to be part of networks that would compete based on price. Competition can occur only where dominant health systems do not unlawfully restrain trade and abuse monopoly power.

34.    Aspirus has monopoly power in the GAC Market because it owns numerous important GAC facilities, including its "must have" flagship hospital in Wausau. Aspirus has monopoly power in the Outpatient Market, including through its control of ANI Providers. No health plan operating in North-Central Wisconsin can put together a commercially viable provider network without including at some Aspirus Outpatient and GAC facilities and providers. Aspirus

has added to its monopoly power in both markets by trapping referrals within the ANI network and tying its dominant network of Outpatient providers that are part of ANI to its GAC facilities through its "all or nothing" scheme.

35.    Because of this GAC Market dominance, Aspirus has been able to coerce purportedly independent providers into joining ANI. Once providers join ANI, they are locked into contracts that require Aspirus's consent before they can directly contract with health plans. These ANI contracts are de facto exclusive dealing, and the ANI Providers cannot leave ANI without losing access to its critical referral network, admitting privileges, and reimbursement rates. In this way, the web of ANI contracts prevents payers from accessing a substantial share of the Outpatient Market—at least 75%. As a result, payers are prevented from working with Aspirus's rival providers to put together a network that can compete with Aspirus.

36.    Further, because payers must assemble a network that includes sufficient providers of both GAC and Outpatient services, Aspirus's "all or nothing" arrangement for payers contracting with ANI means that approximately 65% of the GAC Market—the amount that Aspirus directly controls—is foreclosed from competition by rival providers. This foreclosure, combined with the foreclosure share in the Outpatient Market, means both that payers are prevented from accessing a substantial share of the providers needed to create a market provider network and that rival providers are prevented from accessing payer networks to compete against Aspirus. Moreover, these shares understate the foreclosure effect of Aspirus's Scheme because Aspirus also controls the "must have" GAC facility—AWH—and numerous other GAC and Outpatient facilities in North-Central Wisconsin that are necessary to creating a viable network.

37.    Aspirus forecloses a substantial share of competition in the Relevant Markets. This has enabled Aspirus to gain monopoly power and charge supracompetitive prices to Plaintiffs and

the proposed Class.

## V.    MONOPOLY POWER IN THE RELEVANT MARKETS

38.    Because Aspirus engaged in conduct that is illegal per se under the federal antitrust laws—including tying and horizontal price fixing—Aspirus can be found liable without proof of any relevant antitrust market. Nevertheless, at all relevant times, Aspirus had monopoly power in the Relevant Markets.

39.    Monopoly power may be proven by using *direct* evidence of the ability to (a) coerce providers to sign restrictive contracts, (b) coerce buyers to accept "all or nothing" arrangements, and/or (c) charge supracompetitive prices, reduce quality, or reduce output. Monopoly power may, alternatively, be proven by demonstrating substantial market shares in a relevant or geographic market.

40.    As alleged herein, Aspirus uses its monopoly power in the GAC Market to coerce providers to sign the restrictive contracts required to join ANI. Aspirus could not have done so without the substantial market power it possesses. Further, Aspirus then uses its monopoly power in both Relevant Markets to impose anticompetitive contract terms in its agreements with health plans covering a substantial share of the Relevant Markets. Payers would not accept the "all or nothing" offers if Aspirus did not have substantial market power in one or both Relevant Markets. Finally, Aspirus has charged, and continues to charge, supracompetitive prices for its GAC and Outpatient services. These constitute direct evidence of Aspirus's monopoly power over the healthcare services in the Relevant Markets.

41.    Aspirus's high prices for services are extreme outliers by both Wisconsin and national standards. Wisconsin is already one of the four most expensive states for GAC and Outpatient services. Yet, Aspirus's current prices are high compared to Wisconsin's already inflated prices, and they are rising more rapidly than the rest of Wisconsin.

42.    Academics and policymakers find that comparing prices to a well-established baseline is one of the best ways to understand a hospital's aggregate prices. Thus, a hospital's commercial prices relative to the prices paid by Medicare—which considers a variety of factors like geography and patient mix—is generally understood as the best way to evaluate and compare hospital prices. For example, if Medicare pays $1,000 for a procedure and a hospital price for commercial insurers for that procedure is $2,500, its price is 250% of Medicare.

43.    Measured by the objective Medicare price benchmark, Aspirus's aggregate prices are staggeringly high. While the national average is 224% of Medicare prices and the Wisconsin average is 307% of Medicare, Aspirus prices—including both GAC and Outpatient services—are 365% of Medicare.

