IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TEAM SCHIERL COMPANIES and
HEARTLAND FARMS, INC., on behalf of
themselves and all others similarly situated,

|  |  |  |
|---|---|---|
| | Plaintiffs, | OPINION and ORDER |
| v. | | |
| | | 22-cv-580-jdp |

ASPIRUS, INC. and ASPIRUS NETWORK,
INC.,

Defendants.

---

This is a proposed class action about alleged antitrust violations in the healthcare industry. Plaintiffs Team Schierl Companies and Heartland Farms are self-insured employers that purchase healthcare services from defendants Aspirus, Inc. and Aspirus Network, Inc. Plaintiffs contend that defendants are unreasonably restraining the markets for both inpatient and outpatient care in north-central Wisconsin, in violation of Sections 1 and 2 of the Sherman Act. The court will refer to Aspirus, Inc. as "Aspirus" and Aspirus Network, Inc. as "ANI."

Plaintiffs allege that defendants control most of the market for both inpatient and outpatient services in north-central Wisconsin and that defendants have obtained their large share of the market through multiple kinds of anticompetitive conduct. First, plaintiffs say that defendants are price fixing by setting prices for medical providers who are defendants' competitors. Second, plaintiffs say that defendants created an illegal tie by imposing "all or nothing" contracts on plaintiffs so that plaintiffs must include all of defendants' services in their health plans if they want to include any of defendants' services. Third, plaintiffs say that defendants are engaging in exclusive dealing that eliminates potential competition by entering contracts with medical providers that prohibit the providers from joining other health plan

networks. As a result, plaintiffs say that prices for healthcare in north-central Wisconsin are significantly higher than both the national and state average.

Defendants move to dismiss all of plaintiffs' claims for failure to state a claim. Dkt. 25. Defendants' arguments fall into two categories: (1) plaintiffs' allegations regarding price fixing and tying do not fall within the typical fact pattern for the legal theories they are asserting; and (2) plaintiffs haven't alleged enough details to support their claim for exclusive dealing.

The court will deny defendants' motion in large part. Defendants are correct that some of plaintiffs' legal theories are novel, but that isn't a reason in itself to reject plaintiffs' claims. The important question at this stage is whether plaintiffs adequately alleged the elements of their claims. Defendants don't address that issue for plaintiffs' price-fixing and tying claims, so it would be premature to dismiss those claims now. As for the specificity of plaintiffs' allegations on their exclusive-dealing claim, plaintiffs have provided defendants fair notice and stated claims that are plausible on their face. That is all plaintiffs were required to do. Plaintiffs may have an uphill battle to prove their claims, but that is an issue to be resolved at trial or the summary judgment stage, not on a motion to dismiss.

The court will dismiss two claims in the complaint. First, plaintiffs don't state a claim with their allegations about defendants' efforts to persuade competitors to reject referenced-based pricing because plaintiffs don't allege that defendants ever reached an agreement with their competitors. Second, plaintiffs haven't alleged that Aspirus was involved in exclusive dealing, so the court will dismiss that claim against Aspirus.

BACKGROUND

The following allegations are drawn from plaintiffs' complaint and accepted as true for the purpose of defendants' motion to dismiss.

Plaintiff Team Schierl Companies is a collection of five independent business ventures in the automotive, convenience store, quick-serve restaurant, brand promotion, and commercial real estate business sectors. The company is headquartered in Stevens Point, Wisconsin. Plaintiff Heartland Farms, Inc. is a 27,000-acre farm located in Amherst Junction, Wisconsin. Both plaintiffs provide self-insured health plans to their employees and both plaintiffs purchase inpatient and outpatient services from Aspirus.[1]

Plaintiffs seek to represent a class of self-funded plans and insurers in north-central Wisconsin (Marathon, Lincoln, Wood, and Portage counties) that purchase healthcare services from defendants on behalf of patients. Plaintiffs refer to the self-funded plans and insurers collectively as "payers." Payers contract with a network of healthcare providers for a bundle of services to be offered at negotiated contract prices. The payers then market to employers or individuals a health plan, which includes an "in network" set of providers whose services are covered by the plan. "Out of network" providers typically are either not covered by the plan or will require much higher copayments by insureds. To create a commercially viable network, payers typically must contract for an array of providers that offer both inpatient and outpatient services within a geographic area because the prospective insureds in that area will need in-network access to a sufficient number of both types of providers.

---

[1] Plaintiffs use the term "general acute care" instead of inpatient services. But they define general acute care to mean "treatment services provided in a hospital setting to patients requiring one or more overnight stays." Dkt. 1, ¶ 51. For simplicity, the court will refer to general acute care as inpatient services.

