October 25, 2024

**VIA ECF**

Hon. Anita Marie Boor
U.S. Magistrate Judge
U.S. District Court for the Western District of Wisconsin
20 N. Henry St.
Madison, WI 53703

      Re:  *Team Schierl et al. v. Aspirus Inc. et al.*, 22-cv-580-jdp

Dear Judge Boor:

      We write in response to the Court's September 27, 2024, Order (ECF No. 115), directing the parties to inform the Court of their efforts to resolve outstanding disputes regarding the movant-third parties' compliance with Plaintiffs' subpoenas.  Plaintiffs and the movant-third parties have no outstanding disputes regarding productions by Trilogy Health Solutions, Inc.; Bone & Joint Clinic, S.C.; Network Health, Inc.; and Marshfield Clinic Health System.  Plaintiffs and Security Health Plan (SHP) have an outstanding dispute with respect to the requests for claims data for all of Wisconsin, as outlined in Requests No. 14 and 16 of the subpoena, ECF No. 77-3.

      Per the Court's Order, Plaintiffs and counsel for SHP exchanged letters regarding their disputed discovery issues on October 3 and 11, respectively, and met and conferred on October 17.  Plaintiffs and SHP reached an impasse.  Pursuant to the Order, Plaintiffs and SHP set forth their positions below.

      **Plaintiffs' Position**

      For more than a year from the time Plaintiffs served their subpoena, SHP led Plaintiffs to believe it was intending to produce the claims data requested in Request Nos. 14 and 16 for all of Wisconsin, provided that the parties could reach agreement on a revised protective order, the format of production, and the data fields.  *See* Vaughn Decl., Ex. 1, at 1-2; *see also* ECF No. 84 (J. Crooks Decl.). With that understanding, Plaintiffs agreed to reduce the cost to SHP of producing by accepting the data in a native format, as SHP requested; they agreed to amend the protective order, as SHP requested; and, as late as August 2024, *see* Vaughn Decl., Ex. 1, at 1-2, Plaintiffs and SHP worked to finalize data fields.  Plaintiffs also narrowed the time period of their request from 2014 to present to 2017 to present, also in order to reduce SHP's costs.

      Only on September 9, 2024, after it filed its motion for fees, did SHP suggest for the first time that it was objecting wholesale to providing claims data other than that for the named Plaintiffs.  In an email that day, SHP's counsel stated, "SHP does not have the time nor other

resources to search for, review, and produce the voluminous amount of claims data requested." *Id*. at 1.

Subsequently, in its October 11 letter to Plaintiffs, SHP continued to object wholesale to production of class-related claims data. This time SHP cited two reasons for its refusal: (1) that it would take 30 to 60 hours of employee time to pull the data, and (2) that it believed any data apart from the claims of the named Plaintiffs themselves is irrelevant "[u]nless and until a class is certified in this matter," an entirely new position (that it reiterates below). In the subsequent meet-and-confer on October 17, Plaintiffs explained the relevance of the data to obtaining class certification and asked what additional information could help SHP reconsider its position. *See* Vaughn Decl., Ex. 3, at 2. SHP's counsel stated only that its position was clear in the October 11 letter and offered no additional path to agreement. *Id*. at 1. Plaintiffs followed up on October 21 and October 22 to see if there was more that could be done to reach agreement, but SHP did not respond to Plaintiffs' inquiries. *Id*. Then, at 3:16 p.m. Central Time on October 25, 2024, the day on which the parties were required to present any remaining issues to the Court and after a *year* of negotiations, SHP informed Plaintiffs for the first time of even more objections, none of which it had raised before with respect to producing data: 1) that SHP fears inadvertent disclosure of the claims data, despite the protective order and data security protocol information Plaintiffs sent; 2) that the claims data falls outside the statute of limitations, 3) that Plaintiffs have not shown "substantial need" and 4) that the claims data is available from other sources. In addition, SHP added hours to what it would require to pull the requested data, *compare* Ex. 2 at 2 *with infra*, claiming Plaintiffs have made a new ask. This latter claim is incorrect—Plaintiff have not changed their requests relating to data since serving the subpoena. Plaintiffs' only change in position has been to their requests for documents, which they agreed to drop *entirely* in their October 24 communication to SHP.

SHP's late-in-the-day refusal to provide the claims data Plaintiffs have requested for more than a year is not justified by law, and the limited burden SHP has identified is far outweighed by Plaintiffs' need for the data in order to meet their burden to prove that a class should be certified. The Court should order SHP to provide the data as soon as is practicable.

*1. The requested data is directly relevant to Plaintiffs claims and, therefore, discoverable.*

"The scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules." *Jackson v. Brinker*, 147 F.R.D. 189, 193-94 (S.D. Ind. 1993). Accordingly, parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Here, the requested claims data is highly relevant to demonstrating antitrust injury and damages, as well as several factors necessary for class certification.

