# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| TEAM SCHIERL COMPANIES and HEARTLAND FARMS, INC., on behalf of themselves and all others similarly situated, | |
| *Plaintiffs,* | No. 3:22-cv-00580-jdp |
| v. | Hon. James D. Peterson, U.S.D.J. |
| ASPIRUS, INC. and ASPIRUS NETWORK, INC., | Hon. Anita M. Boor, U.S.M.J. |
| *Defendants* | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF <u>THEIR MOTION FOR CLASS CERTIFICATION</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 6

I.      Background on Health Insurance and the Proposed Class ...................................... 6

II.     Defendants Conspired to Fix Prices of Healthcare Services and Eliminate
Competition at a Network Level ........................................................................... 8

       A.    ANI Eliminates Price Competition by Setting Prices for All ANI
Members. ................................................................................................ 9

       B.    ANI Prevents Competition Through Exclusivity Clauses ....................... 11

       C.    ANI's All-Or-Nothing Contracting and Referral Trapping Amplify
the Scheme ............................................................................................ 13

III.    Plaintiffs Have Classwide Evidence Capable of Proving Their Claims ............... 14

       A.    Plaintiffs Have Common Evidence of Violation of the Sherman
Act ....................................................................................................... 15

       B.    Plaintiffs Have Common Evidence of Classwide Impact ....................... 17

            1.    Step 1: Classwide Evidence of Generalized Impact on Prices
.............................................................................................. 18

                a.    ANI Internal Documents and Testimony .......................... 18

                b.    Expert Analysis ............................................................... 20

            2.    Step 2: Classwide Evidence That Overcharges Were
Widespread. .......................................................................... 23

                a.    Qualitative Evidence of Widespread Impact ................... 23

                b.    Quantitative Evidence of Classwide Impact .................... 25

## TABLE OF CONTENTS
(continued)

Page

C. Plaintiffs Have Common Evidence of Aggregate Classwide Damages.................................................................................. 26

ARGUMENT ............................................................................................ 27

I. Standard for Class Certification............................................ 28

II. Plaintiffs Satisfy the Prerequisites of Rule 23(a).................................. 29

A. Numerosity: The Proposed Class Is Numerous. ....................................... 29

B. Commonality: Questions of Law and Fact are Common to the Class .................................................................................. 30

C. Typicality: The Proposed Class Representatives Are Typical.................. 30

D. Adequacy: The Proposed Class Representatives and Their Counsel Will Adequately Represent the Class. ....................................... 31

III. Plaintiffs Satisfy Rule 23(b)(3).............................................. 32

A. Common Questions of Law and Fact Predominate. ................................ 32

1. Violation is a Classwide Question Capable of Proof Through Common Evidence.......................................................... 33

a. Common Evidence is Capable of Proving the Existence of the Conspiracy. ........................................................ 34

b. Common Evidence is Capable of Proving an Unreasonable Restraint of Trade. ..................................... 35

2. Common Evidence Is Capable of Proving Classwide Impact ...................................................................... 37

a. Step 1: Plaintiffs have classwide evidence capable of showing that the Challenged Conduct inflated prices....... 38

b. Step 2: Plaintiffs have classwide evidence capable of showing that the inflated prices were paid by all or nearly all members of the class.......................................... 41

3. Common Evidence Is Capable of Proving Aggregate Damages........................................................................ 44

**TABLE OF CONTENTS**
(continued)

Page

B.    Classwide Treatment is a Superior Means of Adjudicating
Plaintiffs' Claims. ....................................................................................... 44

CONCLUSION ............................................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocate Health Care v. Mylan Labs., Inc.*,
    202 F.R.D. 12 (D.D.C. 2001) ............................................................................... 27

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................................... 1

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ........................................................................... 28, 32, 33, 36

*Arizona v. Maricopa Cnty. Med. Soc'y*,
    457 U.S. 332 (1982) ............................................................................................. 35

*ATA Airlines, Inc. v. Fed. Express Corp.*,
    665 F.3d 882 (7th Cir. 2011) ............................................................................... 40

*Beaton v. SpeedyPC Software*,
    907 F.3d 1018 (7th Cir. 2018) ............................................................................. 45

*Bell v. PNC Bank, Nat'l Ass'n*,
    800 F.3d 360 (7th Cir. 2015) ......................................................................... 29, 30

*Black v. Occidental Petroleum Corp.*,
    69 F.4th 1161 (10th Cir. 2023) ........................................................................... 38

*Blackburn v. Sweeney*,
    53 F.3d 825 (7th Cir. 1995) ........................................................................... 36, 37

*Bruzek v. Husky Oil Operations Ltd.*,
    520 F. Supp. 3d 1079 (W.D. Wis. 2021) ............................................................ 45

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) ......................................................................... 32, 45

*Castro v. Sanofi Pasteur Inc.*,
    134 F. Supp. 3d 820 (D.N.J. 2015) ..................................................................... 38

*Chavez v. Don Stoltzner Mason Contractor, Inc.*,
    272 F.R.D. 450 (N.D. Ill. 2011) .......................................................................... 29

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*,
    797 F.3d 426 (7th Cir. 2015) ............................................................................... 27

iv

*Dennis v. Andersons, Inc.*,
    2025 WL 1331795 (N.D. Ill. May 7, 2025) ........................................................ 5

*Deslandes v. McDonald's USA, LLC*,
    81 F.4th 699 (7th Cir. 2023) ................................................................. 16, 36

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter., Co.*,
    2016 WL 3579953 (E.D. Wis. June 24, 2016)................................................. 42

*FTC v. Ticor Title Ins. Co.*,
    504 U.S. 621 (1992)................................................................................... 4

*Giuliano v. Sandisk Corp.*,
    2015 WL 10890654 (N.D. Cal. May 14, 2015) ............................................... 39

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).................................................................................. 33

*Hanover Shoe v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968) .................................................................................. 5

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ................................................. 43

*In re Blood Reagents Antitrust Litig.*,
    2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) .................................................. 42

*In re Broiler Chicken Antitrust Litig.*,
    2022 WL 1720468 (N.D. Ill. May 27, 2022) ......................................... *passim*

*In re Broiler Chicken Grower Antitrust Litig. (No. II)*,
    2024 WL 2117359 (E.D. Okla. May 8, 2024) ....................................... *passim*

*In re Capacitors Antitrust Litig. (No. III)*,
    2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ......................................... 32, 43

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    308 F.R.D. 606 (N.D. Cal. 2015)................................................................. 42

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    581 F. Supp. 3d 1029 (N.D. Ill. 2022) ......................................................... 21

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    2024 WL 3509668 (N.D. Ill. July 22, 2024)............................................. 30, 44

*In re Domestic Drywall Antitrust Litig.*,
    322 F.R.D. 188 (E.D. Pa. 2017)................................................................. 43

*In re High Fructose Corn Syrup Antitrust Litig.*,
     295 F.3d 651 (7th Cir. 2002) ........................................... 42

*In re Korean Ramen Antitrust Litig.*,
     2017 WL 235052 (N.D. Cal. Jan. 19, 2017) .................... 43

*In re Nassau Cnty. Strip Search Cases*,
     461 F.3d 219 (2d Cir. 2006) ............................................ 35

*In re Nexium Antitrust Litig.*,
     777 F.3d 9 (1st Cir. 2015) ............................................... 37

*In re NorthShore Univ. HealthSystem Antitrust Litig.*,
     657 F. Supp. 3d 1077 (N.D. Ill. 2023) ........................... 40

*In re Packaged Seafood Prods. Antitrust Litig.*,
     2019 WL 3429174 (S.D. Cal. July 30, 2019) .................. 40

*In re Packaged Seafood Prods. Antitrust Litig.*,
     332 F.R.D. 308 (S.D. Cal. 2019) .................................... 43

*In re Playmobil Antitrust Litig.*,
     35 F. Supp. 2d 231 (E.D.N.Y. 1998) ............................. 27

*In re Ready-Mixed Concrete Antitrust Litig.*,
     261 F.R.D. 154 (S.D. Ind. 2009) .................................... 31

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
     335 F.R.D. 1 (E.D.N.Y. 2020) ........................................ 38

*In re Rubber Chems. Antitrust Litig.*,
     232 F.R.D. 346 (N.D. Cal. 2005) .................................... 34

*In re Scrap Metal Antitrust Litig.*,
     527 F.3d 517 (6th Cir. 2008) .......................................... 34

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
     267 F.R.D. 291 (N.D. Cal. 2010) .................................... 40

*In re Turkey Antitrust Litig.*,
     2025 WL 264021 (N.D. Ill. Jan. 22, 2025) ............... *passim*

*Kleen Prods. LLC v. Int'l Paper*,
     306 F.R.D. 585 (N.D. Ill. 2015) .................................. 6, 39

*Kleen Prods. LLC v. Int'l Paper Co.*,
     831 F.3d 919 (7th Cir. 2016) ..................................... *passim*

*Kohen v. Pac. Inv. Mgmt. Co.*,
    571 F.3d 672 (7th Cir. 2009) ................................................................. 40, 41

*Le v. Zuffa, LLC*,
    2023 WL 5085064 (D. Nev. Aug. 9, 2023) ...................................... 43

*Lytle v. Nutramax Labs., Inc.*,
    114 F.4th 1011 (9th Cir. 2024) ............................................................. 28

*Mejdrech v. Met-Coil Sys. Corp.*,
    319 F.3d 910 (7th Cir. 2003) ................................................................. 45

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ......................................................... *passim*

*Moehrl v. Nat'l Ass'n of Realtors*,
    2023 WL 2683199 (N.D. Ill Mar. 29, 2023) ................................... *passim*

*Morrison v. Olson*,
    487 U.S. 654 (1988) ................................................................................... 4

*Mr. Dee's Inc. v. Inmar, Inc.*,
    2022 WL 3576962 (M.D.N.C. Aug. 19, 2022) ................................. 39

*N. Tex. Specialty Physicians v. FTC*,
    528 F.3d 346 (5th Cir. 2008) ................................................................. 36

*Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ................................................... 38, 41, 43

*Pella Corp. v. Saltzman*,
    606 F.3d 391 (7th Cir. 2010) ......................................................... 36, 41

*Ross v. Gossett*,
    33 F.4th 433 (7th Cir. 2022) ................................................................. 32

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ............................................................. 36

*Saltzman v. Pella Corp.*,
    257 F.R.D. 471 (N.D. Ill. 2009) ........................................................... 31

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ................................................................................. 28

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ............................................................... 41

*Toys "R" Us,* Inc. v. FTC,
     221 F.3d 928 (7th Cir. 2000) ...................................................................... 16, 17

*Tyson Foods, Inc. v. Bouaphakeo*,
     577 U.S. 442 (2016)......................................................................... 29, 32, 33

**Statutes**

Sherman Act, 15 U.S.C. § 1 ................................................................................ 1, 3, 33

**Rules**

Fed. R. Civ. P. 23(a) ........................................................................................ 28, 29, 30

Fed. R. Civ. P. 23(b)(3)........................................................................................... *passim*

**Other Authorities**

6 Newberg & Rubenstein on Class Actions § 20:23 (6th ed. 2025) ................................ 4

6 Newberg & Rubenstein on Class Actions § 20:51 (6th ed. 2025) .............................. 35

6 Newberg & Rubenstein on Class Actions § 20:54 (6th ed. 2025) .............................. 44

7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane,
     *Federal Practice and Procedure* § 1781 (3d ed.) ........................................... 34

## INTRODUCTION

This antitrust case is about an illegal agreement in restraint of trade—price fixing—in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs allege, and the evidence shows, that Defendants set uniform prices for outpatient professional services across both Aspirus-owned healthcare providers and dozens of "independent" outpatient providers, eliminating price competition in North-Central Wisconsin. As a result, Defendants and their co-conspirators charged inflated prices: surpassing the Wausau metro area average, the Wisconsin average, and the national average. *See* Ex. 1, Expert Report of David Dranove, Ph.D. (Mar. 26, 2025) ("DR1") ¶ 131 & n.153; Ex. 2, Reply Report of David Dranove, Ph.D. (June 11, 2025) ("DR2") ¶¶ 50-51 & Table 1.[1] Indeed, a recent RAND Corporation study ranked Aspirus as the eleventh most expensive health system out of 303 studied across the country. Ex. 1, DR1 ¶ 133. Courts routinely recognize price-fixing cases like this one as appropriate for class treatment under Rule 23. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (the test for class certification is "readily met in certain cases alleging . . . violations of the antitrust laws").