**Overall Markup Over Medicare Rates: Aspirus vs. Wisconsin Average**

■ Aspirus    ● Wisconsin Average    ▲ National Average

| | 2018 Overall Markup | 2019 Overall Markup | 2020 Overall Markup |
|---|---|---|---|
| Aspirus | 315% | 334% | 365% |
| Wisconsin Average | 293% | 298% | 307% |
| National Average | 222% | 235% | 224% |

Source: RAND

44.    These high prices extend to both GAC services, where Aspirus is 336% of Medicare compared to the Wisconsin average of 273% of Medicare, and Outpatient services, where Aspirus

is 383% of Medicare compared to the Wisconsin average 337% of Medicare. In both, Aspirus's price differential over the Wisconsin average has grown substantially in recent years.

45.    When evaluating prices for specific procedures, academic literature recommends evaluating the prices of "plausibly undifferentiated" procedures because "there is little variation in how these services are delivered across hospitals or across patients within a hospital." Thus, academic literature considers "plausibly undifferentiated" procedures like MRI scans as a useful way to compare hospital prices because any price differential is likely explained by market power (including market power conferred by anticompetitive restraints and other predatory tactics like those challenged here) rather than higher quality.[4] For example, the price for a Lower Limb MRI scan at Aspirus is $2,434, 34% higher than the national average of only $1,811.



---

[4]  *See* Zack Cooper, *et al.*, *The Price Ain't Right? Hospital Price and Health Spending on the Privately Insured, available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7517591/ ("That there is such substantial variation in prices for plausibly undifferentiated procedures such as lower-limb MRIs within hospitals suggests that the relative bargaining power of insurers with hospitals can strongly influence price levels.") (last visited Oct. 1, 2022).

46.     Academic literature suggests another useful analysis is comparing "generally homogenous" procedures—those that generally have very little variation on quality and occur with sufficient frequency to support empirical analysis. One example of a generally homogenous procedure that is also one of the key profit drivers for hospital systems is a joint replacement. The national average price for a joint replacement is $20,952, while Aspirus is 72% higher at the price of $35,972.



47.     Aspirus's high prices also extend to complicated surgeries that academic research has indicated are among those most often performed unnecessarily. For example, the price for a spinal fusion at Aspirus is over $71,000 versus the national average of under $39,000.

48.     Aspirus also uses its market power to charge supracompetitive prices for situations where vulnerable patients may be forced to seek their services near their home or office. For example, the price of a Level 5 emergency room ("ER") visit at Aspirus is $4,196 versus the national average of $1,848.



49.     In the alternative, Aspirus has monopoly power in the Relevant Markets according to the *indirect* evidence—*i.e.*, Aspirus has a dominant share of both Relevant Markets. The Relevant Markets at issue in this case are defined in detail below. For each, the service market includes only the purchase of medical services by private health plans, namely commercial insurance plans and employer self-funded payers. The service markets do not include sales of such services to government payers, including Medicare and Medicare Advantage, Medicaid, and TRICARE (covering military families) because healthcare providers' negotiations with commercial insurers and employer self-funded plans are separate from the process used to determine the rates paid by government payers.

**A.  The Relevant Services Markets**

50.     As discussed above, there are two product or service markets that are relevant in this action.

51.     First, the GAC Market includes services that consist of a broad group of medical, surgical, anesthesia, diagnostic, nursing, laboratory, radiology, dietary, and a wide range of other

treatment services provided in a hospital setting to patients requiring one or more overnight stays. Although GAC services are not substitutes from a patient's perspective for each other (*e.g.*, orthopedic surgery is not a substitute for gastroenterology), health insurance plans typically contract for various individual inpatient GAC services as a package in a single negotiation with a hospital system. Non-hospital facilities, such as Outpatient facilities, specialty facilities (such as nursing homes), and facilities that provide long-term psychiatric care, substance abuse treatment, and rehabilitation services are not viable substitutes for GAC services.

52.     The second product or service market is the Outpatient Market, which encompasses a broad group of medical, diagnostic, and treatment services that are not inpatient medical services (*i.e.*, healthcare services that do not require an overnight stay). Although individual Outpatient services are not substitutes for each other (*e.g.*, a CT scan is not a substitute for an annual physical), health plans typically contract for various individual Outpatient medical services as a package in a single negotiation with a hospital system and/or set of providers, and that is how Aspirus negotiates with health insurance plans with respect to Outpatient services.