3

Defendant Aspirus is a nonprofit health system based in Wausau, Wisconsin. It provides both inpatient and outpatient services in north-central Wisconsin. It owns 13 hospitals, including Aspirus Wausau Hospital, which "is the dominant hospital in North-Central Wisconsin, and . . . the primary facility providing certain essential health care functions in its geographic region." Dkt. 1, ¶ 6. Payers cannot assemble commercially viable provider networks without including Aspirus Wausau Hospital in the network.

Aspirus also owns dozens of clinics, home health and hospice care, pharmacies, critical care facilities, nursing homes, and physician practices. Aspirus has more than 11,000 employees and earns well over $1 billion per year in revenue.

Defendant ANI, a wholly owned subsidiary of Aspirus, is a network of primary and specialty care physicians, hospitals, and allied health care professionals. ANI includes approximately 800 primary and specialty care physicians, eight hospitals, five ambulatory surgery centers, and other allied healthcare professionals. Approximately 75 percent of the professionals in the network are employed by Aspirus and approximately 25 percent are independent.

Aspirus has approximately 65 percent of the market for inpatient services and approximately 75 percent of the market for outpatient services in north-central Wisconsin. In some municipalities and specialties, Aspirus's share approaches 100 percent. Payers who want to offer health plans in north-central Wisconsin cannot offer a commercially viable plan that excludes Aspirus's inpatient or outpatient providers. Even Marshfield Clinic, Aspirus's top competitor, contracts with ANI through the health plan that the Clinic offers its own employees.

4

Aspirus's prices are higher than the Wisconsin average. The Wisconsin average for inpatient services is 273 percent of Medicare prices; Aspirus's average is 336 percent. The Wisconsin average for outpatient services is 337 percent of Medicare; Aspirus's average is 383 percent.

Aspirus's prices for specific procedures are higher than the national average. The national average for a lower limb MRI is $1,811; Aspirus's average is $2,434. The national average for a joint replacement is $20,952; Aspirus's average is $35,972. The national average for a spinal fusion is $39,000; Aspirus's average is $71,000. The national average for a Level 5 emergency-room visit is $1,848; Aspirus's average is $4,196. In recent years, Aspirus's prices have risen at a significantly greater rate than its costs.

The court will set forth allegations about defendants' alleged antitrust violations as they become relevant to the analysis.

## ANALYSIS

Plaintiffs assert claims under both § 1 and § 2 of the Sherman Act. Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Courts have translated that text into three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury. *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021).

Section 2 makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations. A § 2 claim has two elements: (1) the

possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000).

Plaintiffs assert the same theories under both § 1 and § 2: price-fixing, tying, and exclusive dealing, concepts that the court will explain below. Defendants move to dismiss all claims for failure to state a claim. The question on a motion to dismiss is whether the plaintiff provided the defendant with fair notice of the claims and alleged facts plausibly suggesting that the plaintiff is entitled to relief. *McCray v. Wilkie*, 966 F.3d 616, 620 (7th Cir. 2020). The parties discuss the § 1 and § 2 claims separately, so the court will do the same.

## A.  Price fixing under § 1

Price-fixing agreements between competitors are an example of an unreasonable restraint of trade that violate § 1. *Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 348 (7th Cir. 2022). Plaintiffs allege that defendants fix prices in two ways. First, defendants negotiate with payers to determine the prices for services of all ANI providers and then defendants prohibit providers from contracting directly with payers without defendants' consent. Second, defendants have attempted to persuade competitors to reject reference-based pricing, in which pricing is based on an established benchmark (such as Medicare rates) rather than on prices negotiated between a provider and payer. Defendants seek dismissal of both claims.

### 1.  Negotiations with payers and restrictions on providers

In arguing that this price-fixing claim should be dismissed, defendants don't directly address the elements of a § 1 claim. Rather, defendants contend that the claim should be

6

dismissed because "ANI's negotiation of reimbursement rates with payers for health care services [does not] amount[] to per se price-fixing." Dkt. 26, at 31. Defendants say that their alleged conduct does not qualify as "per se price-fixing" because courts have not previously held that the conduct at issue in this case is "subject to per se treatment," and "[t]he per se rule is only applied where courts have had 'considerable experience with that type of conduct and application of the rule of reason has inevitably resulted." *Id.* at 31–32 (quoting *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983)).