Plaintiffs allege that Defendants' anticompetitive conduct results in supracompetitive prices for healthcare services in North Central Wisconsin. To prove their case, Plaintiffs bear the burden of establishing an antitrust injury (also referred to as antitrust impact). *Blue Cross & Blue Shield United v. Marshfield Clinic*, 881 F. Supp. 1309, 1314-15 (W.D. Wis. 1994). The injury in a purchaser case, like this one, is an "overcharge," which is measured as the difference between the amount charged and the amount that would have been charged absent the challenged conduct. *See Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 488-89 (1968). In class actions like this one, Plaintiffs also must calculate the corresponding aggregate damages to the proposed class

of purchasers affected by the challenged restraint.  *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1048-49 (N.D. Ill. 2022).

SHP is one of the largest insurers in North Central Wisconsin.  It pays Defendants and other healthcare providers directly for healthcare services, and it also administers healthcare contracts for self-insured entities who themselves pay Defendants and others for healthcare services. SHP's claims data contains highly relevant information on the amounts paid to Defendants and other healthcare providers. Contrary to SHP's claims, this data is not available from any other source, including Defendants' files or any publicly available database.  *See infra* at 5-7.

SHP's claims data is directly relevant for two reasons. First, the data will help show the amount of the overcharge because it will show the amounts paid to Defendants by various self-funded payors who are members of the proposed class and who use SHP's network, as well as the amounts paid directly by SHP for SHP's fully insured health plan members.  This information is important to show direct evidence of injury and damages to the proposed class.

Second, SHP's data for healthcare claims paid to healthcare providers in other parts of Wisconsin is relevant to the extent it will be used as a benchmark against which to compare Defendants' prices.  For both class-wide impact and damages, it is well accepted that plaintiffs in antitrust cases can meet their burden on injury and damages through a "yardstick" or "benchmark" approach that compares the prices actually paid by class members to the prices paid in some benchmark that approximates a "but for" world without the anticompetitive conduct.[1]  Using data from comparable firms or other geographic markets is a well-established means of constructing the but-for world—in essence, to determine what the prices would be in the defendant's market had the anticompetitive conduct not occurred.[2]  A benchmark analysis of this type has specifically

---

[1] *See, e.g.*, *Fishman v. Est. of Wirtz*, 807 F.2d 520, 551 (7th Cir. 1986) ("The concept of a 'yardstick' measure of damages, that is, linking the plaintiff's experience in a hypothetical free market to the experience of a comparable firm in an actual free market, is . . . well accepted."); *In re Dealer Mgmt. Sys.*, 581 F. Supp. 3d at 1075 (noting the "yardstick" approach is a "well-established methodology" for computing antitrust damages).

[2] *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 116 & n.11 (1969) (approving district court's comparison of Canadian television market to U.S. market to establish impact and damages caused by the challenged restraint, which was present in Canadian market but not the U.S. market); *Nat'l ATM Council v. Visa Inc.*, No. 21-7109, 2023 WL 4743013, at *7 (D.C. Cir. July 25, 2023) ("Yardstick analysis computes antitrust damages by comparing the prices paid by plaintiffs with those paid by a consumer in a comparable market unaffected by the antitrust violation."); *Moehrl v. Nat'l Ass'n of Realtors*, No. 19-cv-01610, 2023 WL 2683199, at *7-10 (N.D. Ill. Mar. 29, 2023) (finding expert's opinion admissible to prove antitrust impact and damages where he compared broker commissions in the U.S. real estate market to those in Australia, the Netherlands, and the United Kingdom and provided rational basis for using those comparators); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996) (in an antitrust case alleging supra-competitive spreads on the NASDAQ, describing the measurement of damages by comparing the spreads of the securities at issue on the NASDAQ to the spreads of comparable securities on other stock exchanges as a "widely accepted means of measuring damages in antitrust cases").

been held to be appropriate in antitrust cases where a hospital system engaged in anticompetitive conduct that raised the prices paid by insurers, businesses, and consumers. *See, e.g.*, *Sidibe v. Sutter Health*, No. 12-cv-4854, 2020 WL 4368221, at *1 n.8 (N.D. Cal. July 30, 2020) (certifying class based on such benchmarking analysis); *see also* Chipty Decl., *Sidibe*, No. 12-cv-4854, ECF No. 379-1 at 56-72, 84-85 (summarizing benchmark analysis by comparing defendant-hospital to benchmark hospitals in different markets and how it demonstrated common impact).[3]

Thus, the prices paid by SHP and any self-insured entities that use SHP's network to pay healthcare providers, both within and outside the specific market at issue in this case, are directly relevant to Plaintiffs' claims and Plaintiffs' ability to prove class-wide impact and damages. Moreover, benchmarking analysis is a well-accepted method of meeting the burden to demonstrate that impact and damages is susceptible to class-wide proof, as required under Federal Rule of Civil Procedure 23. *See id.*; *Moehrl*, 2023 WL 2683199, at *7-10, 14, 20.

SHP's claims data will also help identify class members. As outlined above, SHP is a direct purchaser of healthcare services in Defendants' market and manages self-funded plans for other entities who are also direct purchasers of healthcare services. Payor data, such as SHP's data, reflects specific claims paid within Defendant's market, and therefore, it is relevant to showing the likely number and identity of class members. *See, e.g.*, *Yates v. NewRez, LLC*, No. 21-cv-3044, 2022 WL 2105933, at *4 (D. Md. June 10, 2022) ("[W]hether other individuals have been injured in a way similar to which Plaintiff has been injured is also relevant to demonstrating whether the proposed class includes a sufficiently large number of individuals.").