The proposed class representatives ("Plaintiffs") are Team Schierl Companies ("TSC"), a family-owned Stevens Point-based firm that primarily operates various consumer businesses, and Heartland Farms, Inc. ("Heartland"), a fifth-generation Wisconsin family farm that primarily grows potatoes for commercial purchasers. Plaintiffs, like all members of the proposed class, pay for the medical services consumed by the members of their health insurance plans ("Payors").

Defendants are Aspirus, Inc. ("Aspirus"), the dominant health system in North-Central Wisconsin, and its subsidiary Aspirus Network, Inc. ("ANI"). ANI is a membership organization

---

[1] Exhibits are attached to the contemporaneously filed Declaration of Daniel J. Walker in Support of Plaintiffs' Motion for Class Certification and are cited as "Ex. __". Per this Court's Electronic Filing Procedures V.E., deposition transcripts have been filed on the docket and are noted with their ECF Numbers.

comprising both Aspirus-owned facilities and providers ("Aspirus Providers") and dozens of ostensibly "independent" outpatient providers who would otherwise be Aspirus's competitors ("Co-Conspirators") (Aspirus Providers and Co-Conspirators are, collectively, "ANI Providers"). ANI negotiates pricing contracts on behalf of all ANI Providers with companies that assemble healthcare provider networks ("Network Vendors") for insurance plans. These contracts fix the prices that Payors pay to all ANI Providers—both Aspirus Providers and Co-Conspirators.

Defendants—through ANI—thus orchestrated a scheme to eliminate competition and fix prices among ANI Providers. Plaintiffs challenge the two primary elements (collectively, the "Challenged Conduct") of the scheme: (1) **Price Fixing**: Defendants and their Co-Conspirators agreed—both orally and in writing—that ANI would set uniform prices for *all* ANI Providers in joint negotiations with Network Vendors, eliminating price competition among Aspirus and the Co-Conspirators, who would otherwise be truly independent, competing providers; and (2) **Exclusivity**: Defendants and their Co-Conspirators agreed, as a condition of ANI membership, not to enter into separate, competing contracts with Network Vendors, and ANI enforced this requirement. Defendants also employed other tactics that amplified the conspiracy and deepened its anticompetitive effects. These include: "all-or-nothing" contracting, whereby Defendants required that a Network Vendor that wanted to contract with *any* ANI Provider must contract with *all* ANI Providers, and "referral trapping," whereby Defendants required ANI Providers largely to refer patients to other ANI Providers.

Extensive evidence, discussed below, shows that this scheme eliminated price competition among ANI Providers and inflated prices for "outpatient professional services"—*i.e.*, healthcare

2

services performed in an outpatient setting—across North-Central Wisconsin.[2] This evidence includes publicly available documents, evidence and testimony obtained in discovery, publicly and non-publicly available data, and expert testimony and analysis. All of this evidence is common to the proposed class.

> Plaintiffs move to certify the following class ("Class"):
>
> All Payors whose funds were used to pay Defendants and/or their Co-Conspirators for in-network outpatient professional services provided in North-Central Wisconsin, during the period October 11, 2018, up to and including June 30, 2023 (the "Class Period").
>
> Excluded from this Class are (1) individuals or entities whose only payments to Defendants were co-pays, coinsurance, and/or other out-of-pocket payments, or any payments for out-of-network claims, and (2) individuals or entities that paid for only one claim. Also excluded from this Class are Aspirus, ANI, Aspirus Health Plan, and their officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all federal governmental entities.[3]

Plaintiffs also seek appointment of TSC and Heartland as Class Representatives under Rule 23(a)(4), and of Berger Montague PC and Fairmark Partners, LLP as Co-Lead Class Counsel under Rules 23(a)(4) and 23(g).

*     *     *

---

[2] Plaintiffs also alleged that this conduct violates Section 2 of the Sherman Act. With fact discovery largely complete, Plaintiffs now focus on how this scheme violates Section 1 and inflated prices for outpatient professional services.

[3] Plaintiffs move in the alternative to certify a narrower class defined as: "All Payors whose funds were used to pay Defendants and/or their Co-Conspirators for in-network outpatient professional services provided in North-Central Wisconsin, during the period October 11, 2018, up to and including June 30, 2023 (the "Class Period") and who used The Alliance, Anthem, Security Health Plan, UnitedHealthcare, and/or UnitedHealthcare Management Resources as a Network Vendor and/or TPA." This alternative class includes the same exclusions as the primary Class. This alternative is narrower in that membership and damages are limited to those who appear in the data collected from the Network Vendors and TPAs listed in the definition, and thus, there is no extrapolation required for a damages calculation. The extrapolation is discussed at pages 26-27, *infra.*

3

Plaintiffs have classwide evidence capable of proving each element of their antitrust claim: "(1) a violation of antitrust law, (2) individual injury, or impact, caused by that violation, and (3) measurable damages." *In re Turkey Antitrust Litig.*, 2025 WL 264021, at *6 (N.D. Ill. Jan. 22, 2025) (cleaned up).

**Violation.** Plaintiffs allege, and the evidence shows, that Defendants engaged in an anticompetitive scheme to eliminate competition and fix prices for outpatient professional services in North-Central Wisconsin. "No antitrust offense is more pernicious than price fixing." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 639 (1992). And unlike the typical price-fixing case where a plaintiff must prove some secret backroom deal, "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). Defendants told the Co-Conspirators that if they gave ANI "███████████████████████" ANI would "████████████████ ██████████████████████████" for all of them. Ex. 3, TEAM-SCHIERL-ASPIRUS-0002488, at -489. Providers who joined ANI recognized that doing so eliminated price competition: "████████████████████████████████████████████ ██████" Melenbacker Dep. at 39:25–40:3 (ECF No. 180). ANI also recognized that the exclusivity requirement worked "██████████████████████████████," Ex. 4, TEAM-SCHIERL-ASPIRUS-0036590, at -591, *i.e.*, to prevent price competition from lowering prices.

"Price fixing cases are generally well-suited for class action adjudication," 6 Newberg & Rubenstein on Class Actions § 20:23 (6th ed. 2025), and this one especially so. The Challenged Conduct was set out in form contracts that ANI required Co-Conspirators to sign. Defendants negotiated with Network Vendors for the prices to be charged by all ANI Providers, and all Co-Conspirators were participants in every such contract. The conspiracy is textbook: Defendants

4

and Co-Conspirators agreed to avoid "█████" and instead charge the same (high) prices. Defendants monitored compliance with the conspiracy and threatened to expel any Co-Conspirator who attempted to separately contract with Network Vendors. That conduct is *per se* illegal and is the same for all class members, making classwide resolution appropriate.

**Impact.** Antitrust injury (or "impact") is presumptively recognized as an inevitable incident of price-fixing, and it will be established here where the prices every class member paid for outpatient professional services were set through the alleged conspiracy, not free competition. *See*, *e.g.*, *In re Turkey Antitrust Litig.*, 2025 WL 264021, at *14 ("This is consistent with [the] 'prevailing view' that 'price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated.'" (quoting *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 600 (N.D. Ill. 2015)).

The injury is an overcharge, which is incurred the moment a purchaser pays an inflated price. *See Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968); *Dennis v. Andersons, Inc.*, 2025 WL 1331795, at *9 (N.D. Ill. May 7, 2025) ("[A]n antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset.").

Plaintiffs have a wealth of classwide evidence of impact. Plaintiffs and their experts use the "broadly accepted two-step method" to show classwide impact—first, that Defendants' conduct artificially inflated prices in the aggregate, and second, that all or virtually all class members paid overcharges. *In re Broiler Chicken Grower Antitrust Litig. (No. II)*, 2024 WL 2117359, at *29 (E.D. Okla. May 8, 2024) ("*Chicken Grower*") (collecting precedent). Plaintiffs also offer analyses from two prominent economic experts. Dr. David Dranove, a PhD economist and the Walter J. McNerney Distinguished Professor of Health Industry Management at Northwestern University, reviews extensive record evidence and performs numerous statistical analyses showing how the Challenged Conduct inflates prices. Dr. Jeffrey Leitzinger, a PhD

economist with more than four decades of experience analyzing market effects in antitrust matters, relies on record evidence and numerous statistical analyses to quantify the extent of the inflation. Dr. Leitzinger also analyzes record and empirical evidence showing that all or virtually all members of the Class paid an overcharge.

**Damages.** Dr. Leitzinger calculates aggregate damages to the proposed Class of ███ ███. His method for doing so is standard in antitrust class actions. More importantly, his method for calculating damages is common to the Class as a whole.

The evidence reveals plainly anticompetitive conduct, but the Court is not asked at this stage to decide whether Plaintiffs will win at trial. It need only decide whether Plaintiffs have classwide evidence "capable of" showing that Defendants engaged in unlawful conduct that harmed the Class. *E.g.*, *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 818 (7th Cir. 2012). The answer is clear, as it is in virtually all price-fixing cases: whether the price-fixing conspiracy took place, whether it was *per se* illegal, whether it inflicted widespread harm, and the class's aggregate damages are all common questions with classwide answers. This is the "prototypical" example of a case in which common issues predominate. *Kleen Prods.*, 306 F.R.D. at 594.

Plaintiffs respectfully request that the Court certify the proposed Class and appoint the proposed Class Representatives and Class Counsel under Rules 23(a), 23(b)(3), and 23(g).

## FACTUAL BACKGROUND

### I.    Background on Health Insurance and the Proposed Class

Many businesses, local governments, and unions provide health insurance plans to employees or members. Some establish "fully insured" plans, in which they and their employees pay premiums to a commercial insurance company, which in turn pays bills from healthcare providers. Ex. 1, DR1 ¶ 50. Others operate "self-funded" plans, in which they pay bills from

healthcare providers and bear the insurance risk themselves. *Id.* In health insurance parlance, both the commercial insurance companies who pay bills for fully insured plans and the self-funded employers who pay bills themselves are "Payors," reflecting that they pay for covered healthcare services consumed by patients. Ex. 1, DR1 ¶ 53. Plaintiffs and the Class are Payors. Defendants and the Co-Conspirators are healthcare providers.

The prices that Payors pay for medical services are determined in negotiations between healthcare providers and Network Vendors.[4] Ex. 1, DR1 ¶¶ 9 n.1, 47. Network Vendors negotiate with providers and assemble provider networks, which consist of healthcare providers that have agreed to provide services at negotiated prices. *Id.* ¶ 47. To have a marketable network, Network Vendors typically need to contract with a wide variety of providers and facilities. *Id.* ¶ 59 & n.62. This is what it means for a provider to be "in-network" for a healthcare plan—an in-network provider is one that agreed to prices negotiated with the Network Vendor. *Id.* ¶ 47; Ex. 5, Expert Report of Jeffrey J. Leitzinger, Ph.D. (Mar. 26, 2025) ("LR1") ¶¶ 15-16. Payors can then pay for access to a Network Vendor's provider network and pre-negotiated rates, selecting whichever network has their desired price and non-price characteristics. Ex. 1, DR1 ¶ 49. Patients typically have financial incentives to use in-network providers so they can access the pre-negotiated rates, which in turn means that providers will generally get more patient volume if they are selected as an in-network provider. *Id.* ¶ 48.