53.     The Outpatient Market is a separate market from the GAC Market because the two types of services are not interchangeable and can be sold separately. Health insurance plans can, and often do, contract for Outpatient services from different providers (*i.e.*, non-hospital providers), unlike with GAC services, which can only be purchased from hospitals. The existence of non-hospital competitors, in a competitive market absent any anticompetitive behavior, reduces the price health insurance plans pay a hospital for Outpatient medical services, but those non-hospital Outpatient competitors would not affect the price a hospital could charge for GAC services. The GAC Market and Outpatient Markets are therefore distinct.

54.     The distinction between the two types of health care services—GAC and

Outpatient—is also widely recognized in the academic and government regulatory literature on health care. Further, both Relevant Markets at issue satisfy the conditions for market definition used by the federal antitrust enforcement agencies under what is widely known as the "SSNIP test." Each of these types of services constitutes a distinct group of services in which a hypothetical monopolist provider could profitably impose a small but significant non-transitory inflation in price above competitive levels (*i.e.*, at least 5%). Indeed, during the period relevant to this case, Aspirus has in fact raised prices for both GAC services and Outpatient services substantially, without causing purchasers to substitute away to other providers or geographies. Therefore, these markets satisfy the SSNIP test.

**B.     The Relevant Geographic Markets**

55.     The Relevant Geographic Market is North-Central Wisconsin, which is approximately coextensive with the United States Center for Medicare and Medicaid Services ("CMS") Rating Area 10 for Wisconsin, which includes Marathon, Lincoln, Wood, and Portage Counties. The Relevant Geographic Market reflects the fact that plan members, and thus health plans, typically choose GAC and Outpatient services that are sufficiently close to members' homes or workplaces, while also recognizing that plans typically must include a broad enough range of potential providers and/or facilities to be commercially viable.

56.     Aspirus has GAC facilities throughout the area. Aspirus also has owned or affiliated Outpatient health care practices with hundreds of Outpatient providers throughout North-Central Wisconsin. While some patients may be able to travel beyond this area for certain medical procedures, Aspirus's GAC and Outpatient facilities cannot be substituted for a sufficient number of facilities outside of North-Central Wisconsin such that practices outside of the relevant geographic market could constrain Aspirus's pricing from rising above competitive levels.

57.     The Relevant Markets also satisfy the SSNIP test because a hypothetical monopoly

provider of GAC services and/or Outpatient Services in this geographic market could profitably inflate its prices above competitive levels by a small but significant non-transitory amount (*i.e.*, at least 5%).

58.     More specifically, Aspirus could inflate its prices for GAC services in North-Central Wisconsin by a small but significant non-transitory amount without causing enough purchasers to switch to providers of non-GAC services or to providers outside of the relevant market such that the price inflation would not be profitable. Likewise, Aspirus could inflate its prices above competitive levels for Outpatient services in North-Central Wisconsin by a small but significant non-transitory amount without causing enough purchasers to switch to providers of non-Outpatient services or to providers outside of the relevant market such that the price inflation would not be profitable.

**C.     Aspirus Controls a Dominant Share of the Relevant Markets**

59.     At all relevant times, Aspirus has possessed a dominant share of the Relevant Markets, with an approximately 65% share of the GAC Market and an approximately 75% share of the Outpatient Market.

60.     Indeed, the overall Outpatient Market share is reflected in the largest population centers and is more dominant in the smaller population centers. For example, Wausau is the largest city by far in the Relevant Geographic Market. In Wausau, 70% of all primary care providers accessible through a commercial insurer are affiliated with Aspirus. And within specialties that insurers must provide access to, Aspirus's market share is similar. For example, 70% of pulmonologists in Wausau are affiliated with Aspirus. Indeed, Aspirus has more than 70% Outpatient Market share in the population centers that account for more than 60% of the population in the Relevant Geographic Market.

61.     But Aspirus's share of providers in Wausau understates its overall share because,

in many other communities, Aspirus controls all or nearly all Outpatient providers. In Stevens Point, the second largest city in the Relevant Geographic Market, 81% of primary care providers accessible through a commercial insurer are affiliated with Aspirus, as are 80% of pulmonologists and 82% of gynecologists. Thus, within the two largest population centers of the Relevant Geographic Market, Aspirus controls an average of 75% or more of Outpatient providers. And as explained below, Aspirus controls well over 75% of Outpatient providers in many rural areas of the Relevant Geographic Market. It is therefore a reasonable conclusion that Aspirus cumulatively controls well over 75% of Outpatient providers in the Relevant Geographic Market.