Defendants' argument invokes the case law describing the different ways that courts have classified alleged antitrust violations. Courts have identified three methods for determining whether actions have anticompetitive effects: per se, quick-look, and rule of reason. *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012).[2] The default method is the rule of reason, under which the plaintiff must show that an agreement has an anticompetitive effect on a given market within a given geographic area. *Id.* The per se rule applies when a practice "facially appears to be one that would always or almost always tend to restrict competition and decrease output." *NCAA v. Bd. of Regents*, 468 U.S. 85, 100 (1984). Under the per se rule, a restraint is deemed unreasonable without any inquiry into the market context in which the restraint operates. *Agnew*, 683 F.3d at 336. Defendants contend that their alleged conduct shouldn't be analyzed under the per se rule, and plaintiffs didn't invoke the other methods of analysis in their complaint, so the price-fixing claim should be dismissed.

---

[2] No party contends that the quick-look method is implicated in this case, so the court will not discuss it further.

Defendants are conflating different issues. Courts have held that certain kinds of restraints on trade are unreasonable per se. These include bid rigging, market allocation, some types of group boycotts, tying arrangements, and horizontal price-fixing agreements. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984); *Always Towing & Recovery*, 2 F.4th at 704–05; *Denny's Marina, Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217, 1220–21 (7th Cir. 1993); *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 555 (7th Cir. 1980). The cases that defendants cite express caution about classifying *other* types of restraints as per se unreasonable. For example, in *Bunker Ramo*, the court declined to hold that a scheme to defraud is per se unreasonable. 713 F.2d at 1284–85. And in *Car Carriers, Inc. v. Ford Motor Co.*, the court concluded that it wasn't per se unreasonable for Ford "to replace its exclusive haulaway transporter for the Chicago area with another carrier on the grounds that the original carrier continually sought higher prices that Ford was unwilling to pay." 745 F.2d 1101, 1109 (7th Cir. 1984).

It is already well established that horizontal price-fixing is per se unreasonable. *Texaco Inc. v. Dagher,* 547 U.S. 1, 7 (2006) ("Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are per se unlawful."). Defendants' position appears to be that conduct cannot qualify as horizontal price fixing unless courts have previously identified the precise conduct at issue as horizontal price fixing. That is not the law. Rather, the Supreme Court has consistently held that any conduct that meets the requirements for horizontal price fixing is per se unreasonable, even in novel contexts. For example, in *Arizona v. Maricopa County Medical Society*, the Court rejected the view that it "should not apply the per se rule . . . because the judiciary has little antitrust experience in the health care industry," reasoning that the Sherman Act, "so far as

8

price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike."  457 U.S. 332, 349–51 (1982) (internal quotation marks omitted). And in *Catalano, Inc. v. Target Sales, Inc.*, the Court held that an agreement among competing wholesalers to refuse to sell unless the retailer makes payment in cash either in advance or on delivery is a form of horizontal price fixing, and, therefore, per se unreasonable, even though the Court had not previously considered whether that type of conduct qualified as price fixing. 446 U.S. 643, 650 (1980).

So the question isn't whether courts have previously considered whether horizontal price fixing includes a healthcare company negotiating prices for all members of its network and placing restrictions on their ability to enter separate contracts with payers. The question is simply whether that conduct meets the requirements for horizontal price-fixing. There are essentially three requirements. There must be an agreement, the agreement must be between competitors, and the agreement must be "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price in the marketplace." *Always Towing & Recovery*, 2 F.4th at 705 (internal quotation marks omitted). Defendants don't explain which of these requirements the complaint fails to allege, and they don't otherwise discuss the requirements in their briefs, so they have forfeited the issue for the purpose of their motion to dismiss.

Even if defendants' alleged conduct doesn't qualify as a per se unreasonable restraint, that would mean only that plaintiffs would have to show under the so-called "rule of reason" that the conduct has anticompetitive effects. *Marion Diagnostic Ctr.*, 29 F.4th at 348. Defendants didn't contend in their opening brief that the complaint fails to adequately allege that their conduct has anticompetitive effects. In their reply brief, defendants contend that

9

plaintiffs failed to expressly invoke the term "rule of reason" in the complaint, so plaintiffs should not be allowed to proceed under that theory. But it is well established that plaintiffs aren't required to plead legal theories, only the facts that support those theories. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014); *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011). Defendants include a short footnote in their reply brief in which they contend that plaintiffs didn't allege sufficient facts under the rule of reason, but that was too little, too late. *Adams v. Bd. of Educ. of Harvey Sch. Dist. 152*, 968 F.3d 713, 716 (7th Cir. 2020) (issues raised for first time in reply brief are forfeited); *Thulin v. Shopko Stores Operating Co.*, LLC, 771 F.3d 994, 997-98 (7th Cir. 2014) (issues raised only in footnote are forfeited). Defendants will have to raise the issue in a motion for summary judgment.