SHP's counterarguments do not justify its refusal to produce its claims data. SHP relies primarily on *Methodist Health Services Corporation v. OSF Healthcare System*, 2014 WL 12733590, at *2 (C.D. Ill. 2014), but that case does not justify SHP's refusal to produce any claims data in this case. As an initial matter, *Methodist Health* disposes of SHP's argument (*infra* at 10-11) that the confidentiality of its claims data makes production in this case inappropriate, because, as the *Methodist Health* court recognized, a court-enforced protective order (such as the protective order in this case and that which existed in *Methodist Health*) belies these concerns. 2014 WL 12733590, at *4 (ordering production because "Keystone is free to designate documents in a manner that it believes in good faith will protect proprietary and other protected information from being distributed to its competitors and others. Keystone's argument that the Protective Order does not address its concerns is without merit."). Moreover, the Court in *Methodist Health* held that production of claims data by a health insurer was not warranted only because in that case "[t]he issue … is whether OSF—a hospital provider of medical services and products—engaged in non-competitive conduct vis-à-vis other medical providers who want to participate in health benefit plans. The internal operation of such *plans* says nothing about the operation of the various *providers*." 2014 WL 12733590, at *12 (emphasis in original). In this case, Plaintiffs do not allege that Defendants engaged in "non-competitive conduct vis-à-vis other medical *providers*," *id.*

---

[3] Initially, the court in *Sidibe* denied class certification without prejudice because Plaintiffs' analysis did not include claims data from all relevant payors. *Sidibe v. Sutter Health*, 333 F.R.D. 463, 494 (N.D. Cal. 2019). After Plaintiffs filed a renewed motion incorporating claims data from all relevant payors, the court granted certification. *Sidibe*, 2020 WL 4368221, at *1 n.8 (noting that once plaintiffs incorporated all relevant payors' data, defendant no longer disputed that the benchmark analysis was a reliable method of common proof and challenged only "pass-through," an issue not relevant to this direct-purchaser case).

(emphasis added), but rather that Defendants imposed contractual restraints on *payors* like SHP, *see, e.g.*, Complaint, ECF 1, ¶ 3 ("Aspirus … foreclose[s] the ability of rival providers to contract with payers—commercial health plans and self-insured employers—and thus to prevent those payers from assembling networks that can compete against Aspirus on price and quality."). Therefore, unlike in *Methodist Health*, SHP's data—which is not available from any provider, including Defendants—is an important piece of the puzzle that Plaintiffs are entitled to.

Finally, SHP is wrong to suggest, *infra* at 8, that the limitations period is somehow a defining line with respect to what is discoverable.  In monopolization cases such as this one, courts (including the Supreme Court) have long made clear that data relating back to the alleged scheme's incipiency is relevant to proving an antitrust violation.  *See, e.g.*, *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 709-10 (1962) (holding that evidence from 30 years prior was clearly material" to a later-in-time antitrust action, to understand the market dynamics at the time of suit); *Sidibe v. Sutter Health*, 103 F.4th 675, 699 (9th Cir. 2024) (finding evidence from pre-limitations period "clearly material" to claim that hospital engaged in anticompetitive conduct); *Rumble v. Google LLC*, 2023 WL 3751797, at *10 (N.D. Cal. May 31, 2023) ("[e]vidence of the possible creation and implementation of an anticompetitive business strategy by [defendant] prior to [the statute of limitations period] would clearly be relevant"); *Jones v. Varsity Brands*, 2021 WL 5889984, at *3 n.7 (W.D. Tenn. Dec. 13, 2021) (acquisition at heart of discovery dispute occurred in 2018; limitations period dated to 2015, allowing before- and after-evidence)); *see also Jones v. ACE Cheer Co.*, 2022 WL 969720, at *3 (W.D. Tenn. Mar. 30, 2022) (in same case, allowing "almost two years of data before the alleged harm occurred").

Accordingly, because the data is directly relevant to Plaintiffs' claims and what Plaintiffs need to prove to obtain class certification, it is discoverable.

### 2.  SHP has not met its burden to be excused from producing the requested data.

As the party opposing discovery, SHP bears "the burden of showing the discovery is overly broad, unduly burdensome, or not relevant."  *EEOC v. Rexnord Indus., LLC*, 11-cv-777, 2012 WL 2525652, at *6 (E.D. Wis. June 29, 2012).  Here, SHP has made five arguments: 1) that it would take 60 to 110 hours of employee time to pull the data, Vaughn Decl., Ex. 2 at 2 and *infra*; 2) the data is not relevant "[u]nless and until a class is certified in this matter," *id.*; 3) the data falls outside the statute of limitations, *infra*; 4) that Plaintiffs must show substantial need, *infra*; 5) SHP fears inadvertent disclosure, despite the protective order and data security protocol information Plaintiffs sent, *infra*; and 6) that the data is available from other sources, *infra*.  None of SHP's objections are a valid basis for not producing the requested claims data.