---

[4] Some entities (*e.g.*, The Alliance) are typically only Network Vendors and do not act as Payors. Some entities are both Network Vendors and Payors (*e.g.*, Anthem Blue Cross/Blue Shield of Wisconsin ("Anthem")). Ex. 5, LR1 ¶ 9 n.1. In the latter case, Anthem would typically serve as its own Network Vendor. *Id.* Plaintiffs collected, and Plaintiffs' experts used, healthcare purchase data from The Alliance, Anthem, and other Network Vendors and Payors. For simplicity, this brief uses the term "Network Vendor" to refer to an entity in its role assembling an insurance network by negotiating with healthcare providers.

The Class is limited to Payors who paid ANI Providers in-network rates for outpatient professional services.[5] Thus, the price negotiations between Defendants and Network Vendors—and Defendants' distortion of them—are at the center of this case. Because Network Vendors represent large numbers of prospective patients, they typically negotiate discounted prices from healthcare providers in exchange for access to the increased patient volume that follows from being in-network. Ex. 5, LR1 ¶ 15. If a healthcare provider does not provide sufficiently high-quality services at sufficiently competitive rates, the Network Vendor can exclude them from the network in favor of other healthcare providers. *See* Ex. 1, DR1 ¶¶ 56-58 (describing "▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮"). This competition among healthcare providers to be included in provider networks plays an important role in reducing healthcare costs. *Id.*

A Network Vendor's willingness to agree to higher rates for a provider depends on how problematic it would be for the Network Vendor to exclude that provider from its network (*i.e.*, how much less attractive the network would be to Payors if that provider were not in-network). *Id.* ¶¶ 62-64. Conversely, a provider's willingness to offer lower rates to a Network Vendor depends on how problematic it would be for the provider to be excluded from the Network Vendor's network (*i.e.*, how much patient volume the provider would lose if it does not participate in the Network Vendor's network). *Id.* ¶¶ 65-74.

## II.    Defendants Conspired to Fix Prices of Healthcare Services and Eliminate Competition at a Network Level.

Plaintiffs allege that Defendants and their Co-Conspirators used an anticompetitive scheme to prevent price competition in negotiations with Network Vendors, enabling them to impose inflated prices on Plaintiffs and the proposed Class.

---

[5] For the sake of clarity, payments for out-of-network healthcare services and patient contributions like co-pays are not part of this Class or case.

Aspirus is by far the dominant healthcare provider in North-Central Wisconsin. Ex. 1, DR1 ¶¶ 21-23, 128-51. Aspirus operates hospitals, outpatient clinics, and other facilities at which it provides a variety of healthcare services, including outpatient professional services. *Id.* ¶ 33. Aspirus employs well over a thousand healthcare providers. *Id.* ANI is a membership organization of healthcare providers whose membership includes all Aspirus employed providers, as well as the Co-Conspirators who, in the absence of Defendants' scheme, would compete with Aspirus on price for outpatient professional services. *Id.* ¶ 11. ANI styles this cooperation among competitors as a "clinically integrated network" ("CIN") of healthcare providers. Ex. 5, LR1 ¶ 12. Here, however, it operates as a price-fixing scheme. Further, to the extent relevant, the ANI CIN does not offer true clinical integration and is not necessary to achieve clinical integration.

## A.    ANI Eliminates Price Competition by Setting Prices for All ANI Members.

Defendants and the Co-Conspirators, through ANI, engaged in a scheme to eliminate price competition among them for inclusion in provider networks. As a condition of joining ANI, ANI requires all Co-Conspirators to sign a standard form contract that gives ANI authority to negotiate prices on their behalf. Ex. 1, DR1 ¶ 13; Ex. 5, LR1 ¶ 21; *see, e.g.*, Ex. 6, TEAM-SCHIERL-ASPIRUS-0380925, at -928 (provider agrees to ███████████████████████ ██████████████████████████████████████████ ).

ANI then enters into one contract with each Network Vendor on behalf of all ANI Members at once, setting uniform prices that apply to all ANI Members for each of the healthcare services offered, including the outpatient professional services at issue here. One ANI executive testified that "████████████████████████████████████████████████████ ████████████████████████████████." Boggs Dep. at 78:14-17 (ECF No. 155); *see also* Ex. 7, TEAM-SCHIERL-ASPIRUS-0349910, at slide 9 ("████████████████████████ ██████████████████████████████████████████████████"); Hammig Dep.

at 54:1-20 (ECF No. 177) (" ██████████████████████████████

██████████████████████████████████████ "). *See generally* Ex. 1, DR1 ¶

152.

ANI used its " ████████████████████ " to set uniform rates for all ANI Members,

eliminating all price competition among them. Each medical procedure has a "billing code," and

classwide evidence shows that, in each of its contracts with Network Vendors, ████████████

█████████████████████████████████ . *See* Boggs Dep. at 242:25-243:8

(ECF No. 155) (" ██████████████████████████████████████

██████████████████████ "). Indeed, ANI negotiators told one Network Vendor that

" ██████████████████████████████████████

██████████ ." Ex. 8, TEAM-SCHIERL-ASPIRUS-0582661, at -662. Similarly, when a

prospective ANI member asked ANI whether it would be paid the same as other ANI members,

the ANI executive in charge of communicating with the Co-Conspirator practices responded

████████████ : " ████████████████████████████████ " Ex. 9, TEAM-

SCHIERL-ASPIRUS-0035792; *see also* Peck Dep. at 145:10-13 (ECF No. 181) (" ████████

██████████████████████████████████████

██████████████████████ "). This joint price-setting is not incidental—

it is, in ANI's words, " ██████████████████████████████████ "

Ex. 3, TEAM-SCHIERL-ASPIRUS-0002488, at -489.

Defendants and their Co-Conspirators also agreed on ██████████████ that ANI would

use during contract negotiations to ensure that the same benefits were achieved consistently across

*all* negotiations with Network Vendors. *See*, *e.g.*, Ex. 10, TEAM-SCHIERL-ASPIRUS-0271961,

at -963. As the ANI executive in charge of contract negotiation testified, these ██████████ " █

████████████████ " that were used " ██████████████████████████████ " and

10

ultimately to "███████████████████████." Hammig Dep. at 66:3-68:12 (ECF No. 177).

As Dr. Dranove explains, ANI's joint price-setting "███████████████████ ██████████████████████████████████████████████████████ ████████████████████." Ex. 1, DR1 ¶ 24. Indeed, one Co-Conspirator recognized that ANI's joint price-setting meant that they no longer competed on price with ANI Members: "██████████████████████████████████████." Melenbacker Dep. at 39:25–40:3 (ECF No. 180). ANI acknowledged that it engages in this joint price-setting with the express goal of "███████████████████████████," *i.e.*, to prevent ANI members from ███████████████████████████████████. Ex. 4, TEAM-SCHIERL-ASPIRUS-0036590, at -591. ANI documents discuss the imperative to prevent "███████" among ANI Members, Ex. 1, DR1 ¶¶ 29, 187, and warn that "█████████ ███" if "████████████" were "█████████████," *id.* ¶ 188. *See also id.* ¶¶ 187-93. The Co-Conspirators understand that the conspiracy is designed to reduce competition and increase prices. As one testified, "████████████" for being an ANI Member is the "████████" prices members receive. *Id.* ¶ 195.

### B.     ANI Prevents Competition Through Exclusivity Clauses.

One problem that price-fixing conspiracies face is the possibility that some conspirators will break from the conspiracy and "offer some buyers a slightly lower price, and thereby capture additional sales and additional profits." Ex. 1, DR1 ¶ 85 n.87. To prevent this, ANI requires that every Co-Conspirator agree to a so-called "limited exclusivity" provision, which prohibits them from negotiating direct agreements with any Network Vendor that already contracts with ANI. *See*, *e.g.*, Ex. 6, TEAM-SCHIERL-ASPIRUS-0380925, at -932 (provider agrees to "████████ ████████" provision). The same provision further prohibits ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████. *See id.* Importantly, however,

ANI contracts with "████████████████████████████████." Boggs Dep. at 224:2-5

(ECF No. 155); *see also* Ex. 1, DR1 ¶ 37 n.27. Thus, this exclusivity provision restrains the major

source of price competition for outpatient professional services that Defendants would have faced.

     Classwide evidence demonstrates that despite the so-called "████" nature of the

exclusivity provision, Defendants routinely interpreted it very broadly in communications with

ANI members. For example, ANI's former Administrative Director of Payor Strategy took the

position with one Co-Conspirator that ANI does not allow direct contracts with any Payors or

Network Vendors "████████████████████████████." Ex. 11, TEAM-SCHIERL-ASPIRUS-

0192464, at -465. And he took the position with another that direct contracts would only be

allowed if the *patients* were coming "████████████████████████." Ex. 12, TEAM-

SCHIERL-ASPIRUS-0321093, at -094. Indeed, ANI has prohibited the Co-Conspirators from

even talking to Network Vendors with whom ANI has a contract.[6] ANI members testified that they

understood that the exclusivity provision gives ANI veto power over any direct contract a member

might want to pursue with a Network Vendor. Melenbacker Dep. at 44:18-25 (ECF No. 180)

(ANI's "████" was "██████" for an ANI member to ████████████████████████);

Turner Dep. at 83:3-9 (ECF No. 184) (ANI member "██████████████████████" to

contract with a Network Vendor).

---

[6] Ex. 14, Alliance_Schierl_00009584, at -84 (notifying Network Vendor that "████████████
████████████████" would be "████████████████████████████████████
████████"); Ex. 15, TEAM-SCHIERL-ASPIRUS-0154104 (ANI Executive memorializing
conversation with ANI Member in which she informed its CEO that "████████████████████
████████████████████████").

Defendants highly valued and strictly enforced the exclusivity requirement. Internal documents note that "████████████████████████" as a core part of ANI's "████████." Ex. 13, TEAM-SCHIERL-ASPIRUS-0169757, at slide 3. ANI told one Network Vendor that it "████████████████████████████████████████████████████████████████," and that ANI Members—who, again, should be competing—"████████████████████████████████████████." Ex. 16, NOVO_0002316, at -317. And ANI repeatedly rejected ANI Members' requests to contract outside of ANI. As ANI's executive in charge of communicating with members explained to one Co-Conspirator, "████████████████████████████████████████████████████████." Ex. 17, TEAM-SCHIERL-ASPIRUS-0255235. Or as she explained to another, "████████████████████████████████████████." Ex. 18, TEAM-SCHIERL-ASPIRUS-0017707, at -708; *see also* Ex. 1, DR1 ¶ 197 & n.243-79 (providing many more examples); Ex. 2, DR2 ¶¶ 162-63 (discussing limited occasions in which ████████████████████████████).

As Dr. Dranove explains, ████████████████████████████████████████████████████████████████████████████████████████████████████████████." Ex. 1, DR1 ¶ 155.

### C.    ANI's All-Or-Nothing Contracting and Referral Trapping Amplify the Scheme.

Classwide evidence shows that Defendants engaged in additional conduct—"all-or-nothing" contracting and "referral trapping"—that reinforced the Challenged Conduct. Ex. 1, DR1 ¶ 37 & n.23. With respect to "all-or-nothing" contracting, ANI requires a Network Vendor

that wants (or needs) to include *any* ANI Provider in its network to include *all* ANI Providers in its network. *See, e.g., id.*; Ex. 19, TEAM-SCHIERL-ASPIRUS-0581254, at -255 (Aspirus CFO writing "█████████████████████████████████████████████████████

███████████████████████████████████ [.]"); Lathers Dep. at 68:24-69:8 (ECF No. 178) (Network Vendor testifying that ████████████████████████████████

████). This all-or-nothing contracting spread the anticompetitive effects of the Challenged Conduct across the entire bundle of outpatient professional services.