62.    In certain smaller communities, Aspirus controls virtually all the providers for certain important specialties. For example, 100% of pulmonologists accessible through a commercial insurer in Tomahawk are affiliated with Aspirus. Similarly, in Tomahawk, 100% of gynecologists accessible through a commercial insurer are affiliated with Aspirus. The numbers are similar in Athens, Wisconsin for Aspirus affiliation: 100% of primary care providers and 100% of gynecologists. Insurers cannot offer a commercially viable plan in a town with two of the most common types of providers entirely unavailable and insurers are generally unwilling to offer networks that have 'holes' within their geography. Therefore, Aspirus's dominance in Tomahawk and Athens is a component of and adds to its overall monopoly power in the Outpatient Market.

63.    Similarly, in Antigo, which is the closest city for many residents of Eastern Marathon County, Aspirus controls 91% of all primary care providers, 100% of pulmonologists, and 80% of gynecologists accessible through a commercial insurer. In Rhinelander, which is the closest city for many residents of Northeastern Lincoln County, 90% of primary care providers, 78% of pulmonologists, and 100% of gynecologists accessible through a commercial insurer are affiliated with Aspirus. In Medford, the numbers are similar: 93% of primary care providers, 100%

of pulmonologists, and 92% of gynecologists.

64.     Aspirus's market shares, while alone sufficient to establish monopoly power, significantly understate Aspirus's market power in North-Central Wisconsin. The geographic reach of Aspirus—indeed, it operates the only GAC and/or Outpatient facilities in certain areas of North-Central Wisconsin—means that insurers cannot exclude Aspirus from a sufficient number of plan networks to offer meaningful price competition. Thus, Aspirus can impose a SSNIP in the Relevant Markets without losing sufficient business to competitors such that the SSNIP would be unprofitable.

65.     A particularly stark example of this dynamic is the fact that Aspirus's top potential competitor, Marshfield Clinic, contracts with ANI through the health plan Marshfield runs. A hospital system would not agree to send business to a top competitor unless it was necessary to run a viable health plan. Marshfield's contract with ANI is an indication of both the "must have" nature of ANI and a reflection of ANI's dominant market power in Outpatient care.

**D.    There Are Significant Barriers to Entry into the Relevant Markets**

66.     There are significant barriers to entry into the Relevant Markets. Building and staffing hospitals and Outpatient clinics is expensive, and healthcare—especially involving hospitals—is heavily regulated, and establishing new facilities often includes significant government approval hurdles. In addition, recruiting professional staff, purchasing equipment, and building physical facilities is typically expensive and time consuming. Negotiating new agreements with commercial insurers can take months or years in any market, even absent the anticompetitive conduct of Aspirus.

67.     Aspirus's own anticompetitive conduct also presents a significant barrier to entry. Because Aspirus uses its market power in each Relevant Market to impose contractual restrictions and engage in other predatory tactics that substantially foreclose competition, it has become

virtually impossible for Aspirus's rivals to effectively compete to lower prices. Aspirus's anticompetitive agreements with health plans and providers make it virtually impossible for rival hospitals to gain any significant market share through other networks by providing customers with better value. Contractual restrictions hinder new entrants and existing competitors from successfully opening or expanding in North-Central Wisconsin where Aspirus currently has substantial market power.

68.    These barriers to entry, and Aspirus's market power more generally, are manifested in Aspirus's ability to dramatically raise prices. Over a recent eight-year period, Aspirus's charges (and prices, since it negotiates using a percentage of charge) have risen dramatically, while its costs of providing those services have been relatively more stable. The chart below shows Aspirus Wausau Hospital's cumulative billed charges for GAC and Outpatient services relative to its costs for providing those over time.



Source: National Academy for State Health Policy

## VI.    ANTICOMPETITIVE CONDUCT

69.    Aspirus has used its dominance in each Relevant Market to engage in

anticompetitive conduct that impaired the competitive process for health care services in North-Central Wisconsin, foreclosed a substantial share of competition in the Relevant Markets, and thereby enhanced Aspirus's monopoly power and enabled it to charge supracompetitive prices to Plaintiffs and members of the proposed Class.