Regardless of whether defendants' conduct is per se unreasonable, defendants contend that plaintiffs' claim fails because "any alleged pricing restraint is only ancillary to ANI's core purpose of delivering direct access to personalized health care." Dkt. 26, at 32. This contention is based on the principle that an agreement among competitors does not violate antitrust laws if the agreement is ancillary to the success of a cooperative venture. *Deslandes v. McDonald's USA, LLC*, — F.4th —, 2023 WL 5496957, at *2 (7th Cir. Aug. 25, 2023). But a "restraint does not qualify as 'ancillary' merely because it accompanies some other agreement that is itself lawful." *Id.* (internal quotation marks omitted). Defendants don't explain how the alleged agreement furthers their ability to provide health care. In any event, the question whether a restraint is ancillary is an affirmative defense, so plaintiffs weren't required to plead facts about that issue. *Id.* at 3. The court will not dismiss this claim.

### 2. Influence on competitors

Plaintiffs include multiple allegations in their complaint that Aspirus tried to persuade competitors to reject reference-based pricing. Dkt. 1, ¶¶ 13(f), 18, 88. Defendants challenge this claim on the ground that plaintiffs don't allege that any competitor actually entered into an agreement or otherwise conspired with defendants to reject referenced-based pricing, which is one of the requirements of a § 1 claim.

In response, plaintiffs don't point to any allegations of an agreement between defendants and a competitor regarding referenced-based pricing. Instead, plaintiffs contend that defendants' alleged attempt to influence competitors should be evaluated collectively with plaintiffs' other allegations about price fixing. But plaintiffs don't explain how unilateral conduct by defendants, whether viewed collectively or in isolation, can support a claim under § 1. Because plaintiffs don't allege a conspiracy between defendants and a competitor, the court will dismiss this claim.

## B.  Tying under § 1

Plaintiffs' tying claim is based on the following allegations. Defendants have acquired 65 percent of the market for inpatient care in north-central Wisconsin and 75 percent of the market for outpatient care. Dkt. 1, ¶ 11. Defendants have market power in the inpatient market in part because they own the Aspirus Wausau Hospital and that no commercially viable health plan in north-central Wisconsin could exclude that facility. *Id.*, ¶¶ 14, 71, 82. Defendants have power in the outpatient market, through the sheer number of facilities that are in defendants' network, so payers will "inevitably" need to contract with one of defendants' outpatient providers. *Id.*

11

Plaintiffs also allege that defendants use their large share in each market to increase their share in the other. Specifically, defendants require a payer who wants to include any of defendants' inpatient services in its plan to also include all of defendants' outpatient services, and any payer who wants to include some of defendants' outpatient services must also include all of defendants' inpatient services. Dkt. 1, ¶¶ 13(d), 81–84. Because a commercially viable health plan in north-central Wisconsin must include at least some of defendants' inpatient and outpatient services, plaintiffs say that they are forced to include services and facilities in their plans that they otherwise would exclude. Plaintiffs refer to these as "all or nothing" agreements, and they contend that the agreements qualify as "tying" that violate § 1.

A tying claim has four elements: (1) the arrangement involves "two separate products or services"; (2) the defendant has "sufficient economic power" in the tying product market to restrain free competition in the tied product market; (3) the tie affects "a not-insubstantial amount of interstate commerce in the tied product"; and (4) the defendant has some economic interest in the sales of the tied product. *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 574 (7th Cir. 2022). Defendants contend that plaintiffs' allegations don't qualify as tying for two related reasons: (1) plaintiffs don't identify a specific product or service that is tied to another specific product or service; and (2) tying doesn't include situations in which a product or service is both tying and being tied, what defendants call two-way tying.

Defendants have raised fair questions about the scope of a tying claim, but they haven't shown at this stage that plaintiffs' claim should be dismissed. As for defendants' first objection, it is true that plaintiffs are focusing on a collection of services rather than a specific product. But defendants haven't cited any authority holding or suggesting that a tying claim requires an individual tying product and an individual tied product. Rather, the critical part of a tying

12

claim is that "the seller has [used its] 'market power' . . . to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13–14 (1984). That is what plaintiffs are alleging in this case. Specifically, plaintiffs are alleging that defendants are forcing them to purchase services from facilities that they would otherwise exclude from their network if they could. It isn't clear why the number of products and services at issue is dispositive.

The cases defendants cite make the point that the tying products and services must be distinct and separate from the tied products and services, *Siva*, 38 F.4th at 578–81, and that the plaintiff must clearly identify what products and services are being tied together, *Association of American Physicians & Surgeons, Inc. v. American Board of Medical Specialties*, No. 14-cv-2705, 2020 WL 5642941, at *4–5 (N.D. Ill. Sept. 22, 2020). Defendants don't contend that plaintiffs' complaint suffers from either of those problems.