As an initial matter, Plaintiffs note that SHP initially told *both* Plaintiffs and Defendants that it will take 30 to 60 hours of employee time to pull the data, *see id.* at 2-3.  The fact that this estimate relates to two subpoenas strongly suggests that the burden in responding to *Plaintiffs'* subpoena—*i.e.*, the relevant inquiry here—is significantly less than SHP admits.

In any event, even if SHP's 30-to-60-hours, now 60-to-110-hours, estimate related solely to Plaintiffs' subpoena, SHP provides no explanation as to why this many hours of work, particularly after all the concessions Plaintiffs have made, would constitute a burden outweighing the clear need Plaintiffs have for the requested data.  Nor, after raising it for the first time at 3:16 p.m. CT on October 25 (today), does SHP explain why the $55/hour it pays its employees who

October 25, 2024
Page 6 of 15

would work on the matter is unduly burdensome in the face of the direct relevance of the data. "One claiming undue burden must do more than intone the phrase." *Papst Licensing GmbH & Co. KG v. Apple, Inc.*, No. 6:15-cv-1095, 2017 WL 1233047, at *3 (N.D. Ill. Apr. 4, 2017). Courts regularly hold that discovery from third parties related to a benchmarking analysis used to prove antitrust impact and damages to be proportional—particularly where, as here, the parties worked to narrow the requests to reduce the subpoena recipient's burden. *See Fusion Elite All Starts v. Nfinity Ath. LLC*, No. 22-cv-2226, 2022 WL 1175691, at *5 (W.D. Tenn. Apr. 20, 2022) (ordering competitor to defendant to produce detailed transactional and sales data after finding plaintiffs had established the need for "high quality, third-party data that was uncontaminated by the challenged conduct" to use as a benchmark); *In re Novartis & Par Antitrust Litig.*, No. 2:19-cv-00149, 2019 WL 5722055, at *6 (E.D. Penn. Nov. 5, 2019) (ordering the production of non-party competitor's sales and forecasting records for its generic version of the drug at issue as "essential in determining potential damages" and finding that "[t]his type of request is neither extraordinary or burdensome given the circumstances" (internal citations omitted)); *Direct Purchaser Class v. Apotex Corp.*, No. 16-mc-62492, 2017 WL 4230124, at *4-5 (S.D. Fl. May 15, 2017) (finding that the non-party drug company's sales and transaction data relating to the generic version of the defendant's drug was a trade secret but that the plaintiffs' need for the data to determine what competitive prices would have been absent the defendant's anticompetitive conduct outweighed the potential harm of disclosure); *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488, 2017 WL 4700367, at *2-3 (S.D.N.Y. Oct. 19, 2017) (rejecting non-party drug company's claim that producing detailed sales and transaction records for its generic drug was unduly burdensome and not proportional because the time and money required to produce it was small in comparison to the potential damages).[4]

SHP's next argument—that all evidence related to class members other than the named Plaintiffs is irrelevant until a class is certified—is meritless as well. If class discovery were irrelevant "[u]nless and until a class is certified," as SHP argues, *infra* at 9, no plaintiff could ever obtain the data necessary to certify a class. For obvious reasons, SHP's procedurally backwards approach is not the law, and has been rejected accordingly. *See, e.g., Halvorsen v. Credit Adjustments Inc.*, No. 15-cv-6228, 2016 WL 1446219, at *2 (N.D. Ill. Apr. 11, 2016) ("The mere fact that the class in this case is only a putative class does not justify denying discovery. A request is not overly broad and unduly burdensome merely because a class action has not yet been certified."). Plaintiffs bear the burden of establishing every relevant prerequisite for class certification outlined in Federal Rule of Civil Procedure 23. *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015) (movant "bears the burden of demonstrating that certification is proper by a preponderance of the evidence").

As described above, the requested data goes directly to satisfying Rule 23's prerequisites, and Plaintiffs must be allowed to marshal the evidence they need to meet their burden. *See Bilek v. Fed. Ins. Co.*, 344 F.R.D. 484, 489 (N.D. Ill. 2023) ("In cases such as this one where [P]laintiffs have not yet filed a motion for class certification, discovery may be used to help determine whether the class can properly be certified, particularly with respect to Rule 23's threshold requirements.");

---

[4] In passing, SHP also cites two cases where parties were ordered to share costs. *See infra*, citing *Medical Center at Elizabeth Place, LLC v. Premier Health Partners*, 294 F.R.D. 87, 95-96 (S.D. Ohio 2013) and *In re Blue Cross Blue Shield Antitrust Litig.*, 2017 WL 10410065, at *2 (N.D. Ala. 2017). SHP provides no additional argument. As outlined in their opposition to SHP's motion for fees, ECF No. 83, SHP has not met its burden to require cost-shifting.