Defendants and the Co-Conspirators also engaged in "referral trapping," meaning that ANI Providers generally agreed to refer patients to other ANI Providers. *See, e.g.,* Lawrence Dep. at 30:21-23 (ECF No. 179) ("███████████████████████████████."); *id.* at 32:5-9 ("████████████████████████████."); Sutherland Dep. at 132:3-133:8 (ECF No. 183) (member testifying to his understanding that ANI contract requires, "████████████

████████████████████████"). This was an incentive to join the conspiracy and a barrier to competition. Ex. 1, DR1 ¶ 202 & n.286-90; *see also, e.g.,* Ex. 20, TEAM-SCHIERL-ASPIRUS-0479436 (Aspirus CEO stating that █████████████████████████████

███████████████████████████); Brewer Dep. at 31:24-32:6 (ECF No. 176) ("██

█████████████████████████████); Lawrence Dep. at 98:27 (ECF No. 179) (██████████████████████████████████████████████

████████████████████████). Internal documents show that over ██████████ of referrals stay within the ANI Providers. Ex. 1, DR1 ¶ 202 n.286-87.

## III. Plaintiffs Have Classwide Evidence Capable of Proving Their Claims.

Plaintiffs allege that Defendants engaged in the Challenged Conduct to fix the prices for outpatient healthcare professional services in North-Central Wisconsin. The questions whether the

conspiracy existed and harmed the Class—and the evidence capable of answering those questions—are all classwide because they will be the same for every Class member.

### A.    Plaintiffs Have Common Evidence of Violation of the Sherman Act.

Plaintiffs have substantial record and expert evidence capable of proving that Defendants and their Co-Conspirators engaged in the Challenged Conduct, and thereby fixed the prices of outpatient professional healthcare services in violation of the Sherman Act.

The agreement is set forth in written contracts between Defendants and the Co-Conspirators, and it is confirmed by substantial record evidence. *Supra* at 9-13. ANI's scheme was implemented uniformly. ANI jointly negotiated and fixed rates for *all* ANI Members in *all* Network Vendor contracts. *Supra* at 9-11; Ex. 1, DR1 ¶¶ 24, 37 & nn.25-26. This was an "█████ ████████████████████████████████████████████." Ex. 8, TEAM-SCHIERL-ASPIRUS-0582661, at -662; *see also* Ex. 21, TEAM-SCHIERL-ASPIRUS-0342604, at -605 ("█████ ████████████████████████████████████████"); Boggs Dep. at 242:25-243:8 (ECF No. 155) (confirming that "████████████████████████████████ ████████████████"); Ex. 1, DR1 ¶¶ 87, 152; Ex. 5, LR1 ¶¶ 46-55.

ANI reinforced this joint price-fixing by demanding exclusivity from Co-Conspirators, preventing them from separately negotiating lower prices with Network Vendors. *Supra* at 11-13. The so-called "███████████" provision appears in all contracts between ANI and the Co-Conspirators, *see* Ex. 1, DR1 ¶ 37 n.27; Ex. 2, DR2 ¶ 141, and was enforced as a core part of ANI's "██████████," Ex. 13, TEAM-SCHIERL-ASPIRUS-0169757, at slide 3; Ex. 22, TEAM-SCHIERL-ASPIRUS-0160556 (describing exclusivity requirement as "████ ██████" of ANI). ANI reinforced its joint price-setting and spread the effects of the Challenged Conduct through "████████" negotiation tactics. ANI "███████████████████," Hammig Dep. at 137:2–21 (ECF No. 177), and required Network Vendors to "█████████

████████████████████████████," Boggs Dep. at 82:10-13 (ECF No. 155). According to Aspirus's CFO, "██████████████████████████████████████████████ ████████████████████████████████████████████" Ex. 19, TEAM-SCHIERL-ASPIRUS-0581254, at -255 (emphasis added); *see also* Ex. 1, DR1 ¶ 37.

Price fixing is per se illegal, and thus Plaintiffs should not have to prove the existence of market power. *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023). Nevertheless, if required, market power can be shown through direct or indirect evidence, *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000), and Plaintiffs have both types.

Direct evidence of anticompetitive effects—here, supracompetitive prices—is proof of market power. *Toys "R" Us*, 221 F.3d at 937. Plaintiffs' classwide direct evidence includes economic analysis showing supracompetitive prices, Ex. 5, LR1 ¶¶ 28, 35-36, 38-39, 40-44 & Ex. 7; Ex. 23, Rebuttal Report of Jeffrey J. Leitzinger, Ph.D. (June 11, 2025) ("LR2") ¶¶ 58-89; Ex. 24, Supplemental Report of Jeffrey J. Leitzinger, Ph.D. (June 11, 2025) ("SLR") ¶¶ 28, 35-36, 38-39; 44 & Ex. 7; *see also* DR1 ¶¶ 167-169, 173-175, 181-185.

ANI and Network Vendors also recognized Defendants' market power. *See*, *e.g.*, Ex. 25, TEAM-SCHIERL-ASPIRUS-0021687 ("████████████████████████████████████ ██████████████████████████████████████████████████."); Lathers Dep. at 81:17-83:8 (ECF No. 178) (Anthem BCBS contract negotiator: ████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████). Defendants recognized their prices were high. For example, ANI's Administrative Director of Payor Strategy stated in 2019 that "████████████████████████████████████████████████." Ex. 26, TEAM-SCHIERL-ASPIRUS-0435485. Network Vendors understood that ANI's rates

were high, too. For example, one Network Vendor complained that Aspirus was "███████"

compared to the rest of the market. Ex. 27, TEAM-SCHIERL-ASPIRUS-0094633.

Indirect evidence typically includes evidence of a sufficient share of a well-defined antitrust market. *Toys "R" Us*, 221 F.3d at 937. Dr. Dranove performs numerous quantitative analyses and cites substantial record evidence in defining the relevant markets and concluding that Defendants and the Co-Conspirators collectively possessed market shares reflecting substantial market power. Ex. 1, DR1 ¶¶ 88-150; *id.* at App'x G13-18; Ex. 2, DR2 ¶¶ 22-24, 30-35, 37-38; *see generally* Ex. 28, Supplemental Report of David Dranove, Ph.D. (June 11, 2025) (updating market share figures with updated Anthem data).

This is just a sample of Plaintiffs' evidence of market power. The questions of whether Plaintiffs need to prove market power, and if so, whether Defendants and the Co-Conspirators possessed substantial market power, are all common to the Class. And those common questions will be answered with classwide evidence.

### B.    Plaintiffs Have Common Evidence of Classwide Impact.

Plaintiffs have classwide qualitative and quantitative evidence that the Challenged Conduct caused supracompetitive prices and that overcharges were paid by all or virtually all members of the Class. *See* Ex. 1, DR1 ¶¶ 156-205; Ex. 5, LR1 ¶¶ 29-35, 45-59; Ex. 23, LR2 ¶¶ 23-57. This evidence, summarized here and addressed below, is set forth in two steps. Step 1 is the classwide evidence showing that the Challenged Conduct artificially inflated prices. Step 2 is the classwide evidence showing that the price inflation was experienced broadly across the Class. *See, e.g.*, *Chicken Grower*, 2024 WL 2117359, at *29 (noting two-step methodology is widely accepted).

1. **Step 1: Classwide Evidence of Generalized Impact on Prices**

   a. **ANI Internal Documents and Testimony**

ANI's own documents reveal that the Challenged Conduct enables ANI Members to avoid price competition and set higher prices. Ex. 1, DR1 ¶¶ 129-134, 187-196; Ex. 5, LR1 ¶¶ 22-27. For instance, ANI states in ordinary course documents that the Challenged Conduct prevents "█████████" among the members and that the members are "████████████." Ex. 29, TEAM-SCHIERL-ASPIRUS-0288158, at slide 6. ANI's Executive Director made a similar statement, writing that "████████████████████████████████████." Ex. 4, TEAM-SCHIERL-ASPIRUS-0036590, at -591. ANI's employees have likewise stated that one of ANI's "██████████████████" is "██████████████████████████████████████████████████████████████." Ex. 3, TEAM-SCHIERL-ASPIRUS-0002488, at -489. This "█████████" results directly from the Challenged Conduct, which "████████████████████████████████████████████████████████████████." Ex. 1, DR1 ¶ 192.

ANI's internal documents and testimony confirm the concrete benefits it expected and achieved from the Challenged Conduct. The ANI executive in charge of communicating with the Co-Conspirator practices testified that, because of the Challenged Conduct, "██████████████████████████████████████" than if they negotiated independently. Boggs Dep. at 112:24-113:13 (ECF No. 155). Internal documents show that ANI considered the "█████" of the Challenged Conduct to be "████████████████," and estimated the value of some of Challenged Conduct to be ██████████████████████████████. Ex. 21, TEAM-SCHIERL-ASPIRUS-0342604, at -605.

Common evidence also confirms that Aspirus knew ██████████████████████████████ ██████████████████. Ex. 1, DR1 ¶ 191.a-f. In testimony, one ANI executive

confirmed that ANI includes "█████████████████████████████████████." Boggs Dep. at 125:15-19 (ECF No. 155). Similarly, Aspirus's long-time CFO testified that Aspirus Providers "███████████████████████████." Sczygelski Dep. at 72:3-8 (ECF No. 182). Aspirus knew that the Challenged Conduct eliminated price competition with those would-be competitors. *See supra* at 9-13. According to a 2018 letter from ANI's Executive Director, the purpose of the Challenged Conduct's exclusivity component is to █████████████████████████ █████████████████████████████ "████████████████████████████." Ex. 30, BJC0000068.

Finally, documents confirm that Defendants and the Co-Conspirators had high prices. *Supra* at 16-17; *see also* Ex. 1, DR1 ¶¶ 129-134, 187-196; Ex. 5, LR1 ¶¶ 22-27. Numerous analyses conducted for Defendants by the consulting firm █████████ indicated that ████████████████ █████████████████████████████████████████████████████████████ █████████████████████████. Ex. 1, DR1 ¶ 131; Ex. 2, DR2 ¶¶ 50-51 & Table 2; Ex. 5, LR1 ¶ 23. Similarly, analysis by the RAND Corporation—a non-profit that analyzes commercial price data—shows that Aspirus was the eleventh highest-priced health system out of a total of 303 U.S. health systems from 2020-2022. Ex. 1, DR1 ¶¶ 132-33. Ordinary course documents further indicate that market participants consider ANI's prices to be high. One Aspirus executive expressed concern at the possibility that h████████████████████████████████ █████████████████, noting that this would allow Network Vendors to "████████████████████████ ███████████████████████████████████████████████████████" Ex. 31, TEAM-SCHIERL-ASPIRUS-0059652. Similarly, an email among ANI employees stated that, according to a Network Vendor, "███████████████████████████████████████." Ex. 27, TEAM-SCHIERL-ASPIRUS-0094633; *see also* Ex. 32, TEAM-SCHIERL-ASPIRUS-0058236, at -236 (Aspirus VP of Finance stating, "██████████████████████████████

███████████████████████████████████████████

████████ .”).