## A. Aspirus Has Engaged in a Multifaceted Anticompetitive Scheme

70.     Aspirus has deployed a Scheme to generate anticompetitive effects by, first, using its monopoly power in the GAC Market to impair competition in the Outpatient Market, and then in turn, by using its monopoly power in the Outpatient Market to maintain and enhance its monopoly power in the GAC Market. The Scheme consists of three types of anticompetitive conduct: exclusive dealing, tying, and collusion, and the Scheme, taken as a whole, foreclosed a substantial share of competition in the Relevant Markets and enabled Aspirus to monopolize both Relevant Markets and charge supracompetitive prices.

71.     One key to the success of Aspirus's plan is its dominance of the GAC Market in North-Central Wisconsin. Aspirus not only has a "must have" hospital in AWH, but it has important facilities throughout the relevant geographic area. Any health plan that wants to be commercially viable must include at least some Aspirus GAC facilities. Because of the restrictive contracts it imposes on health plans, those health plans then must include all Aspirus facilities in all plans in North-Central Wisconsin. These contracts, in turn, prevent effective competition from rival providers who would otherwise contract with health plans or networks that would provide critically important price competition for Aspirus's GAC services, artificially driving up Aspirus's prices, while maintaining and entrenching Aspirus' monopoly power in the GAC market.

72.     Aspirus also uses its dominance in the GAC Market to coerce providers to join ANI. To join ANI, providers must sign exclusive contracts that then prevent the providers from becoming part of health plan networks that could compete against Aspirus and drive down prices.

ANI providers, some of which would be competitors of Aspirus if not for this Scheme, also agree to charge prices that are determined by Aspirus. Providers are dissuaded, through fear of being cut off from Aspirus and its dominant referral network, from entering into direct contracts with health plans or employers to be part of networks that do not include Aspirus. Aspirus thus forces health plans to deal with Aspirus by imposing contracts that foreclose competition from rival providers of Outpatient services.

73.     In sum, Aspirus has managed to implement its "castle and moat" Scheme by preventing rival providers from becoming part of payer networks that would compete with Aspirus and thus, preventing that competition from driving down Aspirus's prices in both the GAC and Outpatient Markets.

### 1.   Aspirus engages in anticompetitive exclusive dealing.

74.     As alleged above, access to a sufficient number of GAC and Outpatient Providers is necessary to a health plan's ability to assemble a commercially viable provider network. By locking up ANI Providers in exclusive contracts, Aspirus is able to foreclose competition in a substantial share of the Relevant Markets and charge supracompetitive prices.

75.     ANI's network includes both Aspirus's owned facilities and providers, as well as purportedly independent Outpatient providers. Aspirus uses various tactics to coerce these independent providers into joining the ANI network. For example, independent Outpatient providers can get access to Aspirus's negotiated insurance reimbursement rates—far higher rates than independent providers could get otherwise—if and only if the providers join ANI. Additionally, ANI contracts require providers to keep referrals within the ANI Provider network, meaning that providers cannot leave ANI without risking termination of access to the critical mass of referrals. Aspirus also imposes these referral requirements on new facilities it acquires. Further, Outpatient Services providers risk losing admitting privileges, or being granted admitting

privileges on disadvantageous terms, by running afoul of Aspirus, either by leaving ANI or trying to enter into direct contracts for payer networks that compete against Aspirus.

76.     To join ANI, the ANI Providers sign contracts that require those members to seek ANI's consent before entering into direct contracts with payers who also have contracts with ANI. Because ANI is so dominant, however, all payers of significance in North-Central Wisconsin are subject to these contractual restrictions. Aspirus also withholds consent for ANI members to enter into contracts with payers that do *not* contract with Aspirus, thus extending the exclusivity of the ANI contract to prevent ANI Providers from entering into contracts with *any* network that might compete with Aspirus.

77.     Aspirus's contractual restraints also prevent ANI Providers from participating in innovative insurance products that promote competition. For example, in a "tiered" network, an insurer will offer patients incentives (for example, lower copays or deductibles) for visiting a set of higher value providers. This encourages consumers to select providers with lower prices and higher quality. However, the ANI contract blocks most Outpatient providers—and *all* Outpatient providers in some communities—from participating in tiered plans where they would be in a different tier than other ANI or Aspirus facilities because they are not allowed to negotiate different prices with payers. The effect is that Aspirus's Scheme substantially constrains the choices of consumers, removes incentives for lower-cost providers to enter the market, and eliminates the incentives for insurers to introduce innovative products that would spur price competition.