For their part, plaintiffs cite several cases in which courts have allowed a plaintiff to proceed under the Sherman Act or a state analogue based on allegations that a healthcare company includes "all or nothing" provisions in its contracts, requiring a payee to include services from multiple markets if the payee want services from one of the markets. *See Uriel Pharmacy Health and Welfare Plan v. Advocate Aurora Health*, No. 22-c-610, slip op. (E.D. Wis. Apr. 28, 2023); *Davis v. HCA Healthcare, Inc.,* No. 21 CVS 3276, 2022 WL 4354142, at *13 (N.C. Super. Sept. 19, 2022); *Sidibe v. Sutter Health*, No. 12-cv-4854, 2021 WL 879875, at *5–6 (N.D. Cal. Mar. 9, 2021); *UFCW & Employers Ben. Trust v. Sutter Health*, No. CGC-14-538451, 2019 WL 3856011, at *7–8 (Cal. Super. Ct. June 13, 2019). To be clear, these cases do not discuss the elements of a tying claim; they focus more generally on whether the alleged conduct is an unreasonable restraint on trade. This suggests that even if plaintiffs can't satisfy

13

the requirements for a tying claim, they may still proceed under § 1 pursuant to the so-called rule of reason. *See Viamedia, Inc. v. Comcast Corporation*, 951 F.3d 429, 468–69 (7th Cir. 2020) ("[T]he technical requirements [of a tying claim] attach only to per se ties.") (internal quotation marks omitted). Defendants do not contend that plaintiffs have failed to adequately allege that defendants' "all or nothing" contracts are an unreasonable restraint on trade. As in *Uriel*, plaintiffs allege that defendants' contracts allow defendants to obtain more market share and raise their prices because payers must accept the prices or lose access to the services that make their plans commercially viable. So the court will not dismiss plaintiffs' tying claim on the ground that it involves multiple products and services.

The same conclusion applies to defendants' contention that a tie can go in only one direction, that is, that a product or service cannot both do the tying and be tied. Defendants make this point more clearly in their reply brief. They say that that a tying claim requires allegations that the "Defendant used its supposed monopoly power in a tying market to create a monopoly in a second, distinct market, within which it lacks monopoly power." Dkt. 36, at 22–23. But this misstates the elements of a tying claim. A plaintiff must show that the defendant has "sufficient economic power in the tying product market to restrain free competition in the tied product market." *Siva*, 38 F.4th at 574. On its face, the element doesn't appear to require the plaintiff to show either that the defendant has monopoly power in one market but not the other or even that the defendant has more market power in the tying market than the tied market. Rather, the important question is whether the defendant has *enough* power in the tying market to restrain trade in the tied market. Plaintiffs allege that defendants had sufficient power in both the inpatient and outpatient markets to further restrain trade in the other market.

14

Neither side cites any case law in which courts have decided whether a plaintiff can assert what defendants call a two-way tying claim. In the absence of authority on the issue or an explanation from defendants regarding which element of a tying claim the plaintiffs can't satisfy, the court will not dismiss the claim at this early stage. Again, even if plaintiffs can't meet the technical requirements of a tying claim, this wouldn't prevent plaintiffs from challenging defendants' conduct as an unreasonable restraint of trade under § 1. Defendants don't explain why it would be unreasonable to use power in one market to restrain trade in another but reasonable to restrain trade in both markets using the substantial economic power that the party has in each market.

Defendants also contend that plaintiffs haven't alleged enough facts about the "contractual mechanism" that created the tying. Dkt. 26, at 27. Plaintiffs have alleged that defendants require a payer who wishes to contract with defendants to include any inpatient or outpatient facility in the payer's plan to also contract with defendants to include all of defendants' inpatient and outpatient facilities in the plan. Dkt. 1, ¶¶ 13(d), 81–84. That's enough to give defendants fair notice at this stage of the case. Plaintiffs aren't required to attach contracts or cite specific contractual language in their complaint. Defendants cite no authority to the contrary.

The court will deny defendants' motion to dismiss plaintiffs' tying claim under § 1.