October 25, 2024
Page 7 of 15

*Mervyn v. Atlas Van Lines*, 13-cv-3587, 2015 WL 12826474, at *5 (N.D. Ill. Oct. 23, 2015) (in deciding a motion to compel production from a defendant, finding that even an "extreme" burden on defendant likely would not overcome the need for documents that are "crucially important to the class certification issues that must be decided").  Of particular note, courts adopt this same approach both to discovery requests served on parties as well as to subpoenas served on non-parties, such as SHP—the need for evidence going to class certification issues justifies imposing a burden on the non-party.  *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, No. 17-cv-1537, 2018 WL 6634324, at *4 (C.D. Ill. Dec. 19, 2018) (denying motion to quash despite the fact that subpoena imposed a burden on the recipient, because "State Farm can use Subpoenas to secure documents relevant to [class certification] issues").[5]

SHP next argues that Plaintiffs can obtain the needed claims data from other sources. Specifically, SHP asserts the claims data is available from Defendants, publicly on its and the Marshfield Clinic's websites, and from the Wisconsin all payor claims database.  SHP is incorrect.

First, Defendants' data is no substitute for SHP's data because Defendants' data does not identify the self-insured entities who purchase directly from Defendants' through SHP's network, so Defendants' data could not be used to identify class members. Additionally, Defendants' data would only include data for those entities who *purchased from Defendants*, but not from other providers. Thus, payor data, like SHP's, will facilitate the calculation of market shares and market power, and it could form part of a benchmark for purposes of analyzing overcharges.

Second, the claims transparency data publicly available on SHP's and Marshfield Clinic's websites are just pricing lists that identify the price per procedure.  They do not include any information about what services were used in what quantities and by whom.  The public pricing list would not allow Plaintiffs to identify the overcharge, control for variables to conduct benchmarking, measure the extent of damages, or identify class members.

Third, APCD does not include any information plaintiffs need to identify class members. As noted above, Plaintiffs seek SHP's data in part to ascertain the identity of class members, which could not be achieved through either the APCD or Defendant's limited data.

Finally, for the first time in this joint letter, SHP objects to providing the claims data based on its fear of inadvertent disclosure through unpredictable events like data breaches.  As an initial matter, as SHP notes below, SHP has provided some claims data already for one of the named Plaintiffs, and it is not clear why data breaches did not concern SHP then but does now.  In addition, after SHP raised this concern with respect to Plaintiffs' documents request in its October 11 letter, *see* Vaughn Decl., Ex. 2 at 2, and in the meet-and-confer on October 17, *see* Vaughn Decl., Vaughn

---

[5] Notably, the court in *State Farm* also rejected the subpoena recipient's argument that the sensitive nature of the requested data created an undue burden due to the existence of a strong protective order.  *Id.* at *16 ("The request also does not impose an undue burden on the individuals because the parties have a HIPAA-qualified protective order in place to protect the documents from improper disclosure.").  Here, there is a similar protective order in place designed with sensitive claims data in mind, thus obviating SHP's purported concern that the "files could be at risk for (even if inadvertent) disclosure to Aspirus and ANI or to someone in the public."  Ex. 2 at 2.  As in *State Farm*, the Court should presume that the parties will follow this case's protective order, which eliminates the disclosure risks SHP gestures to.

October 25, 2024
Page 8 of 15

Decl., Ex. 3 at 2, Plaintiffs provided SHP with the data security protocols its experts use, *id.* Between that time and 3:16 p.m. on October 25, the day of this filing, SHP did not acknowledge or provide Plaintiffs any additional feedback on the data security protocols. And, despite SHP's claim below, SHP has never "asked plaintiffs . . . for any other possible solutions" relating to data security protocols for claims data. As outlined above, SHP bears the burden to demonstrate that it should be excused from discovery.

Plaintiffs have provided evidence that it has security protocols in place to address SHP's privacy concerns, *see Methodist Health*, 2014 WL 12733590, at *4, and that the information that SHP has cannot be obtained from Defendants or any publicly accessible source. SHP's bare assertion that the protective order in this case could somehow prove ineffective is not a valid reason for refusing to produce. *State Farm*, 2018 U.S. Dist. LEXIS 213380, at *16.; *Peoria Day Surgery Ctr. v. OSF Healthcare Sys.*, No. 06-1236, 2008 U.S. Dist. LEXIS 20499, at *17 (C.D. Ill. Mar. 17, 2008) (denying subpoena recipients' motion to quash on privacy grounds because "those concerns are addressed by the protective order in place"); *Dickstein v. Malzone*, No. 22-1360, 2023 U.S. Dist. LEXIS 181524, at *10 (C.D. Ill. Sep. 5, 2023) (same).[6]

The Court should order SHP to produce the requested data immediately. After its bait-and-switch over a year into negotiations, SHP has offered nothing to meet the burden it must carry to avoid producing the highly relevant information Plaintiffs seek.

**SHP's Position**

**I.    Plaintiffs' Subpoena Seeks a Voluminous and an Unduly Burdensome Amount of Non-Public, Competitively Sensitive Claims Data from SHP**

SHP worked with the parties in good faith to respond to their subpoena requests, including attempting to find a compromise to producing voluminous amount and competitively sensitive claims data requested by plaintiffs in their subpoena requests Nos. 14 and 16. In March 2024, in response to plaintiffs' subpoena request No. 14 requesting payer claims data, SHP searched for and produced responsive claims data relating to the two named plaintiffs in this action—Team Schierl and Heartland Farms. SHP produced reasonably accessible Team Schierl claims data, but SHP's search did not reveal any claims data for Heartland Farms (thus, it did not produce any such claims data).