### b.    Expert Analysis

Plaintiffs also have expert evidence from Dr. Dranove and Dr. Leitzinger showing that the Challenged Conduct raised prices. Dr. Dranove used a "structural" approach to show that the Challenged Conduct would lead to inflated prices, while Dr. Leitzinger used a "yardstick" regression to calculate the amount of the overcharge. *See* Ex. 1, DR1 ¶¶ 159-61; Ex. 5, LR1 ¶ 31.

Dr. Dranove conducted three types of standard "structural" analyses and concluded from all three that the Challenged Conduct "enable[d] ANI to negotiate higher prices with Network Vendors." Ex. 1, DR1 ¶ 28. "With a structural approach, the economist specifies a model of a market and uses the model to estimate how the at-issue conduct affects competition in the market . . . ." *id.* ¶ 158. These are standard approaches to assessing the effects of conduct in antitrust cases. *Id.* ¶ 159. Dr. Dranove's structural analyses were: (1) a study of changes in market concentration (as measured by the well-accepted Herfindahl-Hirschman Index ("HHI")) due to the fact that the Challenged Conduct eliminated competition among Defendants and the Co-Conspirators, *id.* ¶¶ 162-169; (2) an analysis called "willingness to pay," developed by Dr. Dranove and others, that analyzes how the reduction in competition among Defendants and the Co-Conspirators due to the Challenged Conduct increases Network Vendors' "willingness to pay" higher prices, *id.* ¶¶ 171-175; and (3) a related "willingness to accept" analysis that analyzes how the Challenged Conduct increases the minimum amounts that Defendants and the Co-Conspirators are willing to accept due to the Challenged Conduct, *id.* ¶¶ 176-185.

Dr. Dranove concluded from these analyses that the Challenged Conduct "would be *presumptively anticompetitive* for many physician specialties under the Department of Justice Antitrust Division's and Federal Trade Commission's 2023 Merger Guidelines," and that the

Challenged Conduct would "cause[] anticompetitive effects by increasing Network Vendor willingness to pay and provider willingness to accept, which individually and together enable ANI to negotiate higher prices with Network Vendors." *Id.* ¶¶ 27-28.

Dr. Leitzinger, in turn, measures the amount of the overcharge due to the Challenged Conduct with a statistical analysis called a regression. Dr. Leitzinger uses a type of regression commonly called a "yardstick" analysis, which uses contemporaneous prices in a market unaffected by the Challenged Conduct as a yardstick against which to assess the prices in the market of interest. Ex. 5, LR1 ¶ 31. The regression includes numerous variables to control for the salient factors, other than the Challenged Conduct, that might affect prices. *Id.* By doing so, Dr. Leitzinger isolated the effects of the Challenged Conduct on prices. *Id.*[7]

To apply this method here, Dr. Leitzinger compares the prices charged by Defendants and the Co-Conspirators to the prices charged for the same services by other outpatient providers in Wisconsin, but outside of the relevant market. He selected other Wisconsin providers as the yardstick for several reasons, including because doing so would inherently control for any state-specific pricing considerations; testimony from a major Network Vender ███████████ ████████████████████████████████████████; the Challenged Conduct (particularly the exclusivity) is unlikely to be widespread in the benchmark because the antitrust authorities caution against it; and a statistical analysis of pricing shows that it is unlikely that the Challenged Conduct is common in the benchmark providers. Ex. 5, LR1 ¶ 34.

---

[7] "[T]he yardstick approach is a well-established methodology" for measuring overcharges in antitrust cases. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1073 (N.D. Ill. 2022); *see also Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *8 (N.D. Ill Mar. 29, 2023) (citing *Fishman v. Est. of Wirtz*, 807 F.2d 520, 551 (7th Cir. 1986)).

Dr. Leitzinger applied his methodology to a robust data set, encompassing over ███ claims, representing over ███████ in charges, for outpatient professional services from ANI Members and other providers across Wisconsin, from January 2017 through September 2024. Ex. 5, LR1 ¶ 29; Ex. 24, SLR ¶ 29. Relying on both economic theory and relevant industry literature, Dr. Leitzinger employed numerous control variables, including the type of procedure, size of the provider practice, identity of the Network Vendor, health system type, insurance plan type, urbanicity (rural or urban locations), date of service, and household income. Ex. 5, LR1 ¶¶ 32-34. These variables control for important aspects of the market, such as bargaining power, scope of provider offerings, the type of facility where the service is offered, health system membership, and local incomes, among others. By controlling for these salient market characteristics, Dr. Leitzinger could isolate the effect of the Challenged Conduct on prices. *Id.* ¶¶ 30, 35. His model's variables accounted for 90 percent of the variation in prices, meaning its "explanatory variables are very well chosen" and "the price variation not explained by the numerous explanatory variables is very limited." Ex. 23, LR2 ¶ 35; *see also* Ex. 24, SLR at Ex. 5.

Dr. Leitzinger's analysis produced statistically significant results showing overcharges caused by the Challenged Conduct. Specifically, the indicator variable that measures the effect of the Challenged Conduct on prices was positive and statistically significant at the 99 percent confidence level, which Dr. Leitzinger noted was "consistent with Plaintiffs' claims about overcharges stemming from the Challenged Conduct." Ex. 5, LR1 ¶ 35. Dr. Leitzinger's analysis concludes that the Challenged Conduct caused average overcharges of approximately 18.9 percent. Ex. 24, SLR ¶¶ 35, 38. Dr. Leitzinger's model was well constructed and produced highly reliable results that are consistent with the other evidence of inflated prices.

Further, Dr. Leitzinger tested the results of the regression analysis with two other econometric analyses, both of which strongly corroborated his overcharge calculation. First, Dr.

Leitzinger performed an event study that simply looked at what happened to independent providers' prices after they joined ANI, and he found that those providers' prices increased by nearly ████████ over the 22 months after joining ANI's network. Ex. 5, LR1 ¶ 28; Ex. 24, SLR ¶ 28. Secondly, Dr. Leitzinger performed a "difference-in-differences" regression, which is widely used in economic research and by courts in antitrust cases. Ex. 5, LR1 ¶ 40 & n.61. This model studied the effect on providers' prices of joining ANI, by comparing those providers' prices (the "treatment group") to the prices of providers outside of North-Central Wisconsin who did not join ANI (the "control group"). *Id.* ¶ 41. This model uses numerous control variables to control for differences between the treatment and control groups so that the model can isolate the effects on prices of joining the ANI cartel. *Id.* ¶ 43. This model finds that joining ANI was associated with an overcharge of 27 percent, which was statistically significant at the 99 percent confidence level. *Id.* ¶ 44; Ex. 24, SLR ¶ 44. This further supports the finding that the Challenged Conduct caused overcharges. Ex. 5, LR1 ¶ 44.

Importantly, the question of whether the Challenged Conduct caused inflated prices is a common question for the Class, and all of the evidence—documents, testimony, and numerous economic analyses—is classwide evidence capable of proving impact.

### 2. Step 2: Classwide Evidence That Overcharges Were Widespread

#### a. Qualitative Evidence of Widespread Impact

Plaintiffs also have ample classwide qualitative evidence capable of proving that the overcharges would be broadly transmitted across the Class. *See* Ex. 5, LR1 ¶¶ 46-55.

The evidence shows ███████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████

Because the purpose of this scheme was uniformity in contracting, the ANI member outpatient providers—Aspirus Providers and the Co-Conspirators alike—charged "████████ ███████████████████████████████████████████████." Peck Dep. at 145:10-13 (ECF No. 181); Ex. 8, TEAM-SCHIERL-ASPIRUS-0582661, at -662 ("████ ███████████████████████████████████████████████ ████."); *see also* Ex. 5, LR1 ¶¶ 53-55. ANI brought its illegally enhanced bargaining leverage to negotiations with every Network Vendor, and as a result, as Dr. Leitzinger explained, "█████ ████████████████████████████████" above what they would have been absent the Challenged Conduct. Ex. 5, LR1 ¶ 46; *see also id.* ¶¶ 47-49. Likewise, Dr. Dranove explained that "███████████████████████████████████████████████ ███████." Ex. 2, DR2 ¶ 20.

Finally, individual class members have "████████████████████████████████ ████████" the prices negotiated by their Network Vendor. Ex. 5, LR1 ¶ 50. Because of the design of the payment system in the health insurance market, the prices any class member paid for services provided by ANI Members "████████████████████████████████████ ████████," and not by anything unique to individual class members. Ex. 5, LR1 ¶ 50. "████████ ███████████████████████████████████████████████ ██████████████████████████" *Id.*; *see also, e.g., id.* ¶¶ 46, 51-55.

In sum, given the market-wide uniformity of this centralized scheme, it is implausible that *any* Class members, let alone many, would have been able to avoid paying overcharges on purchases of outpatient professional healthcare services during the Class Period.

### b.    Quantitative Evidence of Classwide Impact

To demonstrative classwide impact quantitatively, Dr. Leitzinger used a statistical methodology called "in-sample" analysis. This methodology is commonly used in antitrust class actions as empirical evidence of classwide impact. *See infra* n.18 (collecting cases).

Dr. Leitzinger used the output of his primary regression model, which showed a large, statistically significant impact at Step 1, to compare the actual prices each class member paid for each medical service to what the model predicts each would have paid in the "but-for world"—*i.e.*, the world without the Challenged Conduct. Ex. 5, LR1 ¶ 57. He conducted this analysis at the level of each claim line, calculating "but-for" prices for each medical service from a given ANI Member, on a specific date, through a specific provider network, under a specific plan type. *Id.* Dr. Leitzinger's in-sample methodology incorporates all explanatory variables used in Step 1 to refine its "prediction" of the but-for price each Class member would have paid absent the Challenged Conduct. *Id.* Under this approach, there is empirical evidence of antitrust injury whenever the actual price paid for a medical service exceeds the predicted "but-for" price. *Id.* ¶ 58.

The in-sample analysis provides empirical evidence that at least 98 percent of class members suffered injury in the form of an overcharge, with 90 percent of class members paying overcharges on nearly one-half of their transactions. *Id*.; Ex. 23, LR2 ¶¶ 28. Importantly, this in-sample methodology is conservative by its nature because it assumes that the ability of a Payor to avoid an overcharge under the Challenged Conduct would be the same in the world without the anticompetitive conduct, when it is likely that all Payors would have greater ability to avoid overcharges in a world where the ANI Providers compete on price. Ex. 23, LR2 ¶ 25.

In sum, all of this evidence—both qualitative and quantitative—is capable of proving that all or nearly all Class members suffered injury, and all of it is common to the entire Class.

### C.     Plaintiffs Have Common Evidence of Aggregate Classwide Damages.

Dr. Leitzinger used his regression model and the claims data to calculate classwide damages of approximately ███████. Ex. 5, LR1 ¶¶ 30-39; Ex. 24, SLR ¶ 39. To reach this estimate, Dr. Leitzinger multiplied the overcharge (18.9%) by the total amount paid by class members to Defendants and the Co-Conspirators for outpatient professional services during the Class Period, as reflected in the data received in discovery. Ex. 5, LR1 ¶¶ 35-36, 38-39; Ex. 24, SLR ¶ 35, 38-39.

Further, because Plaintiffs have not received all claims data for outpatient healthcare services purchased from Defendants and the Co-Conspirators, Dr. Leitzinger extrapolated from the over ██████ claim lines in his data set to estimate the total amount paid by the class and the total amount of overcharges. Ex. 5, LR1 ¶¶ 29, 37; Ex. 24, SLR ¶ 29. To perform this extrapolation, Dr. Leitzinger used records produced by Defendants showing their "payor mix," meaning the share of ANI claims attributed to each Network Vendor with which Defendants contract. Using those records, Dr. Leitzinger calculated the amount of total commerce subject to the Challenged Conduct, and he applied the overcharge to this total, calculating ██████ in total aggregate damages to the Class across the Class Period. Ex. 24, SLR ¶ 39 & Exs. 5, 6A, 6B; Ex. 5, LR1 ¶¶ 36-39.