78.     The ANI contract requires members to agree to prices that Aspirus has negotiated with payers. Analysis of contracted rates between Aspirus-owned facilities, ANI-affiliated providers, and a large insurer reveals uniform contracting across the ANI network. Insurers' contractual prices with different providers in a competitive market tend to be diverse and highly

varied. Yet, Aspirus hospitals and a sample of more than 20 physician practices affiliated with ANI show that they receive the same exact percent off a uniform "chargemaster" rate—which is essentially the "list price" charged by a health care provider for a particular service—for hundreds of procedures, without exception. Through this contracting and pricing strategy, Aspirus has set supracompetitive prices for Outpatient services at over 75% of providers and guaranteed that Aspirus receives a percentage of the higher prices it has set—even at non-Aspirus providers.

79.     ANI Providers cannot simply abandon these contracts without risking the severe financial repercussions that come with losing access to the ANI referral network, Aspirus admitting privileges, and access to ANI's favorable reimbursement rates. Moreover, at least 75% of Outpatient providers in North-Central Wisconsin are locked into these restrictive contracts. Thus, the ANI contracts operate as perpetual de facto exclusive commitments that foreclose at least 75% of the Outpatient providers in North-Central Wisconsin. These providers are not available to payers who want to assemble networks that can compete with Aspirus (on price, quality, or any other terms).

80.     Absent Aspirus's conduct, Outpatient providers would compete on price to be included in insurance networks and insurance networks would direct patients to the highest value care. However, Aspirus's conduct has eliminated price competition for the vast majority of Outpatient providers and has barred the vast majority of providers from participating in innovative insurance products that—in other geographies—help prevent supracompetitive pricing.

## 2. Aspirus engages in anticompetitive "tying" of Outpatient services to GAC services.

81.     When a payer wishes to contract with Aspirus to offer certain Aspirus GAC or Outpatient facilities in its provider network, Aspirus requires the payer also to contract with ANI,

which controls contracting for Aspirus's facilities. ANI includes both Aspirus-owned facilities and purportedly independent facilities that sign the ANI contract.

82.    In addition, Aspirus requires payers within North-Central Wisconsin to contract for the entire ANI network, regardless of how many facilities the payers want to include within a network and regardless of the high prices at those facilities. Thus, for example, a payer who determines that a commercially viable plan must include AWH in its network because of the importance of that facility, must also include all of the owned and affiliated ANI practices. Similarly, a payer who wants to include a range of Outpatient providers within North-Central Wisconsin will inevitably need to contract with an ANI Provider because of the dominant market share of ANI. This means that payers cannot pick and choose among the Aspirus and ANI practices and/or facilities, to either create a network only with that subset or to add those select practices to a network with other non-Aspirus facilities and providers.

83.    In short, Aspirus uses its dominant market power in the Outpatient Market to force payers to accept services in the GAC Market. Aspirus's dominant market power in the Outpatient Market thus increases Aspirus's market power in the GAC Market. Likewise, Aspirus can use its market power in the GAC Market—in particular, access to its "must have" AWH facility—to force payers to accept other GAC facilities, as well as to accept the large number of Outpatient providers in ANI. In this way, Aspirus is able to tie its more desirable facilities to its less desirable facilities. Because access to at least some of the Aspirus owned and controlled GAC and Outpatient services is necessary to assemble a viable provider network in North-Central Wisconsin, payers are thus coerced into including all Aspirus and ANI facilities in their networks.

84.    This anticompetitive tying prevents payers from picking and choosing among the Aspirus and ANI facilities and providers, and thus, from assembling networks that can compete

against Aspirus and ANI and lower prices.

### 3. Aspirus colludes with horizontal competitors in the Relevant Markets.

85.     Aspirus conspired with competitors in both the GAC Market and Outpatient Market to ensure that lower prices were not accepted by providers in the Relevant Markets.

86.     In competitive markets, there are various prices that can be paid for health providers' services. These are "list prices" or chargemaster rates. Those are the highest prices for services. Patients with private commercial insurance or that are part of self-insured employer plans pay the rates that health plans negotiate with providers. Providers typically offer better pricing to insurers to be "in network" for the health plans. The insurers then incentivize insureds to use the "in network" providers though lower deductibles or co-payments. There are "cash payer" rates for those who do not use insurance; those may be higher than the rates paid by insurers, and they are typically less than chargemaster rates. Additionally, some employee sponsored health plans will use reference-based pricing ("RBP") for provider services. RBP uses standard cost benchmarks, often based on Medicare reimbursement rates, to establish a cost of care.