## C.  Exclusive dealing under § 1

Plaintiffs' exclusive-dealing claim is based on the following allegations. Providers in ANI's network, including providers that aren't employed by Aspirus, are prohibited by contract with ANI from entering into direct contracts with payers who already have contracts with ANI,

15

unless ANI consents. Dkt. 1, ¶¶ 8 and 13(d). Virtually all payers in north-central Wisconsin have contracts with ANI, and ANI always withholds consent. *Id.*

Plaintiffs contend that the alleged conduct qualifies as exclusive dealing that violates § 1 because it has the practical effect of precluding providers from entering contracts with anyone except ANI. In the absence of these agreements, plaintiffs say that payers and providers would "assemble networks of low cost, high quality health care providers for preferential billing arrangements for insureds (with lower deductibles and/or co-pays), thus driving down prices." *Id.*, ¶8; *see also id.* ¶ 80 ("Absent defendants' conduct, Outpatient providers would compete on price to be included in insurance networks and insurance networks would direct patients to the highest value care.").

As an initial matter, defendants seek dismissal of this claim against Aspirus because plaintiffs don't allege that Aspirus is a signatory to the agreements at issue. Defendants also contend that the claim fails against both defendants because plaintiffs haven't plausibly alleged three things: (1) causation; (2) an exclusive contract; and (3) a sufficient effect on competition.

### 1.  Claim against Aspirus, Inc.

Defendants contend that plaintiffs exclusive-dealing claim against Aspirus fails for a simple reason: plaintiffs don't allege that Aspirus had an exclusive-dealing agreement with a provider. Plaintiffs acknowledge that an agreement is an element of their claim and that they didn't allege the existence of an agreement between Aspirus and a provider. But they contend in a footnote that it is appropriate to sue both defendants on this claim because defendants "are a single economic unit for antitrust purposes." Dkt. 34, at 34–35 n.15.[3] Plaintiffs rely on

---

[3] Plaintiffs also say that Aspirus is an appropriate defendant on the exclusive-dealing claim because Aspirus "benefits from the exclusive-dealing scheme." Dkt. 34, at 34 n.5. But plaintiffs

a footnote in *Omni Healthcare, Inc. v. Health First, Inc.*, No. 13-cv-1509, 2015 WL 275806, at *5 n.11 (M.D. Fla. Jan. 21, 2015), in which the court quoted the statement in *Copperweld*, 467 U.S. at 771, that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise."

Plaintiffs allege that ANI is Aspirus's wholly owned subsidiary, but the statement in *Copperweld* was about whether a parent and a wholly owned subsidiary could conspire with each other for the purpose of violating antitrust law. *Copperweld* did not hold that a parent is necessarily liable for antitrust violations committed by a subsidiary. Rather, the general rule, including in antitrust cases, is that a parent is not liable for the conduct of its subsidiary unless the plaintiff shows that it is appropriate to pierce the corporate veil. *See Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 820 (7th Cir. 2015); *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998); *Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*, 456 F. Supp. 3d 1059, 1071 (W.D. Wis. 2020). Plaintiffs don't point to any allegations in their complaint suggesting that defendants ignored corporate formalities or engaged in any other conduct that would make piercing the corporate veil appropriate.

The court will dismiss the exclusive-dealing claim as it relates to Aspirus.

2.  **Causation**

Defendants contend that plaintiffs' alleged injury is too remote from the alleged exclusive dealing to support an antitrust claim. Specifically, defendants say that plaintiffs' claim rests on an assumption that providers and payers would choose to form new networks to compete with ANI but for the alleged exclusivity of the providers' agreements with ANI. The

---

cite no authority for the proposition that a third-party beneficiary may be held liable for an antitrust violation.

parties sometimes refer to the issue underlying defendants' argument as "antitrust standing" in their briefs, but the Court of Appeals for the Seventh Circuit has directed litigants and district courts to use the term "standing" only in the context of the question whether a plaintiff has suffered an injury in fact for the purpose of establishing jurisdiction under Article III of the Constitution. *See Arreola v. Godinez*, 546 F.3d 788, 794–95 (7th Cir. 2008). That type of standing is not in dispute in this case. As defendants recognize, their argument is really about causation: is it reasonable to infer that plaintiffs would pay lower prices if ANI removed the challenged restrictions from its contracts?

In arguing that it isn't, defendants don't dispute that it is reasonable to infer that the formation of new networks of payers and providers would drive down prices. Instead, defendants focus on the required involvement of the providers in plaintiffs' alleged chain of causation: plaintiffs cannot increase competition and lower prices under their theory unless providers agree to form new networks with plaintiffs and other payers once the providers are released from their exclusive contracts. The court understands defendants to contend that any claim of injury that rests on the conduct of third parties is too remote as a matter of law.