There was and is no agreement by SHP's prior or current counsel to produce the full set of claims data. Since SHP's production in early 2024, plaintiffs followed up with numerous questions relating to the data set to which SHP has responded—SHP's counsel understood that the communications were a good faith effort to answer plaintiffs' questions regarding the claims data that SHP previously produced; it was not an agreement to provide the full set.

---

[6] SHP cites *Medical Center at Elizabeth Place, LLC v. Premier Health Partners*, 294 F.R.D. 87, 95-96 (S.D. Ohio 2013) as support for this position, but that case does not discuss confidentiality concerns around claims data. Indeed, the rule SHP is asking this Court to adopt— that a third party's vague fears of data breaches by unidentified bad actors precludes discovery of highly relevant information even subject to a protective order—would render third party discovery prohibited in almost every instance. *But see Methodist Health*, 2014 WL 12733590, at *4.

Plaintiffs continue to press for a "full payer data production," agreeing to limit it to 2017 (instead of 2014 which is well beyond the statute of limitations at issue here) to which SHP has repeatedly objected on numerous grounds since it submitted its initial objections and responses to plaintiffs' subpoenas, and now are requesting that SHP respond to request No. 16 (amounts charged to or paid by subscribers), including:

- <u>Relevance, Substantial Need</u>. Unless and until a class is certified in this matter, SHP maintains that the full set of non-public and confidential claims data and subscriber information is not relevant and SHP has not demonstrated a substantial need for the data.

- <u>Undue Burden</u>. SHP objects plaintiffs' request for a "full payer data production" in request No. 14 and the data requested in No. 16 because it is unduly burdensome for SHP to retrieve and review this data. SHP estimates it will take between 30 to 60 hours (or more) to pull the claims data requested in No. 14 and subsequently review it to ensure it conforms with the specifications to the extent possible. *See* **Exhibit A** (Declaration of L. Boero ¶ 3.) SHP estimates that, in order to respond to request No. 16 (which plaintiffs have not previously indicated is a request they intended to enforce), it will take SHP between 30 to 50 hours (or more) to develop and pull the requested information. (*Id.* ¶ 4.) Defendants' request for claims data (which contains some different fields) will take between 30 to 60 hours (or more) to pull and review. (*Id.* ¶ 5.)  It will cost SHP an average of $55 per hour per IT department individual who is working on plaintiffs' requests. (*Id.* ¶ 6.)  This represents a significant amount of SHP's internal time that will divert it from daily operations and fall on a leanly staffed IT department that experienced a number of departures over the past year. (*Id.* ¶ 7.)

Plaintiffs could obtain recent information regarding MCHS' and SHP's pricing via the following websites: https://www.securityhealth.org/insurance-resources/json, https://www.marshfieldclinic.org/patient-resources/billing/cms-hospital-transparency-requirement. In addition, the parties can obtain claims data from a Wisconsin all payer claims database ("APCD") such as the Wisconsin Health Information Organization—while they would have to pay for the data this would likely cost less than what they are paying for their attorneys to engage in discovery discussions with third parties such as MCHS and SHP (not to mention it would reduce the burden on third parties).

Finally, the claims and subscriber data are some of SHP's most competitively sensitive information and is at risk for (even if inadvertent) disclosure to Aspirus and ANI or to someone in the public despite the existence of a protective order—this disclosure could result in irreparable harm to SHP.

SHP's counsel has met and conferred with plaintiffs' counsel on multiple occasions, yet the parties have been unable to reach a compromise.

October 25, 2024
Page 10 of 15

## II.    The Court Should Limit or Quash Plaintiffs' Claims Data Request

A party issuing a subpoena "must take reasonable steps to avoid imposing undue burden or expense" on the subpoena's target, and the court from which the subpoena issues must enforce this restriction. Fed. R. Civ. P. 45(c)(1); *see also* Fed. R. Civ. P. 45(c)(2)(B)(ii) (noting that when issuing an order resolving a motion to compel subpoena compliance, the court "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance"). The court must limit discovery if it determines that "the discovery sought is unreasonably cumulative or duplicative or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(c)(i).