Dr. Leitzinger opines that this extrapolation is reasonable, and likely conservative, for numerous reasons. Ex. 5, LR1 ¶¶ 37-39; *see also* Ex. 23, LR2 ¶ 88. For example, Network Vendors who did not produce claims data in this litigation had claims included in productions that were received and analyzed, and because the Challenged Conduct sets uniform prices with each Network Vendor, the claims data used is a strong proxy for the claims data not received. Ex. 5,

LR1 ¶ 38. Further, Dr. Leitzinger's available claims data was largely from bigger Network Vendors who have greater bargaining leverage than the smaller Network Vendors whose data Dr. Leitzinger did not analyze, rendering the extrapolation likely conservative. Ex. 5, LR1 ¶¶ 38-39. Finally, Anthem produced additional data after the opening expert reports. Dr. Leitzinger updated his analyses using the supplemental data and found that the overcharge calculation and extrapolation were virtually identical, further supporting the reliability of his extrapolation. Ex. 23, LR2 ¶ 89.[8]

## **ARGUMENT**

A main "purpose of class action litigation" is "to facilitate prosecution of claims that any one individual might not otherwise bring on her own." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015). Cases alleging antitrust conspiracies are "particularly well suited" for class treatment. *Advocate Health Care v. Mylan Labs., Inc.*, 202 F.R.D. 12, 21 (D.D.C. 2001) (collecting cases). "Indeed, defendants seeking to defeat class certification in a case alleging a horizontal price-fixing conspiracy face an uphill battle." *Chicken Grower*, 2024 WL 2117359, at *12. That is because "courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *Moehrl*, 2023 WL 2683199, at *11; *see also In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 240 (E.D.N.Y. 1998) ("Price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy.").

---

[8] As noted above in footnote 3, Plaintiffs move alternatively to certify a narrower Class limited to Payors who appear in the Network Vendor data analyzed by Dr. Leitzinger. The total of aggregate damages for this narrower class—without extrapolation—is ██████. Ex. 24, SLR ¶ 36.

This case is especially well-suited to class adjudication. Defendants orchestrated a price-fixing scheme that operated uniformly across the marketplace. All ANI members—both Aspirus Providers and the Co-Conspirators—participated in the conspiracy. ANI set the rates for all providers in its network, imposed the same exclusivity requirements on all Co-Conspirators, and negotiated with all Network Vendors using the same tactics. The legal question—whether this conduct constitutes unlawful price-fixing—is identical for every Class member. The factual questions—what ANI did, when it did it, and how it affected prices—are common across the Class. And the evidence proving these elements, including Defendants' own documents admitting to price-fixing and the economic analyses quantifying the resulting overcharges, applies equally to all members of the Class. In short, this case presents precisely the type of common legal and factual questions that make class treatment not only appropriate, but essential to the efficient resolution of this antitrust conspiracy.

## I.    Standard for Class Certification.

Rule 23 provides a procedural mechanism for "a federal court to adjudicate claims of multiple parties at once, instead of in separate suits." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010). The Court's task at the class-certification stage is a modest one—it is "merely to decide whether a class action is a suitable method of adjudicating the case." *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (cleaned up); *see also Messner,* 669 F.3d at 818. Applied here, the question for the Court is whether the existence, legality, and impact of Defendants' price-fixing scheme should be decided for all Class members together in one case, or whether thousands of Payors should be required to litigate the same questions separately in hundreds or thousands of individual lawsuits.

Rule 23 provides the framework for the Court's analysis of that question. Rule 23(a) provides that class certification is appropriate if: "(1) the class is so numerous that joinder of all

members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Where, as here, the named plaintiffs seek to certify a damages class, they must also satisfy Rule 23(b)(3), which permits class certification where common questions of law and fact "predominate over any questions affecting only individual members" and class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The plaintiffs bear the burden of establishing that these prerequisites are satisfied "by a preponderance of the evidence." *Messner*, 669 F.3rd at 811.

The Court's assessment of the requirements for class certification may overlap with the merits of the case, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013), but class certification does not involve any determination on the merits, *Messner*, 669 F.3d at 824 (collecting cases). In this respect, Plaintiffs need do no more here than to present evidence that is "reliable in proving or disproving the elements of the relevant causes of action." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016). As to the alleged conspiracy, for example, whether the "evidence is sufficient to survive summary judgment or to demonstrate liability at trial is not at issue in this motion." *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *7 (N.D. Ill. May 27, 2022). On each element, whether Plaintiffs "will ultimately prevail on the merits" is for another day. *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 377 (7th Cir. 2015).

## II.    Plaintiffs Satisfy the Prerequisites of Rule 23(a).

### A.    Numerosity: The Proposed Class Is Numerous.

A proposed class "consisting of more than forty members generally satisfies the numerosity requirement." *Chavez v. Don Stoltzner Mason Contractor, Inc.*, 272 F.R.D. 450, 454 (N.D. Ill.

2011). Plaintiffs clear that bar here: Dr. Leitzinger identified at least 2,000 members of the proposed class. *See* Ex. 24, SLR ¶ 19 & Ex. 4 (Supplemental) (listing class members).[9]

### B.    Commonality: Questions of Law and Fact are Common to the Class.

The commonality requirement of Rule 23(a)(2) asks whether the class members' claims "depend upon a common contention that is capable of classwide resolution." *Bell*, 800 F.3d at 374. Commonality requires only "a single common question of law or fact." *Id.* "[C]ourts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *Moehrl*, 2023 WL 2683199, at *11. This is because "antitrust liability alone constitutes a common question that will resolve an issue that is central to the validity of each class member's claim in one stroke." *Id.* The same is true here: whether the Challenged Conduct violates the antitrust laws is a question common to all Class members and susceptible to resolution by common proof, including "common, class-wide economic methods to evaluate market definition, market power, liability, and antitrust injury." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *4 (N.D. Ill. July 22, 2024); *accord Moehrl*, 2023 WL 2683199, at *5.

### C.    Typicality: The Proposed Class Representatives Are Typical.

Under Rule 23(a)(3), typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The requirement's purpose is to assure that the interest of the named representatives align with interests of the class. Under Rule 23(a)(3)'s "liberal[]" standard, typicality is satisfied "when the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims

---

[9] This is Dr. Leitzinger's conclusion with respect to even the *narrower* class definition the Motion proposes as an alternative. The primary class definition the Motion proposes is broader, and thus would have even more members in it.

are based on the same legal theory." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009). "In the antitrust context, typicality 'will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants.'" *Moehrl*, 2023 WL 2683199, at *12; *accord In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 168 (S.D. Ind. 2009) ("[I]f the named class members' claims are based on the same legal theory or arise from the same course of conduct, factual differences in date, size, manner, or conditions of purchase, the type of purchaser, or other concerns do not make named plaintiffs atypical."). Here, Plaintiffs and the proposed Class allege the same injuries (overcharges) arising from the same Challenged Conduct.

### D.    Adequacy: The Proposed Class Representatives and Their Counsel Will Adequately Represent the Class.

Plaintiffs and their counsel will adequately represent the proposed class. The test for adequacy requires two showings: "(i) the class representatives must not have claims in conflict with other class members, and (ii) the class representatives and proposed class counsel must be able to litigate the case vigorously and competently on behalf of named and absent class members alike." *Broiler Chicken*, 2022 WL 1720468, at *3. Those requirements are satisfied here.

Plaintiffs' interests are fully aligned with those of the Class in proving that Defendants violated the antitrust laws and thereby overcharged them for outpatient professional healthcare services. Second, Plaintiffs have demonstrated that they will prosecute the action vigorously on behalf of the proposed Class. In the more than 2.5 years of this litigation, they have conducted extensive work on behalf of the Plaintiffs and the Class. Walker Decl. ¶¶ 2-5.

Plaintiffs also retained skilled counsel with experience prosecuting antitrust and class action litigation. Proposed Co-Lead Counsel Berger Montague PC and Fairmark Partners, LLP, are experienced counsel in antitrust class actions and have zealously represented the interests of the Class. They have committed thousands of hours and considerable resources, taking dozens of

depositions, engaging in months of discovery, collecting and reviewing thousands of documents, briefing dispositive and discovery motions, and engaging economic experts, among many other tasks. Walker Decl. ¶¶ 2-5. This demonstrates commitment and ability to diligently pursue this case on behalf of the proposed Class.

### III.    Plaintiffs Satisfy Rule 23(b)(3).

Plaintiffs also satisfy Rule 23(b)(3)'s predominance and superiority requirements. To certify a class under Rule 23(b)(3), a court must find that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs satisfy both requirements.

### A.    Common Questions of Law and Fact Predominate.

"Predominance is satisfied when common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication." *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016) (quoting *Messner*, 669 F. 3d at 815). "[C]ourts routinely have found that common questions predominate where the case claims the existence of a widespread or uniform practice." *Ross v. Gossett*, 33 F.4th 433, 439 (7th Cir. 2022); *see also In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *5 (N.D. Cal. Nov. 14, 2018) ("Many courts have noted [that] the claim of a conspiracy to fix prices inherently lends itself to a finding of . . . predominance.").

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469 (cleaned up). Similarly, the inquiry is whether common questions predominate as to the case *as a whole*, not as to individual elements. *Id*; *accord Tyson Foods*, 577 U.S. at 453; *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). Any individualized issues do not defeat predominance unless

they "overwhelm common ones." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014); *see also Tyson Foods*, 577 U.S. at 453 (when common issues predominate, certification is warranted "even though other important matters will have to be tried separately"). Moreover, Plaintiffs need not prove that the common "questions will be answered, on the merits, in favor of the class," *Amgen*, 568 U.S. at 459, but simply that the common questions are "capable of" class-wide resolution, *Messner*, 669 F.3d at 818.

Here, common questions are abundant and predominate over any possible questions unique to individual Class members. Common questions include: (1) whether Defendants and the Co-Conspirators engaged in the Challenged Conduct; (2) whether the Challenged Conduct is *per se* unlawful; (3) if the Rule of Reason applies, where there is proof of market power or anticompetitive effects; (4) whether the Challenged Conduct caused widespread antitrust injury to class members; and (5) the amount of aggregate classwide damages. None of these issues will require evidence that "varies from member to member" of the class; they can all be resolved with classwide proof. *Messner*, 669 F.3d at 815. And any individualized questions that arise would not "overwhelm" the common ones. *Erica P. John Fund, Inc.*, 573 U.S. at 268.

### 1. Violation is a Classwide Question Capable of Proof Through Common Evidence.

Plaintiffs have ample common evidence capable of proving that Defendants' conspiracy violated the antitrust laws. *See*, *e.g.*, *In re Turkey Antitrust Litig.*, 2025 WL 264021, at *6 (finding that "common evidence, including Defendants' own documents and testimony, will be used to [try to] prove that Defendants formed a *per se* illegal conspiracy"). To prove an antitrust violation under Section 1 of the Sherman Act, a plaintiff must show: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an

accompanying injury." ECF No. 47, Op. at 5 (citation omitted). Plaintiffs will use common evidence to prove all three elements.

>    a.    **Common Evidence is Capable of Proving the Existence of the Conspiracy.**

Plaintiffs will use common evidence to establish the existence of an illegal agreement to fix prices. The existence of a horizontal price-fixing conspiracy "is the prototypical example of an issue where common questions predominate, because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence." *Broiler Chicken*, 2022 WL 1720468, at *7. This common question alone can be enough to satisfy the predominance requirement: "proof of the conspiracy is a common question that is thought to predominate over the other issues of the case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008); *see also*, *e.g.*, *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 352 (N.D. Cal. 2005) ("As a rule, the allegation of price-fixing conspiracy is sufficient to establish predominance of common questions."); 7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1781 (3d ed.) ("Whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case.").