87.     Aspirus colludes with competitors to prevent price competition, in two respects. First, Aspirus dictates the pricing that purportedly independent ANI providers can accept—indeed, access to the higher ANI reimbursement rates is one of the inducements to providers to join the network. But because Aspirus also controls and prevents those ANI providers from entering into other direct contracts with competing networks, ANI's pricing for the independent providers essentially sets supracompetitive prices in the Outpatient Market. Moreover, the providers who join ANI know that other ANI Providers will charge the same rates and be bound by the same restrictions against entering into competing payer network contracts. This is price fixing among horizontal competitors in the Outpatient Market.

88.     Second, Aspirus coordinates with horizontal competitors to prevent them from

accepting RBP. Aspirus's supposed competitors, including notably Marshfield Clinic, would accept RBP from employers with self-insured plans. According to individuals knowledgeable about pricing and reimbursements for Aspirus, an Aspirus executive called a Marshfield Clinic executive to induce Marshfield Clinic to agree not to accept RBP, claiming that accepting such pricing would lower market prices for provider services. Aspirus also sent letters to ANI providers—including purportedly independent providers—encouraging them to agree not to accept RBP for their services. This encouragement to agree not to accept RBP bolsters the wider price-fixing conspiracy because RBP—which is a non-contractual type of pricing—could be used to cheat on the ANI cartel.

### 4. Aspirus's Scheme foreclosed a substantial share of commerce in the Relevant Markets.

89.    As alleged above, Aspirus controls a dominant share of both Relevant Markets, with an approximately 65% share in the GAC Market and an approximately 75% share in the Outpatient Market. Aspirus's Scheme has enabled it to foreclose a substantial share of commerce in the Relevant Markets. Through its collusion, exclusive dealing, and tying, ANI forecloses competition in at least 75% of the Outpatient Market and 65% of the GAC Market. In short, Aspirus prevents the ability of rival providers to compete based on lower price and/or superior quality for preferred status in payer networks, and Aspirus forecloses competition by preventing payers from accessing a sufficient number of non-Aspirus and non-ANI providers to compete against Aspirus to lower prices or increase output in the Relevant Markets.

### VII.    ANTICOMPETITIVE EFFECTS

90.    Through the Scheme, Aspirus has been able to substantially foreclose and otherwise impair competition in the Relevant Markets. This has enabled Aspirus to maintain and/or gain market share, and in turn, has enabled Aspirus to charge supracompetitive prices and reduce the

quality of its services in the Relevant Markets. Such supracompetitive pricing and reduction in quality and choice are the types of injury the antitrust laws were intended to prevent.

91.    Aspirus's misconduct has directly caused this injury to Plaintiffs and the proposed Class when Plaintiffs and the members of the proposed Class purchased health care services directly from Aspirus at prices that were inflated due to the alleged anticompetitive Scheme. Plaintiffs and the Class are motivated to enforce the antitrust laws because they have the natural economic self-interest in paying competitive rather than supracompetitive prices

## VIII.   CLASS ACTION ALLEGATIONS

92.    Plaintiffs bring this action in their own right and on behalf of all other similarly situated persons and entities under Federal Rules of Civil Procedure 23(a) and (b)(3), as defined below.

> All persons or entities that purchased GAC and/or Outpatient services directly from Aspirus in North-Central Wisconsin at any time during the period from October 11, 2018 up to the present (the "Class Period").

> Excluded from the Class are Aspirus, ANI, Aspirus Health Plan, and their officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all federal governmental entities.

93.    Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are thousands of Class members such that joinder of all Class members is impracticable. Further, the Class members are readily identifiable from information and records maintained by Defendants.

94.    Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other Class members, and there are no material conflicts with any other member of the Class that would make class certification inappropriate. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Aspirus.

95.    Plaintiffs will fairly and adequately protect and represent the interests of the Class,

and Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

96.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, including cases involving exclusionary contracts and bundling of pharmaceutical products.

97.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Aspirus has acted on grounds generally applicable to the entire Class. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Class is inherent in Defendants' wrongful conduct, because the overcharge injuries incurred by Plaintiffs and each member of the proposed Class arose from the same conduct alleged herein.