Defendants raise a fair point. When the cooperation of third parties is required to bring relief to the plaintiff, that necessarily makes the causal connection between the defendant's conduct and the plaintiff's injury less direct. But none of the cases cited by defendants hold that any third-party involvement requires dismissal for lack of causation. Rather, most of the cases involved downstream purchasers who blamed their increased prices on an upstream seller multiple links up the causal chain.[4] In those situations, the courts held that direct purchasers

---

[4] *See Reading Industries, Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980) ("To establish a causal chain, the actions of innumerable individual decision-makers must be

were a more appropriate plaintiff. Defendants don't identify a more appropriate plaintiff in this case. It is payers like plaintiffs who are most directly harmed by high healthcare costs imposed by ANI.

In their reply brief, defendants cite cases in which courts dismissed on causation grounds antitrust claims of direct purchasers. But in those cases, the problem was that the plaintiffs were challenging antitrust violations in a different market from the one in which they made their purchases.[5] That is not an issue in this case.

---

reconstructed, including the decisions to purchase additional quantities of copper by fabricators who bought copper from the defendants; the impact of those purchasing decisions on the speculators in the LME market; the pricing decisions of copper end-product users, as affected by the LME price, who sold their consumed copper goods for scrap to scrap dealers; and finally the pricing decisions of the independent scrap dealers who determined the scrap market price that Reading faced."); *In re Aluminum Warehousing Antitrust Litigation,* 520 F. Supp. 3d 455, 485–86 (S.D.N.Y. 2021) ("Plaintiffs' theory of harm posits that, as a result of steps defendants took to lengthen warehouse queues, spot-market participants adjusted their purchase prices upward, which ultimately refracted the MWP price at the relevant time, affecting transactions in which defendants did not participate but which embedded the MWP as a price component."); *Hatchett v. Henry Schein, Inc.,* No. 19-cv-83, 2020 WL 733834, at *7 (S.D. Ill. Feb. 13, 2020) (purchasers of dental services challenged costs of dental supplies; plaintiffs didn't identify any specific charges that were affected by cost of supplies); *Supreme Auto Transport LLC v. Arcelor Mittal,* 238 F. Supp. 3d 1032, 1040 (N.D. Ill. 2017) (plaintiff that purchased finished steel products alleged that steel manufacturer engaged in scheme to raise prices through production cuts; plaintiff did not account for interceding parties who purchased and distributed the raw steel from defendants or manufactured and sold the steel-containing consumer products that plaintiffs eventually purchased, and plaintiff did not identify the products it purchased that were made with the defendant's steel); *de Atucha v. Commodity Exchange, Inc.,* 608 F. Supp. 510, 514–15 (D.C.N.Y.1985) (investor alleged that defendant caused collapse of United States silver markets which in turn caused his injury on London Metals Exchange).

[5] *Loeb Industries, Inc. v. Sumitomo Corp.,* 306 F.3d 469, 484–85 (7th Cir. 2002) (scrap copper purchasers challenging antitrust violation in copper cathode market); *Nypl v. JPMorgan Chase & Co.,* No. 15 Civ. 9300, 2017 WL 1133446, at *6 (S.D.N.Y. Mar. 14, 2017) (purchasers in foreign currency end-user market alleged antitrust violations in the FX spot market); *In re Digital Music Antitrust Litig.,* 812 F. Supp. 2d 390, 402 (S.D.N.Y. 2011) (compact disc purchasers alleged antitrust violations in the internet music market).

The bottom line is that none of the cases that defendants cite are instructive in a case like this one in which the plaintiffs are alleging that they are being harmed by higher prices because the defendants are contractually restraining third parties from competing. This counsels in favor of exercising caution before dismissing the claim. Defendants don't contend that it is implausible to infer at the pleading stage that providers currently bound by their contracts with ANI would—if they could—participate in new networks formed by payers like plaintiffs.[6] At summary judgment or trial, plaintiffs will have to come forward with specific evidence that new networks likely would be formed in the absence of the restraints in ANI's contracts. But it would be premature to dismiss the claim now on causation grounds.

### 3. Exclusivity

Defendants contend that ANI's agreements with providers are not properly classified as exclusive because plaintiffs admit that providers could contract directly with insurers so long as ANI gives its consent. But that's not a ground for dismissal because plaintiffs allege that defendants consistently deny consent, and the court must accept that allegation as true.

Defendants assert two arguments in response: (1) the Court of Appeals for the Seventh Circuit doesn't recognize "de facto" exclusive contracts, so it doesn't matter whether ANI ever grants consent, so long as the contract itself allows for exceptions; and (2) defendants don't allege enough facts to support this element.