To determine whether a non-party subpoena presents an "undue burden," courts apply a balancing test where it should consider whether the burden of compliance exceeds the benefit of the information sought. *See, e.g., Northwestern Memorial Hospital v Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004) (affirming the lower court's order quashing DOJ's subpoena). To more fully assess the burden of complying with a non-party subpoena, the Court may consider whether: (1) the information requested is relevant; (2) the party requesting the information has a substantial need for the documents; (3) the document request is overly broad; (4) the time period the request covers is reasonable; (5) the request is sufficiently particular; and (6) whether compliance with the request would impose a burden on the subpoenaed party. *In re Subpoenas to Wisconsin Energy Corp.,* 2010 WL 715429, at *1 (E.D. Wis. 2010) (granting non-party's motion to quash plaintiffs' subpoena); *Methodist Health Services Corporation v. OSF Healthcare System*, 2014 WL 12733590, at *2 (C.D. Ill. 2014) (granting non-party's motion to quash certain subpoena requests, including the request for claims data). Non-parties "are not treated exactly like parties in the discovery context, and the possibility of mere relevance may not be enough; rather, non-parties are entitled to somewhat greater protection." *Wisconsin Energy Corp.*, 2010 WL 715429, at *1 (citing *Patterson v. Burge*, 2005 WL 43240, at *1 (N.D. Ill 2005)); *see also Rossman v. EN Engineering, LLC*, 467 F. Supp. 3d 586, 590, 592 (N.D. Ill. 2020) (denying plaintiff's motion to compel compliance with the non-party subpoena).

In addition to demonstrating relevance of the information sought, to obtain "trade secret or other confidential research, development, or commercial information" from a non-party, a subpoenaing party *must* demonstrate "substantial need" for the information "that cannot be otherwise met without undue hardship." Fed. R. Civ. P. 45 (d)(3). The requirement to show substantial need "is particularly important in the context of enforcing a subpoena when discovery of trade secret or confidential commercial information is sought from non-parties." *See, e.g., Gonzales v. Google, Inc.*, 234 F.R.D. 674, 685 (N.D. Cal. 2006). Courts have liberal discretion to quash or limit subpoena requests seeking disclosure of such information. Fed. R. Civ. P. 45(d)(3)(B).  SHP's non-public provider contract files contain competitively sensitive information, as does SHP's claims data, the disclosure of which to Aspirus, ANI, or the public could cause SHP irreparable harm.

As to whether SHP's claims data is relevant (and whether the parties have a "substantial need" for these documents), the decision in *Methodist Health* is instructive: the court granted non-party Keystone's motion to quash three claims data requests (very similar to plaintiffs' request number 14) stating that the "breadth of this request is nearly breath-taking." Furthermore, "OSF is not entitled to probe Keystone's [the non-party payor] patients' records, nor is it entitled to examine and compare Keystone's administration of its benefit plan in this great detail." *Id.* at *12.

MCHS and SHP dispute the relevance of the information sought and contend that the parties have not shown a "substantial need" for the requested information—in part, because plaintiffs state they are seeking information to show the "amounts paid to Defendants," as well as prices paid by self-insured entities. Prices paid by defendants is information that plaintiffs should seek from defendants first, rather than burdening a non-party with an expansive request for data. *See, e.g., EN Engineering, LLC*, 467 F. Supp. 3d at 590-91 (denying the plaintiff's motion to compel compliance against a non-party and stating that the plaintiff violated the "basic prohibition against heaping unnecessary burden on non-parties because the plaintiff did not exhaust other avenues before targeting a non-party the lawsuit."). Similarly, plaintiffs should seek the information regarding self-insured employers from those entities first.

In addition, plaintiffs state they seek the claims data to use SHP's pricing a "benchmark against which to compare Defendants' prices." Recent pricing information that the plaintiffs seek to glean from claims data is publicly available on providers' and payers' websites per the price transparency rule. In addition, claims data is available from a Wisconsin-based APCD. Again, before burdening a non-party with large, time-consuming data requests, SHP respectfully requests that plaintiffs review and utilize any sources of publicly available pricing information.

SHP objects to plaintiffs' request for a "full payer data production" in request No. 14 and the data requested in No. 16 because it is unduly burdensome for SHP to retrieve and review this data. SHP estimates it will take between 30 to 60 hours (or more) to pull the claims data requested in No. 14 and subsequently review it to ensure it conforms with the specifications to the extent possible. (Declaration of L. Boero ¶ 3.) SHP estimates that, in order to respond to request No. 16 (which plaintiffs have not previously indicated is a request they intended to enforce), it will take SHP between 30 to 50 hours (or more) to develop and pull the requested information. (*Id.* ¶ 4.) This estimate does not include the estimated time it will take to respond to defendants' request—defendants' request for claims data (which contains some different fields) will take between 30 to 60 hours (or more) to pull and review. (*Id.* ¶ 5.) It will cost SHP an average of $55 per hour per IT department individual who is working on Plaintiffs' requests. (*Id.* ¶ 6.) SHP does not yet know how many individuals it will take to work on plaintiffs' requests Nos. 14 and 16. This represents a significant amount of SHP's internal time that will divert it from daily operations and fall on a leanly staffed IT department that experienced a number of departures over the past year, but it does not reflect the full amount of time and resources that SHP and MCHS have devoted to this matter, nor does it reflect the amount of outside attorneys' fees and costs that have been incurred in responding to plaintiffs' and defendants' numerous requests. (*Id.* ¶ 7.)

MCHS and SHP raised concerns regarding inadvertent disclosure by the parties of these materials to Aspirus, ANI, or the public. While there is a protective order in place with a designation for highly confidential material, inadvertent disclosure is not out of the realm of possibility given the prevalence of cyberattacks on law firms and other organizations.[7] Last year, three Am Law 50 firms—Kirkland & Ellis, K&L Gates, and Proskauer Rose—were affected last

---

[7] *Law Firm Data Breach Reports Show No Sign of Slowing in 2024*, THE AMERICAN LAWYER (May 23, 2024), https://www.law.com/americanlawyer/2024/05/23/law-firm-data-breach-reports-show-no-signs-of-slowing-in-2024/?slreturn=20241025-14925.

October 25, 2024
Page 12 of 15

year in a wide-ranging data hack.[8] There are a number of firms involved in this litigation, along with outside experts—the number of organizations and individuals with access to the data increases the possibility that patient's protected health information and SHP's competitively sensitive information could be inadvertently disclosed. MCHS and SHP also asked plaintiffs and defendants for any other possible solutions to which plaintiffs responded by providing security protocols for its outside consultants; defendants' counsel did not provide any suggested solutions.

MCHS and SHP are not alone in their efforts to ensure the confidentiality of their most competitively sensitive information, including claims data and provider contract files. In *Medical Center at Elizabeth Place, LLC v. Premier Health Partners*, non-party Anthem was similarly concerned and refused to produce its provider contract files on confidentiality grounds, among others. The court agreed with Anthem's position, denying the parties' demand that non-party Anthem produce pricing terms of its contracts with area providers, along with communications regarding those contracts. 294 F.R.D. 87, 95-96 (S.D. Ohio 2013). In so doing, it concluded the production was an undue burden, that the "preserved confidentiality of Anthem's contracts' pricing terms trumps the parties' desire to empty Anthem's internal communications about highly confidential business strategies," and that the parties could evaluate the marketplace through other sources of "market-wide information." *Id*. Regarding Anthem's claims data, the parties were ordered to split the cost of Anthem's cost of production. *Id.*; *see also In re Blue Cross Blue Shield Antitrust Litig.*, 2017 WL 10410065, at *2 (N.D. Ala. 2017) (ordering plaintiffs and defendants to pay reasonable costs incurred by non-parties to produce claims data).

The issues presented here are no different—MCHS and SHP should not be required to produce its most competitively sensitive information, the collection and review of which presents an undue burden on SHP, and instead the parties should be directed to seek information from other sources. Should the Court order production, it should require the parties to pay MCHS' and SHP's fees and costs relating to the review and production of such information.

## III.    Conclusion

For the reasons stated above, MCHS and SHP respectfully ask that the Court quash (or in the alternative, further limit) plaintiffs' request for SHP's full set of payer claims data (No. 14) and plaintiffs' request for subscriber information (No. 16). In the alternative, MCHS and SHP respectfully request the Court order the parties to pay for the fees and costs associated with the production of the requested data.

As previously stated in its motion for fees and costs and supporting documents (Dkts. 80, 99), MCHS and SHP have thus far incurred significant fees and costs to respond to the parties' four (now five, with the addition of the SAS) subpoenas. The additional information sought by the parties is, in many instances, publicly available (e.g., pricing information is available from WHIO and the parties' websites, information regarding NPIs is also publicly available) and is obtainable from other sources (such as other providers or payers). In addition to the unduly burdensome nature of the requests (the parties' data requests could take SHP at least 170 hours or more to fulfill), the parties have not demonstrated the requisite substantial need for the information requested from

---

[8] *Kirkland & Ellis, K&L Gates, and Proskauer Rose Affected in Wide-Ranging Data Hack*, THE AMERICAN LAWYER (June 30, 2023), https://www.law.com/americanlawyer/2023/06/30/kirkland-ellis-kl-gates-proskauer-rose-affected-in-wide-ranging-data-hack/.

October 25, 2024
Page 13 of 15

MCHS and SHP which they must do under Rule 45 since what they are requesting is highly confidential and competitively sensitive.

MCHS and SHP appreciate the Court's attention and time spent on this matter.

October 25, 2024
Page 14 of 15

Sincerely,

/s/    *Wendy Arends*
Wendy Arends
**HUSCH BLACKWELL LLP**
33 East Main Street, Suite 300
Madison, WI 53703
Phone: (608) 258-7382
Wendy.arends@huschblackwell.com

*Outside Counsel for Marshfield Clinic Health
System and Security Health Plan*

*/s/ Timothy W. Burns*
Timothy W. Burns
Nathan M. Kuenzi
**BURNS BAIR LLP**
10 E. Doty Street, Suite 600
Madison, WI 53703
Phone: (608) 286-2808
tburns@burnsbair.com
nkuenzi@burnsbair.com

Daniel J. Walker
Robert E. Litan
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Phone: (202) 559-9745
dwalker@bm.net
rlitan@bm.net

Eric L. Cramer
Zachary D. Caplan
Abigail J. Gertner
Grace Ann Brew
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
zcaplan@bm.net
agertner@bm.net
gbrew@bm.net

Jamie Crooks
Amanda R. Vaughn
**FAIRMARK PARTNERS LLP**
1825 7th Street, NW, Suite 821
Washington, DC 20001
Phone: 619-507-4182
jamie@fairmarklaw.com
amanda@fairmarklaw.com

*Counsel for Plaintiffs and the Proposed Class*

cc (via ECF):  Counsel for Defendants