Here, the evidence that Defendants engaged in the Challenged Conduct is common to all Class members. *Supra* Factual Background. For one, the Challenged Conduct was set forth in uniform contracts signed by all Co-Conspirators and supported by extensive documentary and testimonial evidence about the scope, meaning, purpose, and intended effects of the Challenged

Conduct on the marketplace. *Id.* Plaintiffs have classwide evidence "that, if believed, would be enough to prove the existence of the alleged conspiracy." *Kleen Prods.*, 831 F.3d at 927.[10]

### b.    Common Evidence is Capable of Proving an Unreasonable Restraint of Trade.

The parties will likely dispute whether the Challenged Conduct is illegal *per se* under the Sherman Act or should be assessed under the quick look or Rule of Reason modes of analysis. The issue need not be decided now, but the answer to the question will be common to the Class as a whole. *See, e.g.*, *Moehrl*, 2023 WL 2683199, at *14 ("For class certification purposes, it is enough that [liability] can be decided by evidence common to the class regardless of the applicable mode of analysis."). Under either standard, the evidence that will be used to prove this element will be common to the Class.

*Per se.* Defendants engaged in horizontal price fixing, and as the Court noted in its Motion to Dismiss decision, "[i]t is already well established that horizontal price-fixing is per se unreasonable." ECF No, 47, Op. at 8 (quoting *Texaco Inc. v. Dagher,* 547 U.S. 1, 7 (2006)). The Supreme Court has held that "agreements among competing physicians setting . . . the maximum fees that they may claim" were *per se* unlawful price-fixing restraints. *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 335-36 (1982). Application of the *per se* rule here follows *a fortiori* from *Maricopa County*: whereas the physicians there agreed on *maximum* fees in an ostensible effort to offer low-cost medical services, ANI used the price-fixing agreement to raise prices for

---

[10] The fact that Defendants may not dispute that they engaged in the Challenged Conduct does not make the issue any less important to the predominance analysis: "Just as much as do contested issues, resolved issues bear on the key question that the analysis seeks to answer: whether the class is a legally coherent unit of representation by which absent class members may fairly be bound." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006); *see also* 6 Newberg & Rubenstein on Class Actions § 20:51 (6th ed. 2025) ("The predominance test does not involve a comparison of court time needed to adjudicate common issues weighed against time needed to dispose of individual issues.").

all ANI Members. If the Court applies the rule of *per se* invalidity, the Challenged Conduct will be unlawful with respect to the entire class, settling liability "in one fell swoop." *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010).

Defendants will likely argue, as they did at the motion to dismiss stage, that their price-fixing should be analyzed under the Rule of Reason because it is supposedly "ancillary to the success of a cooperative venture," *i.e.*, the ANI "network." ECF No. 47, Op. at 10 (citing *Deslandes*, 81 F.4th at 704). Defendants are wrong because Defendants must prove that their price-fixing is "subordinate and collateral . . . to a legitimate business collaboration" and that it is "reasonably necessary" to achieve the supposedly efficiency-enhancing purposes of that collaboration. *Deslandes*, 81 F.4th at 706 (Ripple, J., concurring); *see also Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986). As Dr. Dranove notes, and as the evidence shows, the Challenged Conduct is not necessary to achieve any of the purported procompetitive justifications offered by Defendants' expert. Ex. 1, DR1 ¶¶ 206-207; Ex. 2, DR2 ¶¶ 172-229.[11]

But, more important for present purposes, whether the Challenged Conduct was "ancillary" to a procompetitive benefit will be a question the Court will necessarily answer on a classwide basis. The answer to that question turns not at all on individual Class members' evidence; either Defendants' restraints—which applied uniformly across the market—were "reasonably necessary" to achieve healthcare-related efficiencies, or they were not. Thus, the parties' dispute over which standard applies is a "significant aspect of [the] case and . . . can be resolved for all members of a

---

[11] The Court might ultimately determine that an intermediate mode of analysis, called "quick look," would be appropriate. *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 362 (5th Cir. 2008) (reviewing FTC's determination of illegality under a "quick look" standard, but noting that the physician network's practices, which are less restrictive than those in this case, "bear a very close resemblance to horizontal price-fixing, generally deemed a *per se* violation").

class in a single adjudication," *Kleen Prods.*, 831 F.3d at 925, based on classwide evidence about ANI's conduct, the design of ANI's network, and the extent to which the Challenged Conduct promotes any efficiencies the network actually delivers.

**Rule of Reason.** If the Court decides the Rule of Reason applies, that will only magnify the number of common issues—particularly, Defendants' market power, which is an element under the Rule of Reason but not the *per se* analysis. *See supra* at 16-17. Plaintiffs have substantial evidence regarding market definition, market power, and anticompetitive effects. *Id.* All that evidence is common to the Class. Finally, even if the jury were to conclude that Defendants had insufficient market power, the entire Class would lose in one fell swoop; there would be no individualized issues. Thus, this issue, win or lose, supports predominance. *See Amgen*, 568 U.S. at 470 ("failure of proof as to an element of the plaintiffs' cause of action" is a "fatal similarity" that supports certification).

### 2. Common Evidence Is Capable of Proving Classwide Impact.

Common evidence will also establish the element of classwide impact—*i.e.*, an injury that is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Blackburn*, 53 F.3d at 830. Supracompetitive prices are a prototypical antitrust injury, *id.*, and a plaintiff suffers antitrust injury from even a single overcharge. *See*, *e.g.*, *In re Turkey Antitrust Litig.*, 2025 WL 264021, at *6, *10 & n.16; *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage."). Plaintiffs' burden is merely to "show that it [is] possible to use common evidence to prove that [the Challenged Conduct] injured the members of the proposed class." *Messner*, 669 F.3d at 816.

Plaintiffs show that antitrust impact is capable of proof at trial through the "broadly

accepted two-step method that antitrust impact presents issues susceptible to common proof." *Chicken Grower*, 2024 WL 2117359, at *29; *accord In re Turkey Antitrust Litig.*, 2025 WL 264021, at *17; *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 15 (E.D.N.Y. 2020); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847-48 (D.N.J. 2015). Plaintiffs have common evidence capable of proving "first, that class members paid artificially inflated prices and, second, that 'this price inflation occurred to substantially all class members.'" *Restasis*, 335 F.R.D. at 15 (quoting *Castro*, 134 F. Supp. 3d at 847). The parties' dispute here is thus fundamentally classwide in nature: The jury either finds common impact or not.[12]

> #### a.    Step 1: Plaintiffs have classwide evidence capable of showing that the Challenged Conduct inflated prices.

Plaintiffs have abundant common evidence "capable of" showing that the Challenged Conduct inflated prices for outpatient professional services.

First, Defendants and Co-Conspirators were competitors. *Supra* at 18-19; *see also* Ex. 1, DR1 ¶ 191. The Challenged Conduct was intended to prevent competition between Defendants and the Co-Conspirators at a Network Vendor level. *Supra* at 9-13, 15-18; Ex. 1, DR1 ¶¶ 193-196. The Challenged Conduct affected all Network Vendor negotiations, and Defendants and the Co-Conspirators recognized that ████████████████████████████████████████ ████████████████. *Supra* at 9-13, 15-18; Ex. 1, DR1 ¶¶ 192-196; *see also*, *e.g.*, Boggs Dep. at 112:24-113:13 (ECF No. 155) (████████████████████████████████████████ ███████████████████████████████████████████████████). Extensive evidence

---

[12] *See Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 681 (9th Cir. 2022) ("If the jury found that [plaintiffs'] model was reliable, then [plaintiffs] would have succeeded in showing antitrust impact on a class-wide basis, an element of their antitrust claim."); *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1184 (10th Cir. 2023) ("[A] failure of proof on the element of antitrust impact would end the litigation for all."); *Chicken Grower*, 2024 WL 2117359, at *23 (a jury finding in defendant's favor on common impact "would be class-wide evidence that Plaintiffs have failed to prove an element of their claim").

shows that market participants, including Defendants themselves, recognized that their prices were

████. *Supra* at 17-18; Ex. 1, DR1 ¶¶ 129-134, 187-196; Ex. 5, LR1 ¶¶ 22-27.

Second, Plaintiffs' economic expert, Dr. Dranove, reviewed the economic theory describing how the Challenged Conduct could reduce competition and raise prices. Ex. 1, DR1 ¶¶ 59-82, 156-185. He analyzed extensive record evidence, *id.* ¶¶ 186-199, leading him to conclude that the evidence "is consistent with anticompetitive conduct and inconsistent with competition on the merits and allows [ANI Members] to obtain supracompetitive prices." *Id.* ¶ 152.

Third, Dr. Dranove's structural economic analyses examine how the Challenged Conduct distorts competitive dynamics and causes supracompetitive prices. *Supra* at 18-19. He concludes that it "enable[s] ANI to negotiate higher prices with Network Vendors." Ex. 1, DR1 ¶ 28. Courts commonly rely on structural models, like Dr. Dranove's HHI analysis, to prove anticompetitive effects in Sherman Act cases. *See, e.g.*, *Mr. Dee's Inc. v. Inmar, Inc.*, 2022 WL 3576962, at *6 (M.D.N.C. Aug. 19, 2022) ("HHI is a commonly accepted measure of market concentration . . . and is relevant to proving a Sherman Act § 1 violation."); *Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *8 (N.D. Cal. May 14, 2015) ("[Defendant] has not cited any authority demonstrating that the HHI . . . is inapplicable" to claims under Section 2 of the Sherman Act.). These structural analyses are common to the entire Class.

Fourth, Dr. Leitzinger's regression analyses are further classwide proof capable of proving that the Challenged Conduct caused supracompetitive prices. *Supra* at 20-23. Regression analysis "is common in antitrust cases, where the plaintiffs use it to show that an alleged 'conspiracy' has a statistically significant impact on the dependent variable—usually price." *Kleen Prods.*, 306 F.R.D. at 602 (citing Daniel L. Rubinfeld, *Reference Guide on Multiple Regression,* in REFERENCE

MANUAL ON STATISTICAL EVIDENCE 305-07 (3d ed. 2011)).[13] "[T]he Seventh Circuit has recognized that courts afford wide 'latitude to experts employing regression analysis, a proven statistical methodology used in a wide variety of contexts.'" *In re Turkey Antitrust Litig.*, 2025 WL 264021, at *19 (quoting *Manpower, Inc. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013)) (cleaned up).[14] Dr. Leitzinger calculates that the Challenged Conduct inflated prices on average 18.9 percent over the Class Period and across all outpatient provider services. Ex. 24, SLR ¶ 38; *see also supra* at 22.

Dr. Leitzinger then performed additional econometric analyses supporting that finding. Ex. 5, LR1 ¶¶ 28, 40-44; *see also supra* at 20-23. In one analysis, Dr. Leitzinger found that independent providers' prices increased by nearly ▇▇▇▇▇ over the 22 months after joining ANI's network. Ex. 5, LR1 ¶ 28; Ex. 24, SLR ¶ 28 (supplementing analysis results with updated Anthem data). In the second analysis, Dr. Leitzinger's "difference-in-differences" regression found that joining ANI was associated with an overcharge of 27 percent, which was statistically significant at the 99 percent confidence level. Ex. 5, LR1 ¶ 44; Ex. 24, SLR ¶ 44 (supplementing analysis results with updated Anthem data). Difference-in-differences models are commonly used as proof of impact in antitrust cases. *See Messner*, 669 F.3d at 818-19 (approving difference-in-differences methodology); *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077, 1085-90 (N.D. Ill. 2023) (same).

---

[13] *See*, *e.g.*, *ATA Airlines, Inc. v. Fed. Express Corp.*, 665 F.3d 882, 889-90 (7th Cir. 2011) (finding the REFERENCE MANUAL reliable for understanding technical evidence).

[14] *See also*, *e.g.*, *Broiler Chicken*, 2022 WL 1720468, at *10 ("Regression analysis is a widely accepted method . . . and is commonly used in price-fixing cases."); *accord Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009); *In re Packaged Seafood Prods. Antitrust Litig.*, 2019 WL 3429174, at *9 (S.D. Cal. July 30, 2019); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D. Cal. 2010).

In sum, the question of whether the Challenged Conduct caused overcharges, and the record evidence and expert analysis used to answer that question, are all common to the Class and support predominance.

> **b.    Step 2: Plaintiffs have classwide evidence capable of showing that the inflated prices were paid by all or nearly all members of the class.**

Plaintiffs have ample classwide evidence—both qualitative record evidence and quantitative evidence—capable of proving that the overcharges were widespread across the class. This evidence is consistent with the "prevailing view" that horizontal conspiracies to fix prices "affect[] all market participants, creating an inference of class-wide impact even when prices are individually negotiated." *In re Turkey Antitrust Litig.*, 2025 WL 264021, at *14 (quoting *Kleen Prods.*, 306 F.R.D. at 600); *accord Chicken Grower*, 2024 WL 2117359, at *8. Further, classwide impact does not require that "each and every class member" has been injured. *Kleen Prods.*, 831 F.3d at 927; *accord Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014). Instead, "a class will often include persons who have not been injured by the defendant's conduct." *Kohen*, 571 F.3d at 677.[15] Plaintiffs' burden is not to prove the element of antitrust impact, but only to "demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Messner*, 669 F.3d at 818.

First, there is economic evidence that the nature of the Challenged Conduct, as well as the way the market functions, would transmit harm broadly across the Class. Dr. Leitzinger notes that the nature of the Challenged Conduct—where ANI would set prices on behalf of all ANI Providers in all Network Vendor contracts and prevent the Co-Conspirators from otherwise competing—

---

[15] *See also*, *e.g.*, *Pella Corp.*, 606 F.3d at 394 (affirming class certification in a consumer fraud case despite the possibility that the class could include people whom defendant's conduct did not injure); *Olean*, 31 F.4th at 668-69 (holding that the court need not decide on class certification whether the class includes only a *de minimis* number of uninjured class members).

"would be expected to have widespread impact on the entities that make up the proposed Class." Ex. 5, LR1 ¶¶ 46-47. He also notes that issues peculiar to this sort of market—namely, that prices paid to the providers "by all Class members were dictated by the agreements negotiated by ANI with the Network Vendors"—means that "every Class member paying for the same services at the same . . . provider . . . would pay the same amount." *Id.* ¶ 50. Likewise, Dr. Dranove notes that because of the way ANI and the Network Vendors negotiate the healthcare services as a "bundle" of the entire set of healthcare services, "a lessening of head-to-head competition ultimately affects pricing for the 'bundle' of services." Ex. 2, DR2 ¶ 20. This sort of structural market analysis is commonly used as evidence of classwide impact. *See*, *e.g.*, *Kleen Prods.*, 831 F.3d at 927 (the structure of the market is a common issue that can support a finding of classwide impact); *In re Turkey Antitrust Litig.*, 2025 WL 264021, at \*13 ("This evidence in conjunction with fundamental economic theory is all common evidence that collusion would cause higher prices for all or nearly all turkey products.").[16]

Second, Plaintiffs have ample documentary evidence that overcharges would be transmitted broadly across the Class. This includes evidence that the Challenged Conduct was uniformly implemented, that ANI intended ███████████████████████████, that ANI negotiators followed ████████████████████████████████████████ ███████████████, that it affected every negotiation with Network Vendors, and that Class

---

[16] *See also*, *e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (crediting expert opinion that market structure was conducive to cartelization and common impact); *Fond du Lac Bumper Exch., Inc. v. Jui Li Enter., Co.*, 2016 WL 3579953, at \*7, \*10 (E.D. Wis. June 24, 2016) (finding market-structure analysis as supportive of class certification); *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at \*31 (E.D. Pa. Oct. 19, 2015) ("Many courts have accepted market-structure analyses in finding predominance with respect to antitrust impact."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 627 (N.D. Cal. 2015) (market-structure analysis supportive of class certification).

members would have little ability to negotiate around price inflation. *See supra* at 9-13; 19-23

(reviewing types of classwide evidence of widespread impact). All of this evidence of uniformity

is common to every member of the Class.

Third, as discussed above, Plaintiffs have empirical evidence of classwide impact. *See*

*supra* at 20-23, 25-26. Dr. Leitzinger concluded that there is empirical evidence, derived from an

"in-sample" model, that *at least* 98% of Class members suffered injury in the form of an

overcharge. *Supra* at 25.[17] This "in-sample" methodology "is the type of market-wide economic

analysis [that] has been accepted by many courts to show predominance as to antitrust impact." *In*

*re Turkey Antitrust Litig.*, 2025 WL 264021, at *9; *see also*, *e.g.*, *Broiler Chicken*, 2022 WL

1720468, at *10, *13 (finding common impact based on in-sample analysis showing "that 97.1%

of customers paid an actual price that exceeded the but-for price at least once").[18]

The intentional uniformity of conduct and pricing in this case provides even stronger

support for Dr. Leitzinger's empirical analysis. Indeed, courts have held that "regression analysis

can be an appropriate tool to demonstrate class-wide impact even when the market involved

---

[17] This does not mean that the other 2 percent of class members did not pay any overcharges; it means only that Dr. Leitzinger's in-sample prediction did not find statistical confirmation of an overcharge for those members. *See* Ex. 23, LR2 ¶ 25. This could result from the model being overly conservative or from unexplained variation in pricing outcomes unrelated to overcharges disguising the presence of overcharges. *Id.* ¶¶ 26-27. In any event, Dr. Leitzinger makes clear that based on his review of all of the evidence in the case, his opinion is that "the scope of impact exceeds the claims for which my in-sample prediction indicates an overcharge" and that "there is no reason to believe that Class members were likely to have avoided an overcharge on any [] claim lines." *Id.* ¶ 28.

[18] *See*, *e.g.*, *Olean*, 31 F.4th at 676-82; *Chicken Grower*, 2024 WL 2117359, at *30; *Le v. Zuffa, LLC*, 2023 WL 5085064 (D. Nev. Aug. 9, 2023); *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019); *In re Capacitors*, 2018 WL 5980139, at *7-9; *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 217 (E.D. Pa. 2017); *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *6 (N.D. Cal. Jan. 19, 2017); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014), *report and recommendations adopted*, 2015 WL 5093503, at *1 (E.D.N.Y. July 10, 2015)).

diversity in products, marketing, and prices" and "even when prices are individually negotiated" by each class member—even where the class members included "nearly every entity in the United States that serves chicken." *Broiler Chicken*, 2022 WL 1720468, at *3, *12, *15. Here, prices were not individually negotiated by the nearly 2,000 class members. Instead, ANI negotiated uniform prices with a small number of Network Vendors on behalf of all Class members, eliminating almost all of the individual variation that might complicate regression analyses in other cases.

If analyses like Dr. Leitzinger's can demonstrate common impact where thousands of class members negotiate individually, they are *a fortiori* sufficient where just a handful of Network Vendors perform the negotiations for the entire Class.

### 3. Common Evidence Is Capable of Proving Aggregate Damages.

At this stage, Plaintiffs need only show that aggregate classwide damages can be determined with evidence common to the Class. *Kleen Prods.*, 831 F.3d at 927. Dr. Leitzinger calculated aggregate damages using the overcharge from his regression model. As with common impact, "courts handling antitrust class actions routinely endorse the practice of using regression models to . . . measure damages on a classwide basis." *Dealer Mgmt. Sys.*, 2024 WL 3509668, at *15 (collecting cases); *see generally Kleen Prods.*, 831 F.3d at 929 ("[P]laintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages.").

### B. Classwide Treatment is a Superior Means of Adjudicating Plaintiffs' Claims.

Rule 23(b)(3)'s final requirement is superiority—*i.e.*, that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Given "the breadth of most antitrust classes" and "the significant cost" of litigating antitrust cases, the "superiority requirement is easily met in most antitrust cases." 6 Newberg & Rubenstein on Class Actions § 20:54 (6th ed. 2025). Non-exclusive superiority factors to consider are: (1) "the class members' interests in individually controlling the prosecution or

defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Generally, a class action is superior "to try[ing] thousands of separate cases alleging the same misconduct using the same proof." *Bruzek v. Husky Oil Operations Ltd.*, 520 F. Supp. 3d 1079, 1099 (W.D. Wis. 2021).

Here, one need look no further than what has already happened in this case to conclude that the best method for adjudicating the identical claims of approximately two thousand Payors, all challenging the same conspiracy, is through a single class action case, not two thousand individual ones. Important issues of substantive law common to the claims of every class member were decided on the motion to dismiss. Extensive merits and expert discovery into data and facts relevant to establishing liability and damages has taken place efficiently, obviating the need for duplication in hundreds or thousands of similar cases. As discussed above, Plaintiffs have substantial record and expert evidence that any member of the Class could use to prove its claims.

Superiority is also satisfied because, while class members suffered meaningful harm, individual damages are insufficient to support the large costs of antitrust litigation on an individual basis. *See Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1030 (7th Cir. 2018) ("Rule 23(b)(3) was designed for situations . . . in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate."). Moreover, requiring thousands of Payors in North-Central Wisconsin to pursue their claims in individual cases would needlessly burden courts in this District and waste resources with hundreds of decisions on questions that are more efficiently decided at once. *See Butler*, 727 F.3d at 801 ("[T]he more claimants there are, the more likely a class action is to yield substantial economies in litigation."); *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) ("If there are genuinely common issues, issues identical

across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings."). The issues central to Plaintiffs' claims are capable of resolution on a classwide basis; Plaintiffs are not aware of any other litigation that involves similar antitrust claims challenging this restraint. Class treatment is superior to individual litigation.

## **CONCLUSION**

Plaintiffs respectfully request that the Court certify the proposed Class and appoint the proposed Class Representatives and Class Counsel.

Dated:  July 2, 2025

   */s/ Timothy W. Burns*
Timothy W. Burns
Nathan M. Kuenzi
**BURNS BAIR LLP**
10 E. Doty Street, Suite 600
Madison, WI 53703
Phone: (608) 286-2808
tburns@burnsbair.com
nkuenzi@burnsbair.com

Daniel J. Walker
Robert E. Litan
**BERGER MONTAGUE PC**
1001 G Street, NW
Suite 400E
Washington, DC 20001
Phone: (202) 559-9745
dwalker@bm.net
rlitan@bm.net

Eric L. Cramer
Zachary D. Caplan
Grace Ann Brew
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
zcaplan@bm.net
gbrew@bm.net

Jamie Crooks
Michael Lieberman
Amanda R. Vaughn
**FAIRMARK PARTNERS LLP**
400 7th Street NW, Suite 304
Washington, DC 20004
Phone: 619-507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com
amanda@fairmarklaw.com

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 2, 2025, a true and correct copy of the foregoing was filed under seal with the Court via this Court's CM/ECF system. In addition, a true and correct copy of the sealed version of the foregoing was served upon counsel of record for Defendants via email.


Dated: July 2, 2025                    */s/ Timothy W. Burns*
                                        Timothy W. Burns