98.     The common legal and factual questions do not vary among Class members and may be determined without reference to individual circumstances, and include, but are not limited to, the following:

    (a)     Whether Aspirus has monopoly power, demonstrated either through direct or indirect evidence;

    (b)     The definition of the relevant services and geographic markets;

    (c)     Whether Aspirus engaged in anticompetitive conduct by willfully or otherwise unlawfully maintaining or enhancing their monopoly power or attempting to do so through the Scheme alleged herein;

    (d)     Whether Aspirus engaged in anticompetitive conduct by entering into anticompetitive agreements with competitors;

    (e)     Whether the Scheme, or any part thereof, is an unlawful restraint of trade;

(f)    Whether the Scheme has artificially inflated prices, reduced output, and/or reduced quality in any or all of the Relevant Markets;

(g)    Whether Plaintiffs and the proposed Class have suffered injury caused by the alleged anticompetitive conduct; and

(h)    Whether and to what extent Plaintiffs and the proposed Class members are entitled to an award of compensatory damages and/or injunctive, declaratory, or equitable relief.

99.    Treatment as a class action is the superior method for the fair and efficient adjudication of this controversy, as it will permit numerous similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, avoiding unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding as a class action, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

100.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## IX.    INTERSTATE TRADE AND COMMERCE

101.    The conduct of Aspirus and ANI have been within the flow of and substantially affected interstate commerce.

102.    During the relevant period, a large percentage of Aspirus's revenues have come from sources located outside of Wisconsin, including the federal government (through the Medicare and Medicaid programs).

103.    Aspirus purchases a substantial portion of its medicines and supplies from sellers located outside of Wisconsin. Many payers have made payments to Aspirus (either directly or

through health plans) to sell or buy products or services in interstate commerce.

## X.    CLAIMS FOR RELIEF

### Count I: Violation of Section One of the Sherman Act, 15 U.S.C. § 1
### (Unlawful Restraint of Trade)

104.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

105.    Aspirus's Scheme, consisting of collusion, exclusionary provider contracts, and all-or-nothing tying arrangements, constitutes unlawful agreements in restraint of trade.

106.    Aspirus has injured Plaintiffs and the proposed Class by charging supracompetitive prices for health care services in the Relevant Markets, and Plaintiffs and the proposed Class were injured when they paid those supracompetitive prices.

107.    Plaintiffs and the proposed Class seek to recoup damages to compensate for overcharges paid to Aspirus resulting from the Scheme, and in addition, seek to enjoin further anticompetitive conduct.

### Count II: Violation of Section Two of the Sherman Act, 15 U.S.C. § 2
### (Monopolization of the GAC and Outpatient Markets)

108.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

109.    Through the alleged Scheme, Aspirus and its controlled subsidiaries, have monopolized the Relevant Markets through collusion, exclusionary provider contracts, and all-or-thing tying arrangements.

110.    Aspirus's Scheme has foreclosed a substantial share of the commerce in the Relevant Markets.

111.    Through the alleged Scheme, Aspirus has maintained and/or gained monopoly power in the Relevant Markets.

112.     Aspirus has injured Plaintiffs and the proposed Class by charging supracompetitive prices for GAC and Outpatient services in the Relevant Markets, and Plaintiffs and the proposed Class were injured when they paid supracompetitive prices directly to Aspirus.

113.     Plaintiffs and the proposed Class seek to recoup damages to compensate for overcharges paid to Aspirus resulting from the Scheme, and in addition, seek to enjoin further anticompetitive conduct.

## XI.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that the Court:

a.    Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare the Plaintiff as the representative of the Class;

b.    Enter joint and several judgments against Defendants and in favor of Plaintiffs and the Class;

c.    Award the Class damages (*i.e.*, three times overcharges) in an amount to be determined at trial;

d.    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

e.    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.   JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

Dated: October 12, 2022

*/s/ Timothy W. Burns*

Timothy W. Burns (WI State Bar # 1068086)
Leakhena Au (WI State Bar # 1113358)
**BURNS BOWEN BAIR LLP**
10 E. Doty Street
Suite 600
Madison, WI 53703
Phone: (608) 286-2808
tburns@bbblawllp.com
lau@bbblawllp.com

Daniel J. Walker*
Robert E. Litan*
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Phone: (202) 559-9745
dwalker@bm.net
rlitan@bm.net

Eric L. Cramer*
Shanon J. Carson*
Abigail J. Gertner*
**BERGER MONTAGUE PC**
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
scarson@bm.net
agertner@bm.net

Jamie Crooks*
**FAIRMARK PARTNERS LLP**
1499 Massachusetts Avenue, NW
Washington, D.C. 20005
Phone: 619-507-4182
jamie@fairmarklaw.com

*Counsel for Plaintiffs and the Proposed Class*

*\*Pro hac vice motion* forthcoming