As for defendants' first contention, the only authority defendants cite is *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 46 (7th Cir.1996), in which the court

---

[6] Defendants contend that plaintiffs' theory would also require providers to refuse to participate in ANI's network. But plaintiffs aren't contending that ANI is violating § 1 simply by including independent providers in its network, only that it is unlawful to restrain those providers from participating in other networks.

distinguished "exclusive dealing contracts" from "exclusive distributorships." The court did not discuss whether exclusivity is determined solely by the terms of the contract rather than how the contract operates in practice. So *Paddock* doesn't provide guidance on this issue.

As defendants recognize, at least two circuits have held that courts must look at both the terms of the agreement and the actual effect that the agreement has on the parties' relationship. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("We look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement "in the real world." (internal quotation marks omitted)); *McWane, Inc. v. FTC*, 783 F.3d 814, 833–35 (11th Cir. 2015) (court should "consider market realities rather than formalistic distinctions" when deciding whether a relationship qualifies as exclusive dealing) (internal quotations omitted). These cases are consistent with *United Shoe Machinery Corporation v. United States*, which held that a contractual clause qualified as exclusive dealing because the "practical effect" of the clause was to prohibit customers from using the machinery of a competitor. 258 U.S. 451, 457 (1922). The cases are also consistent with common sense. A rule that looked only at the express terms of the contract could be too easily evaded. What matters are the actual restraints the defendant imposes on the market, not words on a page.

As for defendants' second contention, defendants say that plaintiffs' claim fails because plaintiffs don't point to any specific examples in which ANI withheld consent from a provider who wanted to enter a contract with another payer. But defendants cite no authority for the view that plaintiffs must include a list of examples in their complaint. Plaintiffs allege that ANI consistently withholds consent, Dkt. 1, ¶¶ 13(b) and 76, and that is enough at the pleading stage. Plaintiffs will have to prove at summary judgment or trial what the practical effects of the provider agreements actually are.

21

### 4. Effect on competition

Exclusive dealing does not violate § 1 unless it "forecloses a substantial amount of competition." *Alarm Detection Systems, Incorporated v. Village of Schaumburg*, 930 F.3d 812, 829 (7th Cir. 2019). In this case, plaintiffs allege that ANI has foreclosed 75 percent of the market for outpatient services and 65 percent of the market for inpatient services.

Defendants don't dispute that 65 and 75 percent of the market qualifies as substantial. *See* XI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1821, at 207 (4th ed. 2018) ("Percentages higher than 50 percent are routinely condemned when the practice is complete exclusion by a contract of a fairly long duration."). Instead, defendants contend that plaintiffs don't adequately allege that there is a causal connection between the exclusive contracts and defendants' market share. This is another example of defendants asking plaintiffs to plead more than is required. Plaintiffs allege throughout their complaint that ANI's contracts had the effect of preventing payers and providers from forming networks that could compete with ANI. At the pleading stage, it is reasonable to infer that ANI's alleged restrictions on potential competitors have contributed to defendants' large market share. At summary judgment or trial, plaintiffs will have to present specific evidence about the effect that the contracts have on competition in the relevant markets.

### D. Monopoly under § 2

Plaintiffs' § 2 claims are based on the same alleged conduct and theories as their § 1 claims: price-fixing, tying, and exclusive dealing. The requirements for a § 2 claim overlap somewhat with a § 1 claim, *see Maryland and Virginia Milk Producers Association v. United States*, 362 U.S. 458, 463 (1960), but the two claims are not identical. For example, § 2 encompasses

unilateral action but is limited to situations that "threaten actual monopolization." *American Needle, Inc. v. National Football League*, 560 U.S. 183, 190 (2010); *Copperweld*, 467 U.S. at 767.

Defendants raise no arguments based on the differences between § 1 and § 2. Instead, defendants contend that plaintiffs' § 2 claims fail for the same reasons as their § 1 claims. The court has largely rejected those reasons for the purpose of defendants' motion to dismiss, so the court need not discuss those reasons again. Plaintiffs similarly do not raise any new arguments under § 2 regarding why they should be allowed to proceed against Aspirus, Inc. on an exclusive-dealing claim or against either defendant on a claim based on attempts to persuade competitors to reject referenced-based pricing. So the court will dismiss those claims under § 2 as well.

ORDER

IT IS ORDERED that the motion to dismiss filed by defendants Aspirus, Inc. and Aspirus Network, Inc., Dkt. 25, is GRANTED in part and DENIED in part. Plaintiffs Team Schierl Companies and Heartland Farms, Inc.'s claims that Aspirus, Inc. engaged in exclusive dealing and that both defendants attempted to persuade their competitors to reject reference-based pricing are DISMISSED for failure to state a claim upon which relief may be granted. The motion to dismiss is denied in all other respects.

Entered October 17